UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


| | | |
|---|---|---|
| TERRY EUGENE SEARS, | ) | Tampa, Florida |
| | ) | |
| Plaintiff, | ) | No. 8:12-cv-288-T-33TGW |
| | ) | |
| | ) | Docket No. 262 |
| vs. | ) | |
| | ) | August 13, 2019 |
| EDUARDO RIVERO, et al., | ) | |
| | ) | |
| Defendants. | ) | Courtroom 14B |
| _____ | ) | |


**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE


(Vol. 2 of 4)


*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

# <u>A P P E A R A N C E S</u>

## <u>PLAINTIFF COUNSEL:</u>

**Lauren Danielle Kerr, Esq.**
**Heather Anne Lee, Esq.**
**Kara Marie Wick, Esq.**
**Mark J. Wolfson, Esq.**
Foley & Lardner, LLP
100 North Tampa Street, Suite 2700
Tampa, Florida 33602
(813) 225-5447

## <u>DEFENSE COUNSEL:</u>

**Shirley Wilson Durham, Assistant Attorney General**
**Joseph Belitzky, Assistant Attorney General**
Office of the Attorney General
400 South Monroe Street
Tallahassee, Florida 32399
(850) 414-3300

## TABLE OF CONTENTS

### EXAMINATIONS

| PLAINTIFF | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SCOTT C. VOORHEES | 7 | 20 | 28 | |
| DENISE COOPER | 36 | 43 | 47 | |

| DEFENDANTS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| TERRY EUGENE SEARS | 57 | 114 | 119 | 121 |
| FELISHA M. DEXTER | 126 | 155 | 166 | 169 |
| DAVID PRINCE | 183 | 199 | 216 | 218 |

### EXHIBITS

| DEFENDANTS | PAGE | LINE |
|---|---|---|
| 2 | 194 | 14 |
| 4A | 196 | 11 |
| 9-K-2 | 98 | 18 |
| 9-M | 60 | 12 |
| 9-N | 102 | 1 |
| 202-A | 197 | 9 |

### ADDITIONAL INDEXING

| | PAGE | LINE |
|---|---|---|
| Plaintiff rests Case-in-Chief | 53 | 3 |
| Defense Rule 50 Motion | 53 | 11 |

1            **P R O C E E D I N G S**

2    August 13, 2019                              9:35 a.m.

3                        - - -

4            COURT SECURITY OFFICER:  All rise.

5            The United States District Court in and for the

6    Middle District of Florida is now in session.  The Honorable

7    Virginia M. Hernandez Covington presiding.

8            Please be seated.

9            THE COURT:  Good morning, everyone.

10           Let me know on the plaintiff's side when you want

11   me to read that stipulation on the video.

12           MS. LEE:  Your Honor, we would like that -- for

13   you to read that before our first witness this morning, if

14   that's all right.

15           THE COURT:  Absolutely.

16           MS. LEE:  Thank you very much.

17           THE COURT:  I'll be happy to.  Are we ready to

18   bring in the jury, then?  And you're ready with your next

19   witness?

20           MS. LEE:  Yes, Your Honor.  I believe Sergeant

21   Voorhees is outside.

22           THE COURT:  All right.  Very good.  We'll bring in

23   the jury.  Thank you.

24           COURT SECURITY OFFICER:  All rise for the jury.

25           (Jury enters courtroom at 9:37 a.m.)

1           COURT SECURITY OFFICER:  Thank you.  Please be

2    seated.

3           THE COURT:  Welcome back, ladies and gentlemen.

4           So sorry to have been later than what I

5    anticipated.  The matter earlier today took longer than what

6    I thought.

7           As we get ready to begin, I wanted to read to you

8    a stipulation.  The parties have agreed to this.  And you can

9    treat it as if the evidence had been presented to this

10   effect.

11          This is a stipulation by the parties:

12          The video taken by Sergeant Scott Voorhees on

13   March 18th, 2010, involving Mr. Sears, would have been

14   returned from the Office of the Inspector General to the Polk

15   Correctional Institution.  The video no longer exists.  I'm

16   going to read it one more time.

17          The video taken by Sergeant Scott Voorhees on

18   March 18th, 2010, involving Mr. Sears, would have been

19   returned from the Office of the Inspector General to the Polk

20   Correctional Institution.  The video no longer exists.

21          All right.  So that's the stipulation by the

22   parties.

23          All right.  Miss Lee, are you ready with your next

24   witness, please?

25          MS. LEE:  I am, Your Honor.  We would like to call

1   Mr. Scott Voorhees to the stand.

2              THE COURT:  All right.

3              THE COURTROOM DEPUTY:  Please raise your right

4   hand.

5              Do you solemnly swear or affirm under penalty of

6   perjury that the testimony you shall give in this cause will

7   be the truth, the whole truth, and nothing but the truth?

8              THE WITNESS:  I do.

9              THE COURTROOM DEPUTY:  Please state and spell your

10  name for the record.

11             THE WITNESS:  Scott Christopher Voorhees,

12  S-c-o-t-t, Christopher, I never spell it out, I just use the

13  middle initial.  Voorhees, V-o-o-r-h-e-e-s.

14             THE COURTROOM DEPUTY:  Thank you.  You may take

15  the witness stand.

16             THE COURT:  All right.  I'll just let the witness

17  know, you're going to be asked some questions by Miss Lee,

18  who represents Mr. Sears in this case.  And then you may be

19  asked some questions in cross-examination -- will it be

20  Miss Durham who will be asking the questions -- okay.

21  Mr. Belitzky will be asking the questions, who represents the

22  defendants in this case.

23             If you don't understand the question, please say

24  so so that it can be stated a different way.  If you have the

25  tendency to speak quickly, slow down so that we can

1    understand what you're saying.  If you're soft-spoken, please

2    speak up so that we can hear you.

3              All right.  Go ahead, Miss Lee.

4              MS. LEE:  Thank you, Your Honor.

5                        SCOTT C. VOORHEES,

6    having been first duly sworn by the Courtroom Deputy,

7    testified as follows:

8                        DIRECT EXAMINATION

9    BY MS. LEE:

10   Q.    Good morning, Mr. Voorhees.

11   A.    Good morning.

12   Q.    Could you please tell us where you work, Mr. Voorhees?

13   A.    Polk Correctional Institution.

14   Q.    Did you work there in 2010?

15   A.    Yes, ma'am.

16   Q.    Did you work there in March of 2010?

17   A.    Yes, ma'am.

18   Q.    And what was your rank in 2010?

19   A.    I was a sergeant.

20   Q.    Sergeant.  And, Mr. Voorhees, as a sergeant at Polk

21   Correctional Institution, in or before 2010, did you receive

22   training regarding the use of video cameras?

23   A.    Yes, I did.

24   Q.    Did you receive training that pertained to videotaping

25   use of force incidents?

1    A.    Yes, I did.

2    Q.    And did that encompass also post use of force

3    incidents?

4    A.    Yes, ma'am.

5    Q.    Okay.  And from that training and experience that

6    you've had, did you understand that use of force incidents

7    had to be videotaped?

8    A.    Yes.

9    Q.    You did.  Okay.  And did you understand from your

10   protocols and experience, that videotaping is supposed to

11   continue uninterrupted from the time that the video camera

12   officer arrives at the scene until the inmate is escorted to

13   medical?

14   A.    Yes, ma'am.

15   Q.    You did understand that.

16          And so if -- Mr. Voorhees, if you're taking a

17   videotape, you're supposed to videotape uses of force

18   uninterrupted from the time that you arrive at the scene

19   until the inmate is done with his medical exam and placed in

20   secure housing?

21   A.    That's correct.

22   Q.    That's correct.  And do you have any specific

23   recollection of March 18th of 2010?

24   A.    I do not.

25   Q.    Not in particular?

1    A.     No, ma'am.

2    Q.     Do you remember at all on March 18th of 2010 that Miss

3    Felisha Dexter asked you to videotape an incident?

4    A.     I remember retrieving the video camera and reporting to

5    where the incident -- near to where the incident occurred,

6    and then began recording.

7    Q.     Okay.  So you do recall.  Did that incident involve

8    Mr. Terry Sears (indicating)?

9    A.     Yes.

10   Q.     It did.  Okay.  And Mr. Voorhees, do you recall which

11   other correctional officers were involved in that incident?

12   A.     I believe it originally started with Sergeant Prince,

13   and then when I arrived, it was Officer Plough and Officer

14   Smith who had -- who were escorting inmate Sears.

15   Q.     Do you remember where you arrived?

16   A.     No, I do not.

17   Q.     You do not.  Okay.

18           Now, you just testified that you were trained in

19   the use of videotape in 2010?

20   A.     Correct.

21   Q.     And do you recall that on that videotape, there was no

22   proper lead-in statement?

23   A.     I do not.

24   Q.     Would looking at the -- some comments regarding the

25   videotape refresh your recollection?

1   A.    Yes.

2   Q.    Okay.  Just one second and I'll get you those comments.

3            MS. LEE:  Your Honor, may I please approach the

4   witness?

5            THE COURT:  Yes, you may.

6            (Document tendered.)

7   BY MS. LEE:

8   Q.    Mr. Voorhees, we are looking at this paragraph right

9   here (indicating).

10  A.    Okay.

11  Q.    Thank you.

12           Mr. Voorhees, I'd ask that you please take your

13  time, take a look, and look up at me when your recollection

14  is refreshed.

15  A.    Okay.

16  Q.    Now, Mr. Voorhees, I'd ask you that you please turn

17  that document over.  Thank you.

18           So after reviewing that, is it correct to state

19  that there was no proper lead-in statement on that videotape?

20  A.    According to the document, yes.

21  Q.    Okay.  And is it also correct to state that nobody

22  identified the institution in the videotape?

23  A.    According to the document, yes.

24  Q.    And nobody identified the date and time?

25  A.    According to the document, yes.

1  Q.    And you didn't identify yourself, Mr. Voorhees?

2  A.    Correct.

3  Q.    Thank you, Mr. Voorhees.

4        And did that videotape capture Mr. Sears before he

5  received medical treatment?  If you don't recall, you can

6  look at the warden's summary again.

7  A.    I don't recall.

8        What was the question again?

9  Q.    Whether that videotape captured Mr. Sears before he

10  received any medical treatment.

11  A.    Reading it, it would say -- I would say yes.

12  Q.    Okay.  And Mr. Voorhees, isn't it also correct that

13  there was a long, unexplained amount of time between the time

14  that Mr. Sears was placed in a confinement cell until the

15  time that he received medical treatment?

16  A.    Yes, according to the document.

17  Q.    That's correct.

18        And, Mr. Voorhees, do you remember what you did

19  with that videotape after you finished filming?

20  A.    I do.

21  Q.    What did you do with it?

22  A.    After the recording of the tape, I would have removed

23  it from the camcorder, placed it in a sealed evidence bag,

24  and completed a chain of custody form and given it to the

25  OIC.

1  Q.    And who was the OIC?

2  A.    That would have been Captain Dexter.

3  Q.    Captain Dexter, Felisha Dexter?

4  A.    Yes, ma'am.

5  Q.    Thank you.  And we're going to switch gears just for a

6  moment.

7          You still work at Polk Correctional Institution;

8  is that correct?

9  A.    Correct.

10  Q.    And your current rank is?

11  A.    Captain.

12  Q.    And you are studying for a --

13  A.    Major's exam.

14  Q.    You're studying for a major's exam.  Thank you,

15  Mr. Voorhees.

16          And in your time at Polk Correctional Institution,

17  have you ever been involved in disciplinary hearings?

18          MR. BELITZKY:  Objection.  Irrelevant and --

19          MS. LEE:  Your Honor, if we may have a quick

20  sidebar, I can explain.

21          THE COURT:  Of course.

22          (The following was held at sidebar:)

23          THE COURT:  And your question was whether he had

24  been involved in any disciplinary proceedings?

25          MS. LEE:  Yes, Your Honor.

1              THE COURT:  You mean with him as an individual

2    being disciplined?

3              MS. LEE:  Your Honor, I'm trying to establish his

4    training regarding disciplinary proceedings.  With regard to

5    some testimony from Mr. Sears yesterday, the fact that

6    Mr. Sears was involved in a disciplinary hearing with

7    relation to this incident, we would like for Mr. Voorhees to

8    please establish the procedures for disciplinary hearings and

9    also, of course, introduce the fact that just because you

10   violate the prison rules does not mean that you're guilty of

11   the conduct.

12             MR. BELITZKY:  I think that -- unless it's shown

13   that Mr. Voorhees participated in the disciplinary

14   proceedings at issue, I don't see the relevance of

15   Mr. Voorhees as a witness on disciplinary.

16             MS. LEE:  I asked the question based on

17   yesterday's testimony from Mr. Sears.

18             THE COURT:  I'm going to overrule the objection.

19   You can try to lay a foundation, if it's possible with this

20   witness.

21             MS. LEE:  Absolutely, Your Honor.

22             (Sidebar ended.)

23             THE COURT:  You may proceed, Miss Lee.

24             MS. LEE:  Thank you, Your Honor.

25   BY MS. LEE:

1   Q.    Mr. Voorhees, in your time at Polk Correctional

2   Institution, have you ever been involved in disciplinary

3   hearings?

4   A.    Yes.

5   Q.    You have been.  And are you familiar with those

6   procedures?

7   A.    Yes.

8   Q.    Okay.  And is it true that disciplinary hearings are to

9   determine if an inmate has violated an institutional rule?

10  A.    Correct.

11  Q.    That's correct.  And it's not to determine whether the

12  inmate has committed a crime?

13  A.    That's a fine line.

14  Q.    I understand that sometimes you might violate a rule

15  and that might also be a crime.  But you can certainly be in

16  a disciplinary hearing, even if you haven't committed a

17  crime; is that correct?

18  A.    Correct.

19  Q.    Thank you, Mr. Voorhees.

20          And in these disciplinary hearings, the inmate

21  doesn't have an attorney; does he?

22  A.    No.

23  Q.    And in the disciplinary hearings, there is no jury?

24  A.    Correct.

25  Q.    And there is no judge; is that correct?

1  A.    Correct.

2  Q.    And, in fact, it's prison employees who make the final

3  determination as to whether a rule has been violated?

4  A.    When an infraction occurs, it's the staff member that

5  observes the infraction that completes the report.  Then it's

6  gone to the hearing -- to the hearing team, which is a

7  classification officer and generally a lieutenant or higher.

8  Q.    So the classification officer and the lieutenant or

9  higher ranked officer, those are prison employees; is that

10  correct?

11  A.    Yes, ma'am.

12  Q.    Thank you.  And isn't it possible that you could commit

13  a disciplinary violation, but the officer involved in that

14  disciplinary violation could still respond with excessive

15  force?

16         MR. BELITZKY:  Objection.  Speculation, Your

17  Honor.

18         THE COURT:  If he's able to answer it.  Why don't

19  you lay a foundation and see if he's got the background to

20  answer that.

21         MS. LEE:  Sure.

22  BY MS. LEE:

23  Q.    So you testified that you're studying for your major's

24  exam?

25  A.    Yes, ma'am.

1    Q.    And have you ever been involved in disciplinary

2    proceedings yourself?

3    A.    Yes.

4    Q.    Have you sat on the panel?

5    A.    Yes.

6    Q.    Okay.  So you're fairly familiar with these

7    proceedings?

8    A.    Uh-huh.

9    Q.    Okay.  So, again, Mr. Voorhees, I ask, is it possible

10   that you could violate a disciplinary rule, but the officer's

11   response was still excessive force?

12            MR. BELITZKY:  Objection, Your Honor.  The

13   officer's response is not relating to the disciplinary rule.

14   It's pure speculation.

15            THE COURT:  Overruled.

16   BY MS. LEE:

17   Q.    You may answer, Mr. Voorhees.

18            THE COURT:  To the extent you're able to.  If

19   you're not able to, you should say that, as well.

20            THE WITNESS:  Well, I can't -- I can't say what an

21   officer's going to do.  I mean, I -- if he sees a rule

22   violation and then it leads up to a use of force, could it be

23   excessive?  That depends on your definition of excess and the

24   circumstances.

25   BY MS. LEE:

1    Q.    Mr. Voorhees, would it be a rule violation for me to

2    not cuff up in response to an officer's request?

3    A.    Yes.

4    Q.    And that rule violation could result in a disciplinary

5    hearing?

6    A.    Yes.

7    Q.    Okay.  But if I refused to cuff up and the officer then

8    tased me, wouldn't that be excessive?

9    A.    No.

10   Q.    It would not be excessive?

11   A.    No.  We don't have tasers, first of all.  But it would

12   be within the rules of use of the force where you're

13   disobeying a lawful order, and to get you to comply with the

14   lawful order, it led up to a use of force, then that would be

15   within the rules.

16   Q.    It would be within the rules if you ask me one time to

17   cuff up, and I say no, you can then tase me?

18   A.    No.  We don't have tasers.

19   Q.    But you could shoot me?

20   A.    We --

21         MS. DURHAM:  Objection, Your Honor.

22         THE COURT:  Yes.  Sustained.

23         MS. LEE:  Just one second, Your Honor.  I'll

24   confer with counsel.

25         THE COURT:  Thank you.  And normally, it's one

1   person per side.

2              MS. DURHAM:   I'm sorry.

3   BY MS. LEE:

4   Q.    Mr. Voorhees, just one more question on the

5   disciplinary proceedings, and then we'll do a couple on the

6   videotape.

7   A.    Okay.

8   Q.    So if I've committed a rule violation that could result

9   in a disciplinary hearing, would that entitle the officers to

10  beat me for violating that rule?

11             MR. BELITZKY:   Objection, Your Honor.   Going

12  beyond the disciplinary question -- proceeding that she's

13  asking him about.

14             THE COURT:   Overruled.

15             THE WITNESS:   Can you ask the question again?

16  BY MS. LEE:

17  Q.    Mr. Voorhees, if I committed a rule violation, and that

18  could result in a disciplinary hearing, would that rule

19  violation entitle the officers to beat me in response to the

20  rule violation?

21  A.    No.

22  Q.    No.   That would be excessive?

23  A.    Yes.

24  Q.    Thank you, Mr. Voorhees.   And now just back to the

25  videotape for one moment.

1            Do you think it would be fair to say that the

2  warden criticized the videotaping?

3  A.    No.

4  Q.    No?  Based on that summary, you don't think the warden

5  criticized it?

6  A.    Based on that summary, the warden reviewed the video

7  and saw what was missing in it according to procedure.  I

8  don't think that's a criticism.  That's just what's missing.

9  Q.    Mr. Voorhees, could you flip that warden statement over

10  one more time.  And if I could direct your attention to the

11  bottom of the warden's summary.  And just look up when you're

12  ready.

13            Mr. Voorhees, at the end of that statement, did

14  you see that the warden said there were issues that had to be

15  addressed in subsequent trainings?

16  A.    It said that there's issues that would be addressed at

17  the next supervisor meeting.

18  Q.    Okay.  So we have issues that we need to address at a

19  supervisory meeting, but that's not a criticism of the video?

20  A.    I don't see it that way, no.

21  Q.    Okay.  And just one last question for you,

22  Mr. Voorhees.  Do you recall whether you saw Vernia Roberts

23  or Jeffrey Hart standing nearby at any point when you took

24  the videotape?

25  A.    I do not.

1    Q.    You don't recall?

2    A.    I don't recall.  Yes.

3              MS. LEE:  Thank you, Mr. Voorhees.  That's all I

4    have for you.

5              THE WITNESS:  Okay.

6              THE COURT:  Any questions in cross-examination?

7              MR. BELITZKY:  Yes, Your Honor.

8                        CROSS-EXAMINATION

9    BY MR. BELITZKY:

10   Q.    Good morning, Mr. Voorhees.

11   A.    Good morning.

12   Q.    Mr. Voorhees, so you apparently were the person who was

13   called to take a videotape of a use of force incident

14   involving Mr. Sears on March 18th, 2010?

15   A.    Correct.

16   Q.    Can you tell the jury what you recall at all about the

17   incident from the point that you arrived.

18   A.    When I arrived, I began videotaping.  And, I mean,

19   that's -- I don't recall much of the incident other than, you

20   know, just being there and recording it.

21   Q.    Do you remember which individuals from correctional

22   staff were present?

23   A.    Outside of the ones that were directly involved in

24   doing the escort, no.

25   Q.    Which was who?

1   A.    Directly involved would have -- before I got there

2   would have been Sergeant Prince, and then when I did get

3   there, it would have been Officer Plough and Officer Smith.

4   Q.    Do you remember the inmate being Terry Sears?

5   A.    I don't remember him, no.

6   Q.    Do you remember what the inmate that you came to

7   videotape, what -- you know, how he appeared?  Was he --

8   A.    I do not.

9   Q.    Okay.  And do you recall how long you would have

10  continued the videotaping and through what process?

11  A.    He would have been videotaped through a shower, an

12  examination, and then placed back into a cell or into a

13  secured cell.  And then that would have ended the

14  videotaping.

15  Q.    Do you know if there was a videotape of the use of

16  force incident itself before you got there?

17  A.    Do I know if there was?  No, there was not.

18  Q.    Assuming it was a spontaneous use of force, would there

19  have been a videotaping of spontaneous use of force?

20  A.    No, there would not have been.  If it's spontaneous and

21  it just starts, there's -- at that time there were not any

22  cameras on the compound that would have caught it.

23  Q.    And do you recall who called you over to undertake the

24  video?

25  A.    I believe I was in the security building and heard it

 1   on the radio and just responded by grabbing it and going

 2   to -- arriving at the scene and doing it.  I don't think I

 3   was told to do it.

 4   Q.   So per procedure, you would have followed through and

 5   videotaped until the inmate, Mr. Sears, would have arrived at

 6   what point?

 7   A.   I would have stopped videotaping once everything had

 8   been completed and he was placed into his cell.

 9   Q.   Would that have included the --

10        MS. LEE:  Objection, Your Honor.  May I just

11   approach?

12        THE COURT:  Sure.

13        MS. LEE:  Thank you.

14        (The following was held at sidebar:)

15        MS. LEE:  Your Honor, I apologize.  The questions

16   that call for speculation and Mr. Voorhees has stated several

17   times he doesn't remember, but he would have, would have.

18   It's all speculative and it lacks any foundation.  He's

19   stated he doesn't remember.

20        THE COURT:  Okay.  Well, you can object to it.

21        MS. LEE:  I'm objecting based on speculation.

22        THE COURT:  Okay.  Well, that's fine.  You can do

23   that.  So you're objecting to the --

24        MS. LEE:  This question, because he said, would

25   you have, would you not have, and he's responding I would

1    have.

2              MR. BELITZKY:  Well, you asked him about

3    procedures as far as the disciplinary board, I'm asking about

4    the procedure he would have undertaken.

5              MS. LEE:  Well, that was about a specific

6    incident.  And he's asking him to speculate on what happened

7    during that incident.  I was asking him general questions.

8              THE COURT:  Well, I mean, I did let some of your

9    speculation questions come in.  So if I let you do it, I kind

10   of need to let him do it, too.

11             MS. LEE:  I understand.  My point is this is about

12   a very specific incident, and he stated he doesn't recall.

13   My questions were generally about disciplinary hearings.  I

14   didn't ask him about Mr. Sears' disciplinary hearings.

15             THE COURT:  So you're also saying he's exceeding

16   the scope of direct?

17             MS. LEE:  Yes.  I mean, he stated he doesn't

18   remember what happened on this day.  And he's speculating to

19   the jury, I would have done this, I would have done that.  He

20   can't say --

21             MR. BELITZKY:  I think he's testified that he has

22   a recollection that there was a -- that he took a videotape

23   of an incident, he doesn't recall the inmate.  But he

24   recalls --

25             THE COURT:  Okay.  But he can't testify, he can't

1   speculate.  So go ahead and object to these questions that

2   involve speculation, I'm happy to rule on them.

3           So let's just move forward and just -- I think

4   everybody understands.

5           MR. BELITZKY:  Right.  Thank you.

6           THE COURT:  All right.

7           (Sidebar ended.)

8           THE COURT:  All right.  You may proceed,

9   Mr. Belitzky.

10  BY MR. BELITZKY:

11  Q.   Mr. Voorhees, of course, you have submitted a report.

12  Were you asked to write a report about the incident, if you

13  recall?

14  A.   Yes.

15          MR. BELITZKY:  May I approach, Your Honor?

16          THE COURT:  Yes, you may.

17          (Document tendered.)

18  BY MR. BELITZKY:

19  Q.   Take a look at that report.

20          Does that report that you've just looked at, does

21  that reflect your reporting at the time of the incident, what

22  you did with the videotape and the taping?

23  A.   Yes.

24  Q.   Now, had you -- do you recall whether you observed

25  anything unusual about the treatment, whether something

1  happened to Mr. Sears by way of physical force while you were

2  videotaping?

3  A.    If something would have happened, I would have reported

4  it, as well.  And I didn't -- I didn't report any additional

5  force being used or anything excessive.

6  Q.    So what you're saying is, if you would have observed

7  any force being applied to Mr. Sears while you were

8  videotaping his being escorted to confinement, you would have

9  written that on the report?

10  A.    That's correct.

11  Q.    Would you have done -- been required to also report

12  that to any senior staff?

13  A.    Yes, I would have.

14  Q.    And that didn't occur?

15  A.    No, it did not.

16  Q.    Do you recall who was -- who else met with Mr. Sears

17  once he reached confinement?  Whether any of the other

18  officers were there at the specific --

19  A.    I don't recall.

20  Q.    And do you still have, Mr. Voorhees, the warden's

21  summary?

22  A.    Yes, sir, I do.

23  Q.    Okay.  Now, do you recall Miss Lee asked you about the

24  portion beginning with "the following circumstances were

25  observed on tape"?

1    A.    Okay.

2    Q.    Do you recall she questioned you about that portion?

3    A.    Yes, sir.

4    Q.    Okay.  Can you read to yourself the beginning portion

5    beginning with "the report of force used," until that

6    portion.

7              Does that portion give you any information as to

8    whether the warden made a finding?

9              MS. LEE:  Objection, Your Honor.  May I please

10   approach?

11             THE COURT:  Yes.

12             MS. LEE:  Thank you.

13             (The following was held at sidebar:)

14             MS. LEE:  Your Honor, I believe that Mr. Belitzky

15   is going to ask Mr. Voorhees to testify regarding the

16   appropriateness of the use of force in the warden's

17   statement.

18             THE COURT:  Okay.  You're not going to?

19             MR. BELITZKY:  I'm only asking him -- she asked

20   about the warden's comments about the video procedures, and I

21   think in the fairness of completeness, I'm not asking him to

22   comment whether he feels the use of force was appropriate.  I

23   think the completeness with what Miss Lee asked, if the

24   warden also -- as a preface to that, was the warden's finding

25   that there was no undue use of force, he should be able to --

1            MS. LEE:  Your Honor, that finding is based on the

2   entirety of the reports from all of the officers, not just

3   the video.  I have limited the scope of direct to the

4   comments about the video because that is what Mr. Voorhees

5   was involved in.

6            If Mr. Belitzky would like to ask questions about

7   the rest of the warden's summary, Mr. Belitzky should call

8   the warden.  And I believe he's listed on the witness list.

9            THE COURT:  Okay.  So can you limit yourself to

10  that?

11            MR. BELITZKY:  Sure.

12            THE COURT:  Okay.  Thank you.

13            (Sidebar ended.)

14  BY MR. BELITZKY:

15  Q.   And just so if I can summarize your testimony, had you

16  noticed any inappropriate use of force upon Mr. Sears from

17  the time that you started videotaping, it would have been --

18  you would have included that in your incident report;

19  correct?

20  A.   That's correct.

21  Q.   And you did not make any such inclusion on your

22  incident report?

23  A.   That's also correct.

24  Q.   So then it would be correct to state that you did not

25  observe anything -- any use of force upon Mr. Sears from

1  that -- from the point that you started taping it?

2  A.    Correct.

3        MR. BELITZKY:  No further questions.

4        MS. LEE:  Your Honor, if I may just have one

5  moment to confer, and then I will have some recross.

6        THE COURT:  You may, of course.

7        MS LEE:  Thank you.

8                  REDIRECT EXAMINATION

9  BY MS. LEE:

10  Q.    One more time, Mr. Voorhees, and I promise we won't be

11  too long.

12        Mr. Voorhees, in response to Mr. Belitzky's

13  question a moment ago, do you recall that you testified you

14  would have been required to report any use of force in your

15  personal report?

16  A.    Yes.

17  Q.    Okay.  And you didn't do that; right?

18  A.    I did not, no.

19  Q.    But you were also required to do a lead-in statement,

20  and you didn't do that, either; did you?

21  A.    I did not.

22  Q.    And you are required to identify yourself on your tape?

23  A.    According to -- yes.

24  Q.    But you didn't do that, either?

25  A.    No.

1   Q.    Okay.  And Mr. Belitzky -- you were also supposed to

2   videotape Mr. Sears through the medical examination?

3   A.    Yes.

4   Q.    Okay.  And so that videotape would have included shots

5   of his injuries; is that correct?

6   A.    No.

7   Q.    Can you explain that?  It would have been in the

8   medical exam, but it wouldn't have included his injuries?

9   A.    In the procedure, you're not -- when you're videotaping

10  when they're being seen by medical, you're not supposed to be

11  right in there.  You're supposed to allow them privacy

12  because whatever they're talking about is a HIPAA violation.

13  So you would be 10, 15 feet away.

14  Q.    I understand.

15  A.    Okay.

16  Q.    So just let me rephrase that question for a moment.

17        It would have included the decontamination shower;

18  isn't that correct?

19  A.    Yes.

20  Q.    Okay.  And in the decontamination shower, that would

21  have shown Mr. Sears' body?

22  A.    No.

23  Q.    No?

24  A.    No.  Because once again, privacy.  And we don't want to

25  show nudity, so there would have been a shroud or a guard or

1   a barrier where all your videotaping is from the chest up.

2   Q.    So you would have seen his face?

3   A.    Yes.

4   Q.    And that would have shown any injuries that he

5   sustained on his face?

6   A.    Possibly.

7   Q.    Okay.  So you're saying you would have seen his face?

8   A.    Uh-huh.

9   Q.    But it's possible that some of the injuries on his face

10  wouldn't have appeared?

11  A.    It would depend on the type of injuries that would have

12  occurred on his face.

13  Q.    Okay.  So you would have seen injuries from the chest

14  up?

15  A.    Possibly, yes.

16  Q.    Okay.  Thank you, Mr. Voorhees.

17          And you did not video the whole incident; isn't

18  that correct?

19  A.    That's not correct.  When I -- I started videoing when

20  I arrived, which, according to procedure, upon -- whenever a

21  video camera can be available, that's --

22  Q.    That's what I meant, Mr. Voorhees.  I'm sorry.  I

23  misstated my question.

24          So from the time you arrived that -- you didn't

25  arrive as soon as this incident started; correct?

1    A.    Correct.

2    Q.    Okay.  That was my point, and I apologize.  I misstated

3    that.

4          So you didn't videotape from the beginning of the

5    incident when Mr. Prince had the pepper spray and this whole

6    thing happened?

7    A.    That's correct.  I did not videotape it.

8    Q.    Okay.  But you said that you received a call on the

9    radio to come videotape; is that correct?

10   A.    No.  I said I heard on the radio that an incident had

11   occurred.

12   Q.    Okay.  And you responded to that.  And do you recall

13   what time you heard that?

14   A.    I do not.

15   Q.    Would looking at your statement just refresh your

16   recollection?  Do you still have a copy of your statement?

17   A.    Yes, I do.

18   Q.    Okay.

19   A.    It says 11:27 a.m.

20   Q.    Okay.  And Mr. Voorhees, are you aware that Miss Dexter

21   had a radio on her when this incident occurred?

22   A.    I would assume so, yes.

23   Q.    You would assume so.  But she didn't radio before 11:27

24   for anyone to come get a videotape; did she?

25   A.    She wouldn't -- when I say, I heard it on the radio, it

1  would have either been Sergeant Prince calling it or somebody

2  near him that observed it.  It wouldn't have been --

3  Q.    I'm sorry.  Didn't you just testify that it was Miss

4  Dexter who radioed you?

5  A.    I did not.

6  Q.    You did not?

7  A.    I said that I heard the incident on the radio and

8  responded to that, going and getting the videotape.

9  Q.    Okay.  But one of the officers involved would have sent

10  the call on the radio?

11  A.    Possible, yes.

12  Q.    And you don't remember which one?

13  A.    No, I don't remember.

14  Q.    Okay.  And so you testified just a moment ago that you

15  didn't video from the beginning; right?  You weren't there

16  for the whole thing?

17  A.    Correct.

18  Q.    Okay.  So it's possible that the use of force that

19  occurred at the beginning, that's not captured on tape?

20  A.    That's accurate.  It was not captured.

21  Q.    Thank you, Mr. Voorhees.

22          MS. LEE:  Your Honor, that's all that I have.

23          THE COURT:  Any recross for this witness?

24          MR. BELITZKY:  No, Your Honor.

25          THE COURT:  Thank you.  Any questions from the

1    jury?

2              (Document tendered.)

3              THE COURT:  Let me see counsel at sidebar.

4              (The following was held at sidebar:)

5              THE COURT:  Okay.  This is the question:  "Are

6    there cameras within Polk Correctional?  If so, are officers

7    at facility aware of all the locations of cameras on site at

8    compound?"

9              MS. LEE:  I mean, I think he can answer that.  I

10   think the first part is fair concerning cameras.  He still

11   works there.  He can certainly testify to that.

12             MS. DURHAM:  Your Honor, I would say not because

13   we don't know how it was in 2010.

14             MS. LEE:  But he does.  He was there in 2010.

15             THE COURT:  So I'm going to say in 2010, were

16   there cameras within Polk Correctional.

17             MS. DURHAM:  And where they were?

18             MS. LEE:  Well, it doesn't ask where they were,

19   right?  It just asks if the officers of the facility --

20             THE COURT:  It says, "If so, are officers of

21   facility aware of all the locations of cameras on site at

22   compound."

23             MS. DURHAM:  See, that -- that would be a problem,

24   that second part about what the officers are aware of,

25   because we don't know what the officers were aware of in

1    2010.  And he can only testify as to what he was aware of.

2              THE COURT:  Okay.  So he can say what he was aware

3    of.

4              MS. LEE:  Right.

5              THE COURT:  So I'm going to say, were there

6    cameras within Polk Correctional and, if so, were you --

7              MS. LEE:  In 2010.

8              THE COURT:  In 2010.  And were you aware of the

9    locations of the cameras in the compound.

10             MS. LEE:  Okay.  Perfect.  Thank you.

11             THE COURT:  All right.

12             (Sidebar ended.)

13             THE COURT:  I need to amend the question a little

14   bit that the juror asked.  So I normally put it up on the

15   PowerPoint, but I'm just going to read it with my amendment

16   in there.

17             In 2010, were there cameras within Polk

18   Correctional and, if so, were you aware of the locations of

19   the cameras?

20             THE WITNESS:  I don't -- I don't understand the

21   question, because there were cameras in some of the

22   dormitories.

23             THE COURT:  Okay.

24             THE WITNESS:  But it would have been two housing

25   units, I believe.  But there were none on the compound or

1   viewing the compound area or anything like that.

2            THE COURT:  Okay.  And that was in 2010?

3            THE WITNESS:  Correct.

4            THE COURT:  Okay.  All right.  Any follow-up

5   questions, just on that specific issue from the plaintiff?

6   Anything, Miss Lee?

7            MS. LEE:  No, Your Honor.

8            THE COURT:  Okay.  Thank you.

9            From the defendant?

10           MR. BELITZKY:  No, Your Honor.

11           THE COURT:  Thank you.  I will excuse the witness,

12   unless there is anything else from the jury?

13           Okay.  I will excuse the witness.  Thank you.  We

14   appreciate your having come in today to testify.

15           And you can call your next witness.

16           MS. KERR:  The plaintiff will now call Denise

17   Copper.

18           THE COURT:  Okay.  Miss Cooper, if you'll come

19   forward, please, and we will swear you in.

20           THE COURTROOM DEPUTY:  Please raise your right

21   hand.

22           Do you solemnly swear or affirm under penalty of

23   perjury that the testimony you shall give in this cause will

24   be the truth, the whole truth, and nothing but the truth?

25           THE WITNESS:  I do.

1              THE COURTROOM DEPUTY:  Please state and spell your

2    name for the record.

3              THE WITNESS:  Denise Cooper, D-e-n-i-s-e

4    C-o-o-p-e-r.

5              THE COURTROOM DEPUTY:  Thank you.  You may take

6    the witness stand.

7              THE COURT:  All right.  Miss Cooper, you're going

8    to be asked some questions by Miss Kerr, who represents

9    Mr. Sears, the plaintiff, in this proceeding.  And then in

10   cross-examination, you'll either be asked by Miss Durham or

11   by Mr. Belitzky, who represent the defendants.  They may ask

12   you, one of them may ask you questions in cross-examination.

13             If you don't understand the question, please say

14   so so they can state it differently.  Wait until the question

15   is finished before you begin answering so that we don't have

16   two people speaking at the same time.

17             If you speak quickly, slow down so we can

18   understand you.  And if you're soft-spoken, speak up so we

19   can hear you.  All right?

20             THE WITNESS:  All right.

21             THE COURT:  Go ahead.

22                      DENISE COOPER,

23   having been first duly sworn by the Courtroom Deputy,

24   testified as follows:

25                      DIRECT EXAMINATION

1    BY MS. KERR:

2    Q.    Good morning, Miss Cooper.

3    A.    Good morning.

4    Q.    As the judge stated, my name is Lauren Kerr.  And I,

5    with my co-counsel, represent the plaintiff in this matter,

6    Mr. Terry Sears.

7              Would you please restate your name?

8    A.    Denise Cooper.

9    Q.    And are you currently employed, Miss Cooper?

10   A.    No, ma'am.

11   Q.    Are you retired?

12   A.    Yes.

13   Q.    What did you do before you retired?

14   A.    Nurse.

15   Q.    Okay.  And what was your nurse designation, R.N.?

16   A.    L.P.N., licensed practical nurse.

17   Q.    Thank you.  Were you employed at Polk Correctional

18   Institution in 2010?

19   A.    I was.

20   Q.    And what was your position there?

21   A.    Senior licensed practical nurse.

22   Q.    And in this position, what were your duties?

23   A.    Making sure that the inmates' medical care was given.

24   Q.    And do you know the defendants in this matter?

25   A.    Do I know the defendants?

1   Q.    That would be Captain Dexter, Colonel Roberts, Sergeant

2   Prince.  Have you met them?

3   A.    I probably have.  Yeah.

4   Q.    In your position at PCI, were you familiar with post

5   use of force examinations?

6   A.    Very much so.

7   Q.    This is something you had done regularly?

8   A.    Yes, ma'am.

9   Q.    What was the purpose of a post use of force

10  examination?

11  A.    It was to assess the inmate for any type of injury that

12  may have been caused.  And, also, if there was need for

13  special housing, to make sure that he was able health-wise to

14  be put in there.

15  Q.    What was the scope of the post use of force

16  examinations in 2010?

17  A.    I'm not understanding.  What do you mean?

18  Q.    What did you do during these post use of -- I will

19  retract the question.

20          Do you recall examining a man named Terry Sears on

21  March 18th, 2010?

22  A.    No, not without --

23  Q.    Would it help you to look at a record from that date?

24  A.    It would.

25          MS. KERR:  May I approach, Your Honor?

1            THE COURT:  Yes, you may.  Of course.

2            (Document tendered.)

3   BY MS. KERR:

4   Q.   Miss Cooper, please take as much time as you need to

5   review that document, and please note it's two-sided.  Once

6   you have finished reviewing it and your memory is refreshed,

7   you may look up at me.

8   A.   Okay.  Can I ask something?  This -- may I ask

9   something?

10            THE COURT:  Well, it depends on what it is.

11            THE WITNESS:  Okay.

12            THE COURT:  I don't know what your -- is it

13   something you don't understand or -- normally, the witnesses

14   don't ask questions.

15            THE WITNESS:  I'm sorry.

16            THE COURT:  I'm not certain without knowing what

17   it is.  So I think I'm going to say that it's better that you

18   not ask a question, unless it's something that -- you can't

19   read it or something along those lines.

20            THE WITNESS:  Okay.  Thank you.

21            THE COURT:  All right.

22            THE WITNESS:  Yes, I recorded this.  This is the --

23   BY MS. KERR:

24   Q.   Ma'am, just review it for your recollection.  Did that

25   help you remember what happened that day?

1    A.    This tells me that I assessed this inmate on that day.

2    Q.    Okay.  And why did you evaluate Mr. Sears on March

3    18th, 2010?

4    A.    It says here it was a post use of force.

5    Q.    Do you know where that examination would have occurred?

6    A.    I seen him in A/C confinement.

7    Q.    Does that mean that you examined him in his cell?

8    A.    In Y dorm.

9    Q.    Were there officers present during this examination?

10   A.    Yes.

11   Q.    Was that the protocol at that time to always have

12   officers present?

13   A.    Oh, yes.

14   Q.    And they stayed for the duration of the exam; is that

15   correct?

16   A.    Yes.

17   Q.    Did your examination of Mr. Sears reveal any injuries?

18   A.    Yes.

19   Q.    And what kind of trauma did your examination reveal?

20   A.    Left knee was small, dime-size abrasion.  Small amount

21   of blood noted.

22   Q.    Did your examination reveal any pain in his left

23   shoulder?

24   A.    He stated he had pain in the left shoulder.

25   Q.    And did your examination reveal pain in the head?

1    A.    He stated he had pain in the head.

2    Q.    Did your examination reveal a lump on his right upper

3    shin with redness and ecchymosis?

4    A.    Without redness, yes.   There was a -- the upper shin

5    was excised, soft lump is without redness or ecchymosis.

6    Q.    But there was swelling on his right shin; is that

7    correct?

8    A.    I called it a soft lump.

9    Q.    Did you perform any x-ray imaging of his shoulders,

10   head or any other body part?

11   A.    I don't know if the doctor did or not.   This is just

12   my --

13   Q.    Well, from your examination of him, did you recommend

14   any x-rays?

15   A.    No, ma'am.

16   Q.    And did you recommend any diagnostic imaging, CT scan,

17   MRI?

18   A.    No, ma'am.

19   Q.    Did you perform a vision check of Mr. Sears?

20   A.    Head to toe.

21   Q.    A vision check of his eyeballs.   Did you check his

22   vision?

23   A.    Oh, yes.   Um-hum.

24   Q.    Would you look at the record and make sure.

25   A.    Okay.   It's not written.

1  Q.    Do you recall how long your examination was of

2  Mr. Sears?

3  A.    I don't.

4  Q.    And did you offer Mr. Sears any treatment for his

5  injuries?

6  A.    No, ma'am.

7  Q.    Could you speak up?

8  A.    No, ma'am.

9  Q.    Even though Mr. Sears was bleeding?

10  A.    The -- I didn't offer him anything for the small amount

11  of blood that I found.  It was a skin -- you know, like a

12  scrape, abrasion.

13  Q.    Okay.  Did you offer him anything for any swelling?

14  A.    No.

15  Q.    Did Mr. Sears complain of head pain?

16  A.    Yes.

17  Q.    But did you evaluate him for a concussion?

18  A.    I looked at his -- I evaluated his -- the back of his

19  head for any type of injury.  Any abrasion, you know,

20  swelling, anything like that.

21  Q.    And just to clarify your testimony, you said you did

22  not perform or recommend any diagnostic imaging of his head;

23  correct?

24  A.    I did not.

25  Q.    At the conclusion of your examination, did you leave

1    him in a cell?

2    A.    I did.

3    Q.    And were there officers present or would he have been

4    left alone?

5    A.    No.  There were officers present.

6    Q.    Did you give Mr. Sears any instructions at the end of

7    your examination?

8    A.    I did.

9    Q.    What were those instructions?

10   A.    That if he has any problems, he's to call medical.

11   Q.    Did you leave after that?

12   A.    Yes.

13   Q.    And how was he supposed to call medical if the medical

14   has gone?

15   A.    He's to tell the officer.

16   Q.    Where were the officers stationed in that building?

17   A.    Right there in the officer's station.

18              MS. KERR:  No questions at this time.  Thank you.

19              THE COURT:  Thank you.  Any cross-examination,

20   Mr. Belitzky?

21              MR. BELITZKY:  Yes, Your Honor.

22                      CROSS-EXAMINATION

23   BY MR. BELITZKY:

24   Q.    Good morning, Miss Cooper.

25   A.    Good morning.

1   Q.    Miss Cooper, you stated that your examination occurred

2   in Mr. Sears' cell?

3   A.    Yes, sir.

4   Q.    Do you know why he would have been in his cell and not

5   in a medical wing?

6   A.    Well, if I had my other paper -- because this is just

7   the E.R. records.  If I had the special housing, my -- the

8   number one form to this, it would help.

9   Q.    Miss Cooper, at this point in time, we're going to

10  confine your -- the questions to the document that Miss Kerr

11  has shown you.

12  A.    Okay.

13  Q.    Again, if you could just explain to the jury what

14  brings you to the confinement cell to evaluate him after a

15  use of force incident.

16  A.    Okay.  Yeah.  We were -- I was -- he was a medical

17  emergency post use of force to confinement because he was at

18  that time yelling, screaming profanities and everything at

19  the staff, so they had to, you know, confine.

20  Q.    When you use the term "medical emergency," why do you

21  use that term?

22  A.    Well, medical emergency, post use of force is just in

23  case there was, you know, an emergent situation that could

24  arise from him being like sprayed with a chemical agent.  Had

25  he had asked for something like that, that could have been a

1    medical emergency, you know.  So everything to me is urgent

2    when it comes to post use of force.

3    Q.    Do you recall or do your notes reflect whether he

4    complained of any difficulty from having chemical agents

5    being sprayed?

6    A.    No.  That was not a complaint.

7    Q.    Had that been a complaint, would you have notated that

8    on the record?

9    A.    Any complaint would have been notated on the record,

10   yes, sir.

11   Q.    So are you testifying that if the complaint isn't

12   notated on the record or your evaluation isn't notated on the

13   record, that means you did not observe that or hear that?

14   A.    Right.

15   Q.    Now, Miss Kerr asked you if there were correctional

16   officers present.  I believe you said yes, there were?

17   A.    There were.

18   Q.    Is that protocol for confinement evaluation?

19   A.    Yes.

20   Q.    And at any point, did correctional officers interfere

21   with your examination or evaluation of Mr. Sears?

22   A.    No, they did not.  They are not -- in fact, they

23   weren't allowed to be within earshot.  So I was close with

24   Mr. Sears through the bars, speaking low (indicating),

25   because that was his business, not theirs.  But they were

1   there as security.

2   Q.    Now, Miss Kerr also asked you whether you recommended

3   any further treatment or tests, and I believe you said you

4   did not?

5   A.    I did not.

6   Q.    Had you felt that further tests or evaluations were

7   required, would you have put through the order?

8   A.    I most certainly would have, yes.

9   Q.    And as far as you -- your practice at the time, would

10  those orders, if requested, had been followed?

11  A.    Yes.

12          MS. KERR:  Objection, Your Honor.  I think that

13  goes beyond the motion in limine that was already ruled on.

14          MR. BELITZKY:  I'm asking a question -- asking her

15  about -- I asked her about her examination, and I think it's

16  part of the examination process.

17          THE COURT:  I'm going to go ahead and overrule the

18  objection.  Let's just move on from this subject.

19  BY MR. BELITZKY:

20  Q.    Based on your recollection from the notes that you

21  made, did you reach any -- did your evaluation give you any

22  feelings of what the healing process would be for his

23  injuries that were reflected in your examination?

24          MS. KERR:  Objection, Your Honor.  Same objection.

25          THE COURT:  That is sustained.  That's sustained.

1  BY MR. BELITZKY:

2  Q.    All right.  So just if I can summarize and understand,

3  you're saying that you did an evaluation and you recorded

4  everything you saw; correct?

5  A.    Correct.

6  Q.    And you recorded any complaints that he would have --

7  Mr. Sears would have made?

8  A.    Yes.

9  Q.    And anything that wasn't recorded is something that

10  means you didn't observe it or hear it?

11  A.    Right.

12  Q.    And correctional officers did not interfere with your

13  process?

14  A.    Not at all.

15         MR. BELITZKY:  Thank you.  Nothing further.

16         THE COURT:  All right.  Any redirect for this

17  witness?

18         MS. KERR:  Yes, Your Honor.

19         THE COURT:  You may proceed.

20                REDIRECT EXAMINATION

21  BY MS. KERR:

22  Q.    Miss Cooper, when I got up here first, I asked you if

23  you remembered this incident, right, and you said no; isn't

24  that correct?

25  A.    Correct.

1   Q.    But then when Mr. Belitzky got up here, you testified

2   that you recalled Mr. Sears yelling and screaming

3   profanities?

4   A.    That's --

5   Q.    Is that correct?

6   A.    That's off the paperwork that I read.

7   Q.    Right.

8   A.    Not that I recalled it from memory.

9   Q.    You briefly saw Mr. Sears directly after the use of

10  force; is that correct?

11  A.    I saw him briefly after the use of force.

12  Q.    Right.  You saw him right after the use of force;

13  correct?

14  A.    I'm sorry.  I saw him as long as it took for me to

15  assess him, which would have been a head to toe.

16  Q.    Okay.  But the timing of your examination was directly

17  after the use of force; correct?

18  A.    Once he was showered.

19  Q.    Okay.  Not the next day, not the next week?

20  A.    No, ma'am.

21  Q.    And did you ever see him again?

22  A.    I have no clue.

23  Q.    And if you looked at Mr. Sears' eyes, as you testified

24  you did, wouldn't that be in your report?

25  A.    Yes.

1   Q.    But you testified you don't leave anything out of your

2   report; right?

3   A.    Huh-uh.

4   Q.    Okay.  Thank you.

5              MS. KERR:  That's all.

6              THE COURT:  Any recross?

7              MR. BELITZKY:  No, Your Honor.  Thank you.

8              THE COURT:  Any questions from the jurors?

9              (Document tendered.)

10             THE COURT:  Let me see counsel at sidebar.

11             (The following was held at sidebar:)

12             THE COURT:  Here's the question:  "Would an inmate

13  automatically have a doctor visit then after the nurse

14  examination?  If not, what is the criteria that triggers the

15  need for the doctor?"

16             MS. KERR:  Your Honor, I think that's a medical

17  decision beyond the nurse.

18             MR. BELITZKY:  I think it's an appropriate

19  question as a follow-up to her examination.

20             MS. LEE:  No, because I think that depends on so

21  many different variables.

22             THE COURT:  I think it crosses over to the motion

23  in limine.  That last question, that really was inappropriate

24  that you asked.  It violated that motion in limine.

25             MR. BELITZKY:  I apologize.  I will be mindful of

1    that in the future.

2              THE COURT:  All right.  I'm not going to allow

3    this question.  I will just say that we just need to move on.

4              MR. BELITZKY:  Your Honor, she's also under

5    subpoena, so she's not excused from the whole case.

6              THE COURT:  That's fine.

7              MR. BELITZKY:  I just wanted --

8              THE COURT:  Okay.  Do you want me to say anything

9    to her?

10             MR. BELITZKY:  Well, just so she knows that she --

11             THE COURT:  Okay.  I'll say it after I excuse the

12   jury.

13             MR. BELITZKY:  Thank you.

14             (Sidebar ended.)

15             THE COURT:  Ladies and gentlemen, as I said

16   earlier, not all questions can be asked of all witnesses, so

17   we're going to move on.  We will go ahead and take our

18   morning break.  The witness should stay for just a second.

19   And we're going to take our morning break.  Ten minutes,

20   ladies and gentlemen.

21             Please don't discuss the case or form any opinions

22   until you've heard all the evidence.  We'll see you back here

23   in 10 minutes.

24             COURT SECURITY OFFICER:  All rise for the jury.

25             (Jury exits courtroom at 10:32 a.m.)

1              COURT SECURITY OFFICER:  Please be seated.

2              THE COURT:  Okay.  And I just need to tell the

3    witness, while you've finished your testimony for the

4    plaintiff, I believe that the defendant has also subpoenaed

5    you to testify.  So they wanted to make certain that I

6    alerted you to the fact that you are not excused from that

7    subpoena.  So you may be called during their case.  And since

8    you're retired, that's why they've sent you a subpoena.  They

9    want to make certain that you're here and that you understand

10   that you are not excused.  Okay?

11             THE WITNESS:  Yes.

12             THE COURT:  But you're excused for now, is that

13   right, or --

14             MR. BELITZKY:  Oh, yes, for now, Your Honor, until

15   our case.

16             THE COURT:  Okay.  Whenever he tells you.  He will

17   talk to you now privately about when he would like you back

18   here.  So I just wanted to make certain you know to talk to

19   him about that.

20             THE WITNESS:  Okay.

21             THE COURT:  Thank you very much.  You are excused.

22             Anything that we need to take up now during the

23   break?  Otherwise -- and you'll be ready with your witnesses,

24   the rest of your witnesses?

25             MS. LEE:  Yes, Your Honor.  To the extent that we

```
 1   have others.
 2              THE COURT:  Okay.  Very good.  Anything else you
 3   want to move into evidence, anything before you rest your
 4   case?  It would be the opportunity to move your exhibits into
 5   evidence.
 6              MS. LEE:  Absolutely, Your Honor.
 7              THE COURT:  Okay.  Thank you.
 8              (Recess taken from 10:34 a.m. to 10:46 a.m.)
 9              COURT SECURITY OFFICER:  All rise.
10              This Honorable Court is now in session.
11              THE COURT:  Are all the jurors ready?
12              COURT SECURITY OFFICER:  Yes, Your Honor, they
13   are.
14              THE COURT:  Everyone ready to proceed?
15              MR. BELITZKY:  Yes, Your Honor.
16              MS. LEE:  Yes, Your Honor.
17              THE COURT:  We'll bring the jurors in.  Thank you.
18              COURT SECURITY OFFICER:  All rise for the jury.
19              (Jury enters courtroom at 10:46 a.m.)
20              COURT SECURITY OFFICER:  Thank you.  Please be
21   seated.
22              THE COURT:  Welcome back, ladies and gentlemen.
23              Does the plaintiff have any other witnesses that
24   you would like to present?
25              MS. WICK:  Just one moment, Your Honor.
```

1          THE COURT:  Of course.

2          MS. LEE:  Your Honor, at this time the plaintiff

3    has no more witnesses, and rests its case.

4          THE COURT:  Thank you.  Let me just see counsel

5    for a moment at sidebar.

6          I didn't know if you wanted to check the exhibit

7    list to see if there is anything else that you need to --

8    that needs to be received into evidence, just to double-check

9    things.

10         (The following was held at sidebar:)

11         THE COURT:  I'll hear your motions, if you have

12   any.  They normally will move for a Rule 50 at the conclusion

13   of the plaintiff's case.

14         MS. DURHAM:  Also, Your Honor, I thought they had

15   more witnesses.  We need to talk about something I want to

16   admit prior to opening our case.  I thought they were going

17   to call more witnesses, but they're not.  Sorry.

18         THE COURT:  So what is it you need to talk about?

19         MS. DURHAM:  Some medical records that I gave them

20   this morning, and I just gave them to them this morning that

21   I want to use for rebuttal -- well, for impeachment.  I want

22   to introduce them, but it will be in our case.

23         THE COURT:  So it's not impeachment, it's your own

24   witness?

25         MS. DURHAM:  Yes.

 1            MS. LEE:  Do you know which witness you plan to do

 2   that?

 3            MS. DURHAM:  Not yet.

 4            THE COURT:  Well, let's do this.  Would you like

 5   to move for a directed verdict?

 6            MS. DURHAM:  Yes.

 7            THE COURT:  Okay.

 8            MS. LEE:  We can do it outside the presence of the

 9   jury?

10            THE COURT:  Well, I'm going to reserve ruling on

11   it, unless you want to say something.

12            MS. LEE:  No.

13            THE COURT:  I reserve ruling on it.  Okay.  So are

14   you ready, then, with your first witness?  We can talk about

15   the medical records later.  We'll do it at lunchtime.  Ready

16   with your first witness?

17            MS. DURHAM:  Yes.

18            THE COURT:  We're ready to go.  Okay.  Thank you.

19            (Sidebar ended.)

20            THE COURT:  Okay.  And were there any exhibits

21   that you need to move in?  I'm sorry.  I didn't double-check

22   that.  Any exhibits that you need to move in?

23            MS. LEE:  No, Your Honor.  There are no exhibits

24   that we need to move into evidence at this time.

25            THE COURT:  All right.  Thank you very much.

1          MS. LEE:  Exhibit 1 has already been moved into

2     evidence.

3          THE COURT:  Was that the --

4          MS. LEE:  The photographs of Mr. Sears' injuries

5     on his legs.

6          THE COURT:  Yes.  I believe that those have been

7     received.  Let me double-check with the clerk.  Right.  Those

8     have been received into evidence.  Yes, ma'am.  That's it.

9     And then the stipulation I read earlier to the jury.

10          MS. LEE:  Thank you, Your Honor.

11          THE COURT:  Okay.  You're welcome.

12          So the plaintiff has rested its case.  Now the

13     defendant can present its case.  It doesn't have to, but they

14     most certainly can.

15          So Miss Durham, do you have any witnesses you

16     would like to call at this time?

17          MS. DURHAM:  Yes, Your Honor.  We would like to

18     begin with Terry Sears.

19          THE COURT:  Okay.  All right.  Mr. Sears.  I'm so

20     sorry.  Let me just take a -- I need to excuse the jury for a

21     minute.  And ladies and gentlemen, I will excuse you for just

22     a minute, and then we'll come back.

23          COURT SECURITY OFFICER:  All rise for the jury.

24          (Jury exits courtroom at 10:52 a.m.)

25          COURT SECURITY OFFICER:  Please be seated.

 1              THE COURT:  All right.  So we'll bring Mr. Sears

 2     forward to the witness stand.

 3              Would you all be okay if I don't place Mr. Sears

 4     again under oath?  What I would tell him is he's still under

 5     oath from when it was previously administered, and that's

 6     what I would do for other witnesses, too.

 7              MS. DURHAM:  That's fine, Judge.

 8              THE COURT:  Okay.  That's what I'll do.  We'll

 9     bring the jury in, please.

10              COURT SECURITY OFFICER:  All rise for the jury.

11              (Jury enters courtroom at 10:53 a.m.)

12              COURT SECURITY OFFICER:  Thank you.  Please be

13     seated.

14              THE COURT:  All right.  Welcome back, ladies and

15     gentlemen.

16              All right.  Mr. Sears has been called as a witness

17     by the defense.

18              Mr. Sears, we're not putting you under oath again.

19     But you understand, sir, that you are still under oath from

20     before?

21              THE WITNESS:  Yeah.

22              THE COURT:  Is that a yes?

23              THE WITNESS:  Yes, ma'am.

24              THE COURT:  Okay.  Very good.

25              You may proceed with your examination of the

1    witness, Miss Durham.

2              MS. DURHAM:  Thank you, Your Honor.

3                      TERRY EUGENE SEARS,

4    having been previously duly sworn on August 12, 2019 by the

5    Courtroom Deputy, testified as follows:

6                      DIRECT EXAMINATION

7    BY MS. DURHAM:

8    Q.    Good morning, Mr. Sears.

9    A.    Good morning.

10   Q.    Mr. Sears, could we begin by you telling the jury how

11   it was that Vernia Roberts, Colonel Roberts, was able to take

12   pictures of you, pictures of you nude when you were

13   showering?

14   A.    Your question is why did she do it?

15   Q.    Can you tell us how she did it?

16   A.    She had a camera phone.  And she came inside and, you

17   know, I was in the shower nude, trying to cool off, and she

18   had it, you know.

19   Q.    She came in the shower?

20   A.    No, right there.  You know, the shower have bars, you

21   know, it's like bars.  And she was in the hallway, like on

22   the little catwalk, so to speak, the hallway.

23   Q.    Was there not a shroud or something covering you?

24   A.    Of course not, no.

25   Q.    So you were just standing there, and she was there

1    taking pictures?

2    A.    Exactly, you know.

3    Q.    With Jeffrey Hart -- with Lieutenant Hart, as well?

4    A.    Hart, if he was in confinement, I ain't see him.  He

5    wasn't where she was.  If he was in confinement, he wasn't --

6    he wasn't in my view, you know.  I'm sure he came back there,

7    but I didn't see him at the time when I was in the shower.  I

8    only seen her.

9    Q.    So if you said in your complaint that they were both

10   there, that was a misstatement?

11   A.    I don't recall saying that Hart was taking no pictures

12   with his -- with the cell phone.  I don't believe I said

13   that.

14   Q.    Mr. Sears, let me refer you to Defendant's Exhibit 9-M.

15   Do you recognize this?

16              (Document tendered.)

17   A.    Yes.

18   Q.    What do you recognize that to be?

19   A.    This is a grievance I filed.

20   Q.    And was it a grievance that you filed about this

21   incident?

22              MS. LEE:  Your Honor, may we have a moment before

23   the questioning continues?  We're still trying to locate the

24   document.

25              THE COURT:  Okay.  Of course.

1          MS. LEE:  If defense counsel has an extra copy, we

2     would be most grateful.

3          THE COURT:  All right.  So why don't you give her

4     a moment to look at it.

5          MS. DURHAM:  Yes.

6          MS. LEE:  Thank you, Your Honor.

7          THE COURT:  You've had a chance to review it?

8          MS. WICK:  Yes.

9          THE COURT:  All right.  You may proceed, then,

10    Miss Durham.

11    BY MS. DURHAM:

12    Q.   First, I want to begin by -- we used a lot of words

13    that we didn't explain to the jury.  Can you tell the jury

14    what a grievance is?

15    A.   A grievance is a written form of a complaint from a

16    prison official or incident that occurred in an institution,

17    you know.  It could be something like a piece of -- a radio,

18    property that was confiscated or something, and they've taken

19    it from me and I don't agree with it.  So I can complain to

20    the supervisor officials in the form of writing.

21    Q.   So it's completed by the inmate; correct?

22    A.   Pardon me?

23    Q.   The grievance is completed by the inmate?

24    A.   Yes.  The inmate initiate the complaint and serves it

25    to the prison official, and then they respond to it.  They

1   supposed to give you a response in a timely manner.  Like if

2   it's informal, they have like 10 days.  If it's formal, they

3   have like 20 days.  And if it's Tallahassee, they have like

4   about a month, you know, like that.  So they have a

5   timetable.  They don't have the rest of the year to respond

6   to the issue.

7   Q.    Okay.

8           MS. DURHAM:  Then, Your Honor, at this time,

9   defense would like to introduce their Exhibit 9-M.

10          THE COURT:  All right.  9-M is received into

11  evidence and may be published to the jury.

12          (Defendant Exhibit 9-M received in evidence.)

13          MS. WICK:  Your Honor, may we have a moment

14  regarding their request to enter --

15          THE COURT:  Okay.  I'll tell you what, I didn't

16  give them enough time.  So before you publish that -- and I'm

17  sorry.  I know I knew your name at one point.  Could you give

18  it to me again.  No, him.  The gentleman who's the paralegal.

19          MR. DANIEL:  It's Tyrell Daniel.  T-y-r-e-l-l

20  Daniel.

21          THE COURT:  Okay.  Thank you.  I'm sorry.

22  Mr. Daniel, just hold on a second, and let me give her a

23  chance to look at that.

24          MS. WICK:  Thank you, Your Honor.  There is no

25  objection.

1          THE COURT:  All right.  Thank you.  So it is

2    indeed received into evidence.  That is Defendant's Exhibit

3    9-M, M as in Mary.

4          All right.  Mr. Daniel, you can help her get that

5    set up.  Thank you.

6    BY MS. DURHAM:

7    Q.    Mr. Sears, could you please tell the jury what you said

8    about why Officer Prince administered chemical agents?  Oh,

9    it's not showing.

10          THE COURT:  We'll look at it.  Give us a second.

11    I'm sorry.  Okay.  Do you want to try the overhead projector

12    as opposed to the computer?  We've called IT to see if they

13    can help, but there is -- we do have the overhead, also.

14          THE COURTROOM DEPUTY:  The overhead is not

15    working.

16          THE COURT:  Neither one?  Okay.  Neither one is

17    working.  But we've called IT.  I'm sorry.  Just hold on a

18    second.

19          MS. DURHAM:  Well, what I can do is do something

20    else.

21          THE COURT:  Can you do that?  You're going to be

22    interrupted, sadly, when they come in.  If you don't mind

23    doing that, I would appreciate it.  Thank you.

24          MS. DURHAM:  I'll just ask the Court, can I read

25    it to the jury?

1            THE COURT:  Sure.  Why don't you do that.  I'm

2   really sorry the machine isn't working.

3            MS. DURHAM:  That's okay.

4   BY MS. DURHAM:

5   Q.    Now, Mr. Sears, you wrote in your grievance -- and this

6   is a grievance that you wrote because you wanted their

7   behavior addressed; is that correct?

8   A.    Yes.

9   Q.    You wrote in the grievance that "the gung-ho Sergeant

10  Prince thought I was yelling at the captain, and administered

11  chemical agents in my face."  Is that what you said?

12  A.    I don't have that right here.  I don't have that.

13            MS. DURHAM:  Your Honor, this is why I needed the

14  jury to see this.

15            THE COURT:  I know.  I'm sorry.  I feel horrible

16  about it.

17            MS. DURHAM:  Well, I'll tell you what we'll do.

18  Well --

19            THE COURT:  Why don't you just wait a second.

20  They're supposed to be on their way.  I don't know how else

21  to do it.  Short of giving him a copy of it, which is the way

22  we used to do it.  If you don't have two copies, then --

23            MS. DURHAM:  Well, I can give them a copy of it.

24            THE COURT:  Do you have an extra copy?  That's the

25  way we used to do it before overheads, PowerPoints, and all

1   that other stuff.

2            I'm sorry.  Just so I know what's going on.

3            MS. DURHAM:  That's the copy for the jury, a copy

4   of the exhibit.  He has a copy.

5            THE COURT:  He's got a copy?

6            MS. DURHAM:  Yes.

7            THE COURT:  But only one juror can look at it at a

8   time.  Does the plaintiff object to that, to passing that

9   among the jury, which is what she's proposing?

10            MS. LEE:  In the interest of speeding things

11   along, because I think we've been keeping the jury for quite

12   some time, I think that would be acceptable.  That would be

13   fine, Your Honor.

14            THE COURT:  Okay.  All right.  Well, thank you.  I

15   appreciate that.  She's right.  We normally don't do it that

16   way, and I appreciate her consideration.

17   BY MS. DURHAM:

18   Q.    Okay.  Now, Mr. Sears, you wrote in your grievance when

19   you were complaining about the incident, that "the gung-ho

20   Sergeant Prince thought I was yelling at the captain and

21   administered chemical agents in my face."  Is that correct?

22   A.    Yes.

23   Q.    And this is on page -- Exhibit 9-M-2; is that correct?

24   A.    Yes.

25   Q.    And what -- can you tell the jury what you said about

1   your eyes, what happened to your eyes, what the chemical

2   agent did to your eyes?

3   A.    On this document or just from the incident?

4   Q.    From the incident.

5   A.    It burned my eyes, you know.  He sprayed chemical

6   agents in my eyes.  It felt like I got stabbed in the eye

7   with a sharp object or a pencil or something.

8   Q.    But did you say that you were blinded?

9   A.    Yes, I was blinded by --

10  Q.    The chemical agent; is that correct?

11  A.    Yes.

12  Q.    Now, also in the grievance, you wrote -- well, first,

13  just tell the jury what you -- what you said happened to you

14  when you were in medical.  You said someone kicked you and

15  you fell; did you testify to that yesterday?

16           THE COURT:  Hold on a second, please.  We've got

17  the IT folks.  Come in.  We need the equipment fixed for the

18  trial.  So just hold on a second.  All right.

19           THE WITNESS:  I don't know.

20           THE COURT:  Just hold on a second, Mr. Sears, so

21  we can have this fixed.

22           Can we just do the overhead so that she can show

23  it if this doesn't work?  Can we just do the overhead, if

24  that's comfortable?

25           Miss Durham, I don't know how long it's going to

1    take them to fix this.  And so I think that we're going to

2    have to just proceed without it rather than delaying this

3    further already.  So maybe they can fix it at lunch.  Do you

4    mind going forward without the overhead and just --

5              MS. DURHAM:  No.  I don't mind presenting it the

6    way I am.  It's okay.

7              THE COURT:  I don't know how long it's going to

8    take them all to fix it.  I think if you could come back at

9    lunch, that might be better.  All right?

10             Okay.  Thank you.

11   BY MS. DURHAM:

12   Q.   Do you recall testifying yesterday, Mr. Sears, that you

13   were knocked to the ground?

14   A.   Yes.

15   Q.   Can you please tell the jury what you said in your

16   grievance when you wrote about the complaint to complain

17   about the incident, about when you went to medical and you

18   were kicked?

19             Well, this is what you said.  I'll read it.  It

20   says, "Sergeant Prince also sucker punched me in the jaw as I

21   was entering the medical building.  When I complained, he

22   kicked me in the buttock as Officers Plough and Smith held

23   me."

24             Now, did you say anything at all about falling to

25   the ground in your complaint when you wrote it?

1    A.    I sure did.  I don't have that document.

2    Q.    Is it in here?  Is it in this document?

3    A.    I don't have what you're reading right there.

4    Q.    You don't have this?  It's on Page 10.

5              MS. WICK:  Your Honor, objection.  I believe the

6    question was regarding the complaint.  I think that's vague

7    if we're talking about the document that we have.

8              THE COURT:  All right.  Can you just specify.  The

9    objection is sustained.  Just specify what you're talking

10   about.

11   BY MS. DURHAM:

12   Q.    I'm talking about the grievance, page -- the exhibit

13   that I handed you on Page 10.  Do you have Page 10?  Oh, you

14   don't have Page 10.  Okay.  I'm sorry.  I need to give you

15   Page 10.

16   A.    Exactly.

17   Q.    Please tell the jurors what you said on Page 10 --

18             THE COURT:  Just so I'm clear, what exhibit?

19             MS. DURHAM:  It's 9-M.

20             THE COURT:  But I don't have Page 10 on my list,

21   so I'm not certain what you're talking about.

22             MS. DURHAM:  You don't have Page 10 on the exhibit

23   list?

24             THE COURT:  I just have the listing of what the

25   exhibit is, and it doesn't identify it as Page 10.  That's

1   what threw me off.

2           MS. DURHAM:  Okay.  It's a grievance -- grievance

3   number -- he has it now.  Can I retrieve it?  It's 9-M,

4   Page 10.  It's Page 10 of 9-M.  Do you not have that, Your

5   Honor?

6           THE COURT:  I just have a different numbering

7   system.  That's all right.  If you all are on the same sheet

8   of music, that's fine.

9           MS. DURHAM:  Your Honor, could you see if the jury

10  has Page 10 on their exhibit?

11          THE COURT:  Why don't you ask to see it.  I will

12  let the court security officer get a copy of that.

13          Thank you.  And, again, I'm awfully sorry that

14  machine isn't working.

15  BY MS. DURHAM:

16  Q.   And on Page 10, you said that you were kicked, but that

17  Plough and Smith held you.  And you didn't mention falling on

18  the ground; did you?  Did you, Mr. Sears?

19  A.   Not in this grievance, counsel.

20  Q.   Thank you, Mr. Sears.

21          And, also, did you complain in this grievance

22  about going to see the colonel -- this is the first grievance

23  that you complained about going to see the colonel; isn't it?

24  A.   I don't recall.  But at this stage right here, I was

25  grieving the use of force.  I didn't think going to the

1  colonel mattered at this particular time.  At this stage, I

2  was talking about how I was abused and handcuffed.

3  Q.    So that's why you didn't mention the colonel, about

4  going to her office?

5  A.    No, I didn't grieve that, you know.

6  Q.    You didn't grieve that?

7  A.    I didn't, you know.  I talked about it in the

8  complaint, but I don't recall specifically filing the

9  grievance on Colonel Roberts for running me out of her office

10  for not initiating an investigation about being assaulted by

11  a prison official.

12  Q.    Okay.  Now, in this grievance, you did -- this is the

13  first time you mentioned them being in the corridor; correct?

14  They were in the corridor of the visiting park?  You don't

15  have them out on the steps; do you?  Where you showed us

16  yesterday, those two places you showed us yesterday, you

17  don't have them there; do you?

18  A.    I said they were standing at the entrance of the

19  corridor leading to the visiting park.

20  Q.    It says entrance?

21  A.    That's where I had them at.

22  Q.    No.  Is that what this says?  Did you have entrance in

23  this?

24  A.    This says Lieutenant Hart and Colonel Roberts stood by

25  and watched from the corridors of the visiting park.  That's

1   all it says.

2   Q.    Thank you, Mr. Sears.

3           Now, Mr. Sears, I would like to refer you to our

4   Exhibit 5, 5-1, 2, 3, 5, and 12.  Do you recognize --

5           MS. WICK:  Could we have just one moment to review

6   the document?

7           THE COURT:  Let us know how long you need.  It's

8   fine.

9           Miss Durham, I just want to make certain that I've

10  crossed my T's here.  I don't think that you formally moved

11  into evidence Defendant's Exhibit 9-M.  Did you?  Or if you

12  did, I missed it.

13          MS. DURHAM:  I did.  That's how I was able to

14  publish it to the jury.

15          THE COURT:  Okay.  And I'm sorry that I missed

16  that.  So it is received into evidence, DX-9-M.  Okay.

17          Have you had the chance to look at the document?

18  That's all right if you need a minute more.  That's okay.

19          MS. WICK:  Yes, Your Honor.  As long as we're

20  permitted to keep these copies, it doesn't seem that our

21  exhibits match up.

22          THE COURT:  Is that okay?

23          MS. DURHAM:  Yes, they can.  But you all -- we

24  gave them the exhibits.  I just can't get everything in

25  because they objected to it.  I'm getting in what you allowed

Durham/Sears Examination

1    us.

2              THE COURT:  Okay.  That's all right.  We don't

3    need to go into that level of detail, because I would -- I

4    sustained the objection.  So she needs her copy back, I think

5    is what she's saying.

6    BY MS. DURHAM:

7    Q.    Now, Mr. Sears, we talked yesterday about you grieving

8    a disciplinary report from Officer Dees for not allowing him

9    to search you; is that correct?

10   A.    Yes.

11   Q.    And this is about the incident; is that correct?

12   A.    From Officer Dees?

13   Q.    About -- not about that disciplinary report, but about

14   the incident.

15   A.    The use of force incident?

16   Q.    Correct.

17             MS. WICK:  Objection, Your Honor.  May we

18   approach?

19             THE WITNESS:  Yeah, because you --

20             THE COURT:  Okay.  Hold on a second.  There is an

21   objection.  All right.

22             (The following was held at sidebar:)

23             MS. WICK:  Your Honor, I understand that she's

24   using these to impeach, but I believe that she's getting into

25   information that is hearsay, and this document hasn't been

1  moved into evidence yet.  So the questions themselves call

2  for --

3          THE COURT:  So this next document hasn't been--

4  first of all, is it his own statement, is it Mr. Sears' own

5  statement?

6          MS. LEE:  Parts of it.

7          MS. DURHAM:  Parts of it.  I'm trying to get him

8  to identify it before --

9          THE COURT:  So if it's his own statement, it's a

10  statement of a party opponent.  That's a party opponent.

11          MS. DURHAM:  And this is a business record.

12          THE COURT:  I let in M.  I let in M.  I don't

13  really know, to tell you the truth, what the purpose of the

14  next line of questioning is.  So I don't know if we want

15  to --

16          MS. DURHAM:  I'm trying to impeach him, Your

17  Honor.  They said he didn't bring his witnesses yesterday,

18  and because he -- when he was testifying, and I couldn't show

19  the jury the documents --

20          THE COURT:  Well, you can't -- if it's not

21  received into evidence, you can't show it to them.  But you

22  can use it to impeach.  So I've received that into evidence;

23  correct?

24          MS. DURHAM:  No.  I'm about to offer it into

25  evidence, but he has to identify it first.

1          THE COURT:  Okay.  Wait a minute.  What exhibit

2  are we talking about now?

3          MS. DURHAM:  Five.

4          THE COURT:  Okay.  Hold on a minute.  Defendant's

5  Exhibit 5.  We're on Defendant's Exhibit 5.

6          MS. DURHAM:  Five.

7          THE COURT:  All right.  So all I see is relevance,

8  403.  Any other objection?

9          MS. WICK:  To the extent that -- I believe he

10 makes reference to what other people are saying.  So they're

11 not his own statements.  It's the statements of other people

12 is what I'm --

13         THE COURT:  Well, it's a business record.  What is

14 your basis for getting in that document?  Business record or

15 what?

16         MS. DURHAM:  A business record.

17         THE COURT:  Well, he can't -- he's going to

18 establish it's a business record?

19         MS. DURHAM:  No.  No, Your Honor.  I thought that

20 you said it could -- once he identifies it, we said our

21 documents were business records.  We've already said that we

22 could get in our business records.

23         THE COURT:  But somebody needs to establish it's a

24 business record, for sure.  I mean, I think the disciplinary

25 reports most certainly are.  But who was establishing that?

1          MS. DURHAM:  The warden, Your Honor.  He's going

2   to establish all of our business records.  He's next to last.

3          THE COURT:  Okay.  Well, that's fine.  But you

4   can -- that's fine.  That's how you establish it.  No problem

5   whatsoever with that.  The problem is it's the sequence

6   you're doing it in.

7          MS. DURHAM:  Okay.  I'm sorry.  Yesterday I

8   thought you said that our business records would still come

9   in, but we have to make sure that they were relevant.

10         THE COURT:  They can come in.  The business

11  records for sure can come in.  But somebody needs to --

12         MS. DURHAM:  We have an affidavit that we can give

13  the Court from the custodian of records.

14         THE COURT:  Okay.  Well, then, that's fine.  I

15  don't have any problem whatsoever.  I think these things,

16  generally speaking, are business records.  I have no problem

17  whatsoever with that.  But it does -- you need to give me

18  something on that.  Look --

19         MS. DURHAM:  We will offer the affidavit now

20  saying they're the business records?

21         THE COURT:  I'll tell you what.  Instead of

22  keeping the jury here right now while we go through this, I

23  think we need to go ahead and take care of this.  I can

24  either -- I think the best thing is to just tell the jurors

25  to take an early lunch at 11:30.  I mean, we'll tell them to

1    come back at -- maybe a little bit longer, then, because it

2    will take us about 15 minutes, maybe, to do all this and to

3    go through this.

4              MS. DURHAM:  Can we do the medical, too, so that

5    we don't have a problem?

6              THE COURT:  Okay.  We'll take care of all that.

7    Okay.  I'll tell them to -- it's 11:30.  I'll tell them to

8    come back at a quarter to 1:00.  All right?  And we'll take a

9    lunch break and we'll resolve these issues during the next

10   15, 20 minutes, and then we'll take our lunch break.  I think

11   that's the best way of doing it.  All right.

12              (Sidebar ended.)

13              THE COURT:  So ladies and gentlemen of the jury,

14   the best and most efficient way for us to proceed is for --

15   there are a few evidentiary matters that I need to take care

16   of.  I'll take care of them with the lawyers.  Rather than

17   whispering at sidebar, we'll take care of this.  And I'll ask

18   you to take an early lunch.  It's 11:30.  We're going to

19   resume at a quarter to 1:00.  So we'll take about an hour and

20   15 minutes for lunch.

21              Please don't discuss the case or form any opinions

22   until you've heard all the evidence.  We'll see you back here

23   at quarter to 1:00.

24              COURT SECURITY OFFICER:  All rise for the jury.

25              (Jury exits courtroom at 11:30 a.m.)

1           COURT SECURITY OFFICER:  Please be seated.

2           THE COURT:  Okay.  Thank you.

3           A couple of things.  First of all, normally, you

4    should direct your comments to the Court.  That's done so

5    that we don't have side talking.  And it's okay, I know

6    you're trying to get the job done.  And I appreciate it,

7    which is why I haven't said anything.  I know you're all

8    working hard and you're all doing a great job.

9           But it just makes for a more orderly process if

10   you direct your comments to me.  And then that way, I know

11   that if there is -- I can maintain order in the courtroom.

12          Secondly, normally, I don't hear objections at

13   sidebar unless it's something that really rises to the level

14   of, you know, so prejudicial or such a big deal.  The reason

15   for that is, first of all, it takes time to have everybody

16   come up here and handle these matters at sidebar.

17          Number two, the jury kind of feels like they're

18   out of it when all these side conversations are taking place.

19   And what makes our system so special is that everything is

20   out in the open.  We tend not to have these secret meetings

21   or sidebar meetings.

22          In criminal cases, I do do it because sometimes

23   you do have matters that rise to that level.  In a civil

24   case, most of our matters should be handled in open court

25   with an objection and a response.

1           All right.  I've allowed this to happen.  I've

2   made these decisions.  It's fine.  But I just ask that unless

3   you have something that really rises to that level, please

4   try to just do the objections in open court.

5           All right.  Now, let me just tell Mr. Sears,

6   Mr. Sears, you can go back.  Your lawyers may need to consult

7   with you because we're going to go through a couple of

8   matters now that we've had on this list of exhibits.

9           Okay.  Very good.  Now, let's go through these

10  exhibits just so that it's clear, because the courtroom

11  deputy is also obligated to keep track of everything, and I

12  want to make certain that we have what's been received into

13  evidence.

14          So Defendant's Exhibit 9-M, as in Mary, I received

15  that into evidence.  That's the one that the juror -- you had

16  handed the copy to the jurors.  So we're all on the same

17  sheet of music with respect to that; right?

18          MS. DURHAM:  That is correct.

19          THE COURT:  All right.  Very good.  What is the

20  next exhibit that you've been -- that you have there?  And

21  give me one second, too, to pull up my notes.  Just give me

22  one second, as well.

23          So I had -- with respect to grievances and

24  disciplinary hearing history, I think what I had said

25  yesterday, and I'm looking at the endorsed order, was I

1  reserved ruling until we came -- until these matters came up,

2  you know, at trial.

3           Generally speaking, I do think these disciplinary

4  matters are business records.  I do think that.  But you need

5  to give me something with respect to that, because I'm being

6  asked to rule on that just based on what a lawyer is telling

7  me as opposed to some evidence that's presented.

8           I think they are, generally speaking, business

9  records, though, and I think it's a very easy decision.  But

10 I just need to have something there.  And I see that it's

11 tying up moving on to the next piece.  So I think it's

12 probably best that I rule on that.

13           MS. DURHAM:  Your Honor, one moment.  I have a

14 certification for all these records.

15           THE COURT:  I'm sorry.  You need to come to the

16 podium.  I just want to make certain I can hear you.

17           MS. DURHAM:  Your Honor, I have certification for

18 his -- for the information that was in his files, the

19 disciplinary reports, the grievances.

20           THE COURT:  Okay.  Is it your position these are

21 self-authenticating documents?

22           MS. DURHAM:  Yes, Your Honor.  I have an affidavit

23 from the custodian of records.

24           THE COURT:  Okay.

25           MS. LEE:  Your Honor, just one note here.  I know

1  that opposing counsel has represented that these documents

2  are self-authenticating.  We do not want to get into a big

3  spat over whether or not they're authentic.  However,

4  opposing counsel has handed me an affidavit from the

5  custodian of records for Zephyrhills Correctional

6  Institution.

7            THE COURT:  Okay.

8            MS. LEE:  Now, the incidents at issue here today

9  obviously occurred at Polk Correctional Institution.  So I'm

10 not sure which documents from Zephyrhills that opposing

11 counsel intends to admit into evidence.  I believe yesterday

12 it was stated, and I may be mistaken, but I thought my

13 understanding was that the only grievances and disciplinary

14 reports that opposing counsel intended to admit were those

15 related specifically to the incidents on March 18th.

16            MS. DURHAM:  They are, Your Honor.  The only

17 reason Zephyrhills is on these documents is because they had

18 to certify them out of the inmate's file where the documents

19 are kept.

20            THE COURT:  Okay.  So we're just talking about the

21 documents from March 18th; correct?

22            MS. DURHAM:  Correct.

23            THE COURT:  That's all we're talking about?

24            MS. DURHAM:  That's correct.

25            MS. LEE:  No.  Your Honor, with regard to those

1    documents, while, again, I'm not sure that they're exactly

2    self-authenticating, but if they can be admitted as business

3    records, that's fine, and the affidavits are there.

4            Again, we're not objecting on that ground.

5    However, some of the documents do contain hearsay within

6    hearsay.  So they've met the business records exception for

7    hearsay, and that's fine.  But some of them do seem to

8    contain other hearsay statements from either -- maybe not

9    Mr. Prince because, of course, he's a party opponent, but

10   other people, what Mr. Prince or --

11           THE COURT:  Mr. Sears.  That's all right.

12           MS. LEE:  Sorry.  What Mr. Sears said David Prince

13   said, and other things like that.  So I don't believe we've

14   established an exception to the hearsay rule for those

15   statements of hearsay within hearsay.

16           And furthermore, I think for the disciplinary

17   reports -- and I very much appreciate that opposing counsel

18   has limited the pages from Exhibit 5 to -- I believe to

19   exclude the actual disciplinary record; is that -- is that

20   correct, Your Honor, or --

21           THE COURT:  I'm not certain exactly what she's

22   done here.  She should probably tell us.

23           MS. DURHAM:  I've eliminated the information that

24   counsel objected to yesterday that was contained in the

25   disciplinary report.

1              THE COURT:  Why don't -- why don't you let me see

2     exactly what you wish to admit right now.  Let me take a look

3     at it.  I don't have any exhibits in front of me.  Not one.

4     So I don't even know what we're talking about until you show

5     it to me.

6              MS. DURHAM:  Yes, ma'am.  This is Your Honor's

7     copy.

8              (Document tendered.)

9              THE COURT:  Thank you.  All right.  So this is

10    Defendant's Exhibit 5.  Okay.  Previously, the objections

11    were, let's see -- your objections were relevance, unfairly

12    prejudicial.

13             MS. LEE:  Your Honor, if I may?

14             THE COURT:  Yes.

15             MS. LEE:  And this is no slight to opposing

16    counsel.  We received over 2200 documents in this case that

17    Mr. Sears had requested when he was pro se.  And counsel

18    graciously provided us those documents on a USB stick.

19             And in going through those documents, we attempted

20    to match up the exhibits that are listed on the defendant's

21    exhibit list to the Bates numbers of those documents because,

22    if you see the exhibit lists, they don't actually use the

23    Bates numbers from the produced documents but, rather, they

24    just state the name of the document.

25             Now, I don't work at a prison.  And I think what

1    happened was in matching up the numbers of the incident

2    reports to the Bates numbers that we had received from

3    opposing counsel, we may have made some errors in what we

4    were correlating.

5              THE COURT:  Well, because it's hard to figure out.

6              MS. LEE:  It's hard, because we weren't sure

7    exactly which pages it would encompass.  So we would see,

8    you know, on top of Page 1, it would be the incident report

9    number, but it wasn't always clear which pages that went to,

10   which is why, candidly, today we're having a bit of trouble

11   locating the documents.

12             THE COURT:  Sure.

13             MS. LEE:  So those objections, of course, were

14   based on what we had correlated that day to the Bates

15   numbers.  And so it's possible, for instance, I didn't hear

16   you say hearsay within hearsay.  Perhaps, we didn't object on

17   that ground.  And, candidly, I don't have Exhibit 5, the

18   specific pages in front of me, so I'm not sure that --

19             THE COURT:  You should.  In all fairness to you,

20   you should have that in front of you.  Here's what I would

21   like to do:  I would like both of you to sit down or the two

22   sides to sit down for the next 10 or 15 minutes to see if you

23   can work out these objections.

24             Let me just tell you, generally speaking, these

25   disciplinary reports, I do think it's a classic case of it

1    coming in under a business record exception.  I'm still

2    looking for, you know, if you have that affidavit, terrific.

3    You should go ahead and move it into evidence -- was that

4    your intention, to move it into evidence?

5              MS. DURHAM:  Yes, Your Honor.

6              THE COURT:  Okay.  I think you ought to do that so

7    this record is clear.  What is that exhibit number?

8              MS. DURHAM:  It would be Defendant's Exhibit 21.

9              THE COURT:  Exhibit what?  This goes up to 20.

10   What is it?

11             MS. DURHAM:  It would be 21.

12             THE COURT:  Well, you need to go show it to them.

13   It's not on my exhibit list.

14             I'll tell you what.  I'm going to take a recess.

15   You show her that.  She needs to -- she needs to have these

16   exhibits.  It's really unfair for her to have to go through

17   all these lists rather than having a hardcopy of an exhibit

18   that you plan to introduce, and see what you can work out.

19             And I'll, you know, probably tell the jury, it

20   will probably -- I don't know.  I've got to give them the

21   time to try to work this out, and then they need to have

22   lunch, too.  So it may be a little bit after a quarter to

23   1:00.

24             I think that's what I told them.  It will probably

25   be closer to 1:00.  But somewhere between a quarter to 1:00

1    and 1:00, because they need to have lunch, too.  But you need

2    to resolve these issues on these exhibits so that it goes as

3    smoothly as possible, knowing how, generally speaking, I

4    would handle these.

5            But, you know, if it's hearsay within hearsay,

6    look, generally speaking, if it's a business record, it comes

7    in as a business record.  It comes in.  You're going to have

8    to point to me where there is that hearsay within hearsay,

9    the part you want redacted.

10           MS. LEE:  If any, yes, Your Honor.

11           THE COURT:  If any.  That takes a little bit of

12   time to do.

13           MS. LEE:  Agreed.

14           THE COURT:  So hopefully, our IT people are on

15   their way, and we'll be able to make it a little bit easier

16   in the afternoon.  But those are the things that I think you

17   two sides need to sit down and try to resolve over the next

18   15 to 20 minutes so you still have time for lunch.

19           MS. LEE:  Thank you, Your Honor.

20           THE COURT:  All right.  Well, thank you very much.

21   I appreciate everybody working together.  Let me just hand

22   you back Defendant's Exhibit No. 5.

23           All right.  Is there anything else?  Okay.  We'll

24   be in recess.  Let's resume at a quarter to 1:00.  Thank you.

25           (Recess taken from 11:44 a.m. to 12:49 p.m.)

1          COURT SECURITY OFFICER:  All rise.

2          This Honorable Court is now in session.

3          THE COURT:  Back on the record.  The IT equipment

4   we hope has been repaired, but we have a backup plan in case

5   it has not or it fails.  So, hopefully, we won't go through

6   what we went through earlier.

7          So when we recessed, I asked plaintiff's counsel

8   to meet with defense counsel to see if you could come to some

9   resolution with respect to the exhibits.  Were you able --

10  I'm just going to start with Ms. Durham -- or Mr. Belitzky.

11  Were you able to do that?

12         MR. BELITZKY:  We met, and I think we made a lot

13  of progress as far as getting the numbering together and sort

14  of trying to reach an accommodation so there won't be

15  confusion as to what one exhibit is versus another.

16         THE COURT:  Okay.  Perfect.

17         MR. BELITZKY:  There was one other matter that

18  came up that I think will require the Court's resolution.

19         THE COURT:  Sure.

20         MR. BELITZKY:  During Mr. Prince's testimony --

21  and he's the defendant who was alleged to have used the

22  chemical agent that will be testimony to this.  We were not

23  able -- I've not been able to get a replica of the canister.

24  It was in 2010.  So I have spoken to security personnel.

25  When I was trying to -- what I would like to do is to be able

1   to have him point to or use one of these security officers,

2   not use, but as a demonstrative aid, not an exhibit into

3   evidence, but just to show mainly the size of what he was

4   wearing.  I think he will testify he was wearing it on his

5   hip the same way.  And I think Miss Kerr objected to any such

6   kind of demonstration.

7           THE COURT:  Okay.  And what is your objection

8   based on?

9           MS. WICK:  Yes.  We think that's completely

10  improper.  First of all, Your Honor, the evidence will show

11  that the canister that was used was a canister of Sabre red.

12  I don't know what canister the officers may have.

13          Additionally, to have a law enforcement officer

14  completely not involved in this case stand up and hold up a

15  canister that was not involved in this case is completely

16  improper.  If the witness wants to testify as to the size of

17  it, or describe it, that's fine, but we don't have the

18  canister that was involved.

19          THE COURT:  I think there is the potential for

20  confusion.  I have to agree with the plaintiff on this.  It's

21  not the same canister.  I mean, I'm not against demonstrative

22  exhibits or a presentation to the jury.  But it would have to

23  be with the same canister or the same kind of canister.  And,

24  apparently, we don't have one.  So he can testify to it.  But

25  I prefer that a demonstration not be done.

1          MR. BELITZKY:  Your Honor, as my backup plan, I

2     have a photograph of what I think Mr. Prince can identify as

3     similar as far as the size.  I'm not trying to -- we're not

4     trying to talk about the, you know, content itself, but just

5     to give the jury an idea of what the size was.  I don't know

6     that I've shown it to --

7          MS. WICK:  I've seen it.  Thank you.  Again, it's

8     not Sabre Red, first of all.  It's a different -- it's a

9     Google image of Sabre Cross Fire, which is a completely

10    different chemical agent that was used.  I just think it's

11    irrelevant.

12         MR. BELITZKY:  If I could respond.  I think

13    Mr. Prince -- he could answer yes or no whether this is the

14    same size as what he used at the time.

15         THE COURT:  Let him try.  I know that you have an

16    objection.  You can try to lay the foundation with that

17    witness.

18         MS. WICK:  Thank you.

19         MR. BELITZKY:  All right.  Thank you.

20         THE COURT:  What have we been able to resolve on

21    these exhibits?  Have you spoken to each other, and are you

22    in agreement as to how you're going to handle them?

23         MS. LEE:  Your Honor, there still are a few

24    remaining objections that we would ask the Court to resolve

25    right now.  It was incredibly helpful, and I very much

1    appreciate defense counsel providing us with copies of these

2    exhibits.  And we withdrew and identified specifically which

3    pages, and that enabled us to, of course, locate the exhibit

4    in hearsay and --

5           THE COURT:  Right.  Let me jut say something on

6    the record.  I mean, the defendants were told at the

7    beginning of trial by the courtroom deputy who was here then

8    that we needed paper copies of everything.  And I didn't

9    have -- I still don't have my exhibits.  So, I mean, it's

10   okay that I don't have it.  It's just that if there's an

11   issue, I need to -- but it put the plaintiffs in a tough

12   situation.

13          So it's only fair that people have a copy of what

14   it is that you're going to admit into evidence before you're

15   going to admit it, so they have the chance to review it.

16          MS. DURHAM:  Your Honor, we apologize.  And I

17   apologize to counsel.  We had copies for everyone and, you

18   know, there was no communication.  I just thought everybody

19   had their copies.

20          THE COURT:  No, including the Court.  I don't have

21   it, either.  But I really care about the plaintiff.  That's

22   really who I care about so ...

23          MS. LEE:  Your Honor, we would ask that just a few

24   of these objections, just for purposes of saving time, if we

25   could go through some of them, at least the ones that defense

1    counsel intends to admit through Terry Sears, if we could

2    discuss those before the jury returns.  It could be helpful

3    just to clarify a few things.

4            THE COURT:  Okay.  Well, normally, I do it as it

5    comes up in testimony.  Why is it that you would like to do

6    it now?

7            MS. LEE:  I just think for purposes of expediting

8    the testimony, and we've had the jury kind of waiting for

9    quite some time.  But there is also just a few --

10           THE COURT:  I don't do it that way.

11           MS. LEE:  Okay.

12           THE COURT:  I appreciate it.  But I think it's

13   much better for me to hear it in its context, unless there's

14   something overwhelmingly prejudicial that you think is going

15   to taint the trial, then I would hear it.  But if it's just

16   your routine, evidentiary matters, I just hear it as the

17   evidence comes in.

18           MS. LEE:  The problem is that some of the

19   documents contain hearsay within hearsay, and others are

20   quite prejudicial because of -- they're related to the

21   disciplinary incident, and they contain some prejudicial

22   language.

23           And we did reach an agreement with defense counsel

24   for redacting some of that language, but I just don't think

25   that's going to be strong enough, given the fact that these

1   documents state that Mr. Sears was found guilty of a

2   disciplinary violation.

3          Those were the objections that I would like to

4   address just before the jury returns.  But I understand if

5   you prefer --

6          THE COURT:  Well, why don't you take a moment and

7   talk about it.  That's fine.

8          MS. LEE:  Thank you, Your Honor.  So I am looking

9   at Exhibit No. 5.  And defense counsel intends to introduce

10  Pages 1, Pages 5, and Pages 12.  And so I'm going to start

11  with Page No. 1.  If we look at Page No. 1 of Exhibit 5, it

12  states at the top --

13         THE COURT:  Hold on a second.  I don't have

14  Exhibit 5.  I don't have it.

15         MR. BELITZKY:  Tyrell has now supplied a complete

16  copy.  If I can approach.

17             (Documents tendered.)

18         THE COURT:  I'm sorry.  I just need to get the

19  exhibits so I can follow along.

20         MS. LEE:  I understand.

21         THE COURT:  This is all Exhibit 5?  These are all

22  the exhibits?

23         MS. DURHAM:  Yes, ma'am.

24         THE COURT:  Which one is five?  Is it marked with

25  a little tag?  Okay.  It's supposed to be marked with a

1   little tag.  Where is Exhibit 5 with its little tag?

2             MS. DURHAM:  I'm sorry, Your Honor.

3             THE COURT:  I don't have it here with its little

4   tag so ...

5             MS. DURHAM:  Your Honor, could I provide a copy?

6             THE COURT:  Well, it's supposed to be with its

7   little tag on it so we can find it.

8             (Document tendered.)

9             THE COURT:  Okay.  I have five in front of me.  Go

10  ahead.

11            MS. LEE:  Your Honor, I'm going to start with Page

12  No. 1.  And as I stated, we don't have to go through every

13  page.  There are only three pages.

14            So on Page No. 1, at the top you'll see it says,

15  "inmate's plea not guilty, findings guilty."  And then again

16  in the paragraph that starts, "basis for decision," the

17  second line, "inmate was found guilty."

18            Now, this is highly confusing for the jury and

19  highly prejudicial to Mr. Sears.  This is a disciplinary

20  report about the case that the jury is supposed to try today.

21  And the jury is supposed to find the facts of that case.

22  They are not supposed to take the facts from the disciplinary

23  hearing and use those to make their determination.

24            So we would ask that this not be admitted or, at

25  the very least, redact the guilty.

1          THE COURT:  Yeah, that's a little troubling.  What

2    does the defendant say?

3          MS. DURHAM:  Well, Your Honor, counsel had --

4    well, counsel had the witness talk about how the disciplinary

5    hearing was pretty much a kangaroo court.  The defendants

6    should be able to present their case to show that the

7    disciplinary hearing was more than a kangaroo court.

8          Now, I told counsel that I could redact it for

9    Mr. Sears, but it's my intent to have it introduced through

10   the warden.

11          MS. LEE:  Your Honor, if I may respond?

12          THE COURT:  Okay.

13          MS. LEE:  Initially, we had not intended to bring

14   up anything about the disciplinary hearing.  However, when

15   opposing counsel was cross-examining Mr. Sears yesterday,

16   evidence of the disciplinary hearing was introduced, and

17   opposing counsel asked Mr. Sears whether he was found guilty,

18   and even stated that he was convicted.

19          So we thought at that point it was absolutely

20   necessary to let the jury know that these are not findings

21   made by a judge or a jury.  I was certainly not trying to

22   make the disciplinary hearings sound like kangaroo court.

23   And I absolutely understand if defense counsel would like to

24   have the warden or other witnesses testify as to the

25   structure and integrity of those courts.

 1            However, I do not think it is important for the

 2   jury to see that Mr. Sears was found guilty of a disciplinary

 3   rule violation for the very incident that they are supposed

 4   to be deciding here today.  It's confusing and it is

 5   prejudicial.

 6            MS. DURHAM:  Your Honor, may I?

 7            THE COURT:  Well, I have some concerns about this.

 8   And I think that -- I mean, I'm just a little bit concerned

 9   that the jury, when they see things like this, like findings

10   guilty, that it's too -- that it's overly prejudicial when I

11   balance its probative value versus its prejudicial value.

12   Why can't he just testify to these things?

13            MS. DURHAM:  Well, for one thing, Mr. Sears won't

14   just testify to what I asked him.

15            THE COURT:  I'm sorry?

16            MS. DURHAM:  Your Honor, he's been a difficult

17   witness as far as the defense is concerned.  He won't just

18   testify.  That's why I had to recall him.

19            MS. LEE:  Your Honor, if I may, he's already

20   testified yesterday that he was, quote, found guilty and,

21   quote, convicted based on this disciplinary hearing, and that

22   alone was prejudicial enough.  To bring in the document is

23   just not necessary, and I think all of the evidence or

24   statements in the document are available elsewhere.

25            THE COURT:  I think its prejudicial value

1    outweighs its probative value.  I don't think five should

2    come in.  What else?  Go on to your next one.

3           MS. DURHAM:  Your Honor, may I use the statements,

4    at least?

5           THE COURT:  What you've given me today, as I have

6    looked through it, if you had wanted to redact, that's why I

7    gave you the time now to work this out to see if you could

8    redact part of it or admit it.  As I look at it, and I'm

9    being asked to make a decision on this package, I think the

10   prejudicial value outweighs its probative value.

11          In other words, it could confuse the jury.  So

12   what you've given me, this package of 30 pages -- I'm sorry,

13   51 pages doesn't come in.

14          MS. LEE:  Thank you, Your Honor.

15          THE COURT:  You're welcome.  I'm ready to bring

16   the jury back in.

17          MS. LEE:  Oh, I'm sorry.  It's the same issue with

18   Exhibit No. 7.  Again, this is the ICT report relating to the

19   disciplinary hearing.

20          THE COURT:  Okay.  Here's the problem.  I don't

21   have these exhibits.

22          MS. LEE:  I apologize.

23          THE COURT:  Well, they're not your exhibits.

24   They're the defense exhibits.

25          MR. BELITZKY:  Your Honor, we have them marked

1    with the tag.  I'm handing them to the deputy.

2              THE COURT:  You know what, I'm going to receive

3    these way -- I'm not used to doing these pretrial rulings.

4              MS. LEE:  Understood, Your Honor.

5              THE COURT:  I did that one for you, but this isn't

6    the way it's done.  You call a witness, you admit it into

7    evidence.  You try to admit it into evidence.  You object,

8    you sustain the objection, you overrule the objection.

9    That's the way it's normally done.  Not pretrial rulings.

10   That's very unusual.  So I'm just going to do it the way I'm

11   used to doing it, which is that way.

12             MS. LEE:  Thank you, Your Honor.  I will just

13   state that Exhibit 7, again, is a report about the

14   disciplinary hearing.

15             THE COURT:  They can try to lay a foundation for

16   it.  And if I don't have any of the exhibits, I cannot rule

17   on them.

18             MS. LEE:  I understand.  Of course not.

19             THE COURT:  So I need to have the exhibits.

20   All right.  We'll bring the jury in.  Thank you.

21             MS. DURHAM:  Your Honor, just for the record, can

22   I object to the Court's ruling on Exhibit 5, just for the

23   record?

24             THE COURT:  All right.  So we're now in the

25   defendant -- so that I understand, why is Mr. Sears back on

 1   the stand?  Were you finished with him?  They asked

 2   questions?  What do you want to put him on the stand for?

 3            MS. DURHAM:  Because I have evidence that I want

 4   to put before the jury.

 5            THE COURT:  Weren't we finished with him?

 6            MS. DURHAM:  No, ma'am.  Your Honor, we stopped so

 7   that --

 8            THE COURT:  No?  We weren't completely finished

 9   with him.  Okay.  We were partially finished.  Okay.  That's

10   fine.  You may go ahead and finish your examination.  Thank

11   you.

12            Go ahead.  We'll bring the jury in.

13            COURT SECURITY OFFICER:  All rise for the jury.

14            (Jury enters courtroom at 1:05 p.m.)

15            COURT SECURITY OFFICER:  Thank you.  Please be

16   seated.

17            THE COURT:  Thank you.  Welcome back, ladies and

18   gentlemen.

19            Let's see.  When we had taken our break for lunch,

20   I think that Miss Durham, you were doing your direct

21   examination of Mr. Sears.  Is that right?

22            MS. DURHAM:  Yes, ma'am.

23            THE COURT:  You may proceed with your continued

24   direct examination of the witness.

25                     DIRECT EXAMINATION (resumed)

1   BY MS. DURHAM:

2   Q.    Mr. Sears, you testified that -- can you tell the

3   Court -- can you tell the jury today what occurred when

4   Officer Dees wanted to pat you down again?  You told us

5   yesterday, but can you tell us again today what happened?

6          MS. WICK:  Objection, Your Honor, asked and

7   answered, and cumulative.

8          THE COURT:  What is your response to that?

9          MS. DURHAM:  Well, Your Honor, we're just

10  beginning our case.  Yesterday he told his version to the --

11         THE COURT:  All right.  Well, you know, it's fine.

12  I'll let you cover a little bit of this.  But if it's

13  something that's already been covered, I ask that you not --

14         MS. DURHAM:  Your Honor, it wasn't covered

15  appropriately.

16         THE COURT:  Okay.  That's fine.  It's your

17  witness.  It's fine.  You can go ahead and proceed.  I just

18  ask you if it's something that you could have covered before,

19  that you not go into great detail.  But go ahead.  That's

20  fine.  Overruled.

21  BY MS. DURHAM:

22  Q.    Okay.  So -- well, you said Officer Dees was trying to

23  make conversation with you; is that correct?

24  A.    Yes.

25  Q.    And were you inside or outside the building?

```
 1   A.    I'm outside the building.

 2   Q.    Okay.  I'm going to show you what's been marked as

 3   Exhibit 9-K.

 4             MS. DURHAM:  May I approach?

 5             THE COURT:  Yes.

 6             (Document tendered.)

 7   BY MS. DURHAM:

 8   Q.    Do you recognize that?

 9             THE COURT:  You need to go back to the podium so

10   we can hear you.

11   BY MS. DURHAM:

12   Q.    Do you recognize that document?

13   A.    Yes.

14   Q.    Mr. Sears?

15   A.    Yes.

16   Q.    What do you recognize it to be?

17   A.    This is the D.C. 1303 form in which I'm appealing the

18   disciplinary report to the disciplinary hearing officers.

19   Q.    Okay.  You're telling what happened during the

20   incident; is that correct?

21   A.    Yes.

22             MS. DURHAM:  Your Honor, at this time, defense

23   would like to move their Exhibit 9-N into evidence.

24             THE COURT:  Hold on a second.  Let me find it.

25             MS. DURHAM:  Page 1.
```

Durham/Sears Examination

1              MS. LEE:  I thought it was 9-K.

2              MS. DURHAM:  Oh.  Yes, she has it, 9-K.

3              THE COURT:  9-K?  All right.  Is there an

4    objection to 9-K?

5              MS. WICK:  Your Honor, our 9-K has three pages.

6    From our discussions with counsel, we understand they're just

7    trying to admit 9-K-002.  I want to make sure that's

8    accurate.

9              MS. DURHAM:  That is correct.  That's the page

10   that Mr. Sears has.

11             THE COURT:  Okay.  So you're only moving to admit

12   Page 2 of 9-K; correct?

13             MS. DURHAM:  That's correct.

14             THE COURT:  Is there an objection to 9-K-2?

15             MS. WICK:  No, Your Honor.

16             THE COURT:  Okay.  9-K-2 is received into evidence

17   and may be published to the jury.

18             (Defendant Exhibit 9-K-2 received in evidence.)

19   BY MS. DURHAM:

20   Q.   Now, in the document, don't you say that he came over

21   to you and you ignored him; correct?

22   A.   Yes.

23   Q.   Is that visible?  Am I the only one who can't see it?

24             THE COURT:  It's a little bit hard to see, but

25   it's up there.  Can the jury see it?  Do we need to make it

1    larger or anything?

2              (Jurors en masse indicating affirmatively.)

3    BY MS. DURHAM:

4    Q.    Now, you indicate that he tried to make conversation

5    with you, and you ignored him.  He claimed he wanted to pat

6    search me.  So you call Sergeant Cooper to pat search you so

7    that -- because you didn't want Officer Dees to plant

8    contraband on you, and Sergeant Cooper refused.  Is that

9    correct?

10   A.    Yes, ma'am.

11   Q.    As I exited G dorm, Officer Dees grabbed my left

12   shoulder with shirt and fists.  I immediately snatched away,

13   and told Officer Dees, don't put your hands on me.  And you

14   say, and another bogus DR resulted, along with the

15   use-of-force assault to my person, as I informed Captain

16   Dexter why I came to her complaining about Officer Dees.

17             Is that what you said?

18   A.    Exactly.  Yes, ma'am.

19   Q.    And in this, you don't say that Officer Cooper told him

20   to let you go; did you?

21   A.    No, ma'am.

22   Q.    And neither did you say that you went to Colonel

23   Roberts' office; is that correct?

24   A.    Uh-huh.

25   Q.    And you didn't mention Colonel Roberts taking those

1  pictures of you; did you?

2  A.    There wasn't no need for it.  No, ma'am.

3  Q.    Oh, don't you write a --

4  A.    I'm writing a disciplinary team.

5  Q.    And you make attachments when you want to let -- when

6  you want everyone to know what's going on; don't you?

7  A.    Yeah.

8  Q.    You don't mention Colonel Roberts, and you don't

9  mention Lieutenant Hart; is that correct?

10  A.    Officer Dees' grievance was really -- like it started

11  the use of force, but it was separated.  It's a completely

12  different situation.  So that's why I had to write that

13  complaint on a separate grievance form, per policy of DOC.

14  Q.    Okay.  Well, let's go to the separate grievance form.

15  Let's look at 9-N.

16              (Document tendered.)

17  BY MS. DURHAM:

18  Q.    Do you recognize this?

19  A.    Yes, I recognize it.

20  Q.    What is that, Mr. Sears?

21  A.    This is another disciplinary team appeal concerning the

22  1-15 complaint against Sergeant Prince.

23  Q.    And that's the one that you talk about the use of

24  force?

25  A.    Yes.  Use of force, yes.

1    Q.   All right.  Well, let's talk about that.

2              MS. DURHAM:  Your Honor, at this time the defense

3    would like to move Exhibit 9-N into evidence.

4              THE COURT:  9-N.  All right.  Is there any

5    objection to 9-N?

6              MS. WICK:  Yes, Your Honor.

7              THE COURT:  Okay.  Then I need to have 9-N in

8    front of me.  Hold on a second, please.

9              (Document tendered.)

10             THE COURT:  Now, 9-N exists of three pages.  And

11   you would like to move all three pages?

12             MS. DURHAM:  No, Your Honor, just Page 1.

13             THE COURT:  Page 1.  Okay.  All right.  Is there

14   an objection to Page 1?

15             MS. WICK:  Yes, Your Honor.  Specifically to the

16   first line of Page 1.  It's highly prejudicial to Mr. Sears.

17             THE COURT:  All right.  Are you okay with the rest

18   of it if we redact the first line?

19             MS. WICK:  Yes, Your Honor.

20             THE COURT:  Okay.  Can you redact the first line,

21   please.  I'll receive 9-N with the first line redacted in

22   that its prejudicial value outweighs the probative value.  So

23   let me get the number correctly.  It is 9-N, Page 1.  Okay.

24   Page 1 with the first line redacted is received into

25   evidence.

1              (Defendant Exhibit 9-N received in evidence.)

2    BY MS. DURHAM:

3    Q.    Now, Mr. Sears, you indicate that when you were talking

4    to Captain Dexter, you were telling her what transpired with

5    Officer Dees.  You say you went to Captain Dexter complaining

6    about Officer Dees; correct?

7    A.    Yes, ma'am.

8    Q.    You don't mention that you went to Colonel Roberts and

9    then went to Captain Dexter; do you?

10   A.    No, ma'am.

11   Q.    And then you say, she ordered me to cuff up.  Is that

12   not true?  She ordered me to cuff up.  Do you see that?

13   A.    No, ma'am.  And she had no reason to order me to cuff

14   up.  That's what my paper say.  And I believe yours say the

15   same thing.  She had no reason to order me to cuff up.

16   Q.    She had no reason to order me to cuff up?

17   A.    Yes.

18   Q.    But yesterday you said she told them not to cuff you

19   up, or she tried to stop them from cuffing you?

20   A.    No.

21   Q.    You didn't testify to that yesterday?

22   A.    No, I sure didn't, counsel.  Let me -- let me --

23   Q.    Well, tell us what you said.

24              THE COURT:  Okay.  Hold on, folks.  Hold on,

25   folks.  The jury needs to use their own memory to remember

1   what went on.  You need to ask your next question.

2   BY MS. DURHAM:

3   Q.    So you say that she had no reason to order you to cuff

4   up.  And Sergeant Prince was gung-ho, and just maced you; is

5   that correct?

6   A.    That's what happened.

7   Q.    And Captain Dexter had a video camera on her; correct?

8   A.    True.

9   Q.    You say you didn't attack Sergeant Prince and hit him;

10  right?

11  A.    Right.

12  Q.    You don't mention Colonel Roberts and Lieutenant Hart;

13  did you?

14  A.    Namely because, counsel, as I stated before, this is

15  the disciplinary appeal to the disciplinary team.  I didn't

16  go into every detail with them.  This is the team, the

17  disciplinary findings of the hearing, of the disciplinary

18  report.  All that didn't come out at the disciplinary

19  hearing.

20          I kept it basically to what was presented, what

21  they accused me of, what was stated in the DR, all that

22  wasn't stated in the DR, neither, you know.  So I kept it to

23  the basic, you know.  That's why it's not all included.

24  Q.    When you file grievances, aren't you supposed to file

25  complaints about what occurred?

1   A.    Yes.  But that's why we have so many grievances,

2   counsel.  We have to -- because you know the rules going to

3   tell me, they're going to reject my grievance.  I got more

4   than one issue on the grievance.

5   Q.    Well, let's go to another grievance.  We will go to --

6   we will go to --

7                 MS. DURHAM:  One moment, Your Honor.

8                 THE COURT:  That's all right.  Take your time.

9                 MS. DURHAM:  Your Honor, can I take a look at the

10  exhibit that was already admitted?

11                THE COURT:  Okay.

12  BY MS. DURHAM:

13  Q.    Okay.  Well, let's go to the exhibit that we already

14  talked about earlier.

15                Now, you filed a grievance in May.  And I

16  believe -- this is Defendant's Exhibit 9-M.  And I believe

17  that you didn't mention Officer Roberts -- I mean, Colonel

18  Roberts and Lieutenant Hart in this grievance, either.  And

19  this is a grievance -- I'm going to show it to you.

20                This is a grievance that's not about the

21  disciplinary report.

22                (Document tendered.)

23  BY MS. DURHAM:

24  Q.    Is that about the disciplinary report, Mr. Sears?

25  A.    No, ma'am.  This response, this grievance right here is

1  a response -- my continuous -- my continuation response

2  proceeding to the next level because prison officials failed

3  to timely respond, you know.  It's a rule that tell them they

4  have 15 days to respond.  Once they exceed the 15-day time

5  limit, I can proceed to the next level, according to the

6  rule.

7  Q.    Well, when you go to the next level, what do you put in

8  the grievance?

9  A.    Well, basically I put the facts that I'm grieving in

10  the next grievance.

11  Q.    Exactly.  Exactly.

12  A.    Yes.

13  Q.    And in this grievance, do you have Lieutenant Hart and

14  Colonel Roberts in it?  You're going to the next level.

15  A.    If you look at the grievance, counsel, it states I'm

16  complaining about the 1-15 disciplinary report that was filed

17  against me was a falsified document.  And I'm talking about

18  Sergeant Prince.

19  Q.    Okay.  Well, let's go to the next page, M-3.  Who do

20  you talk about on that page?  And Sergeant Prince, wasn't he

21  part of the use of force?

22  A.    That's who it was on, yes.

23  Q.    And wasn't that the incident that Lieutenant Hart and

24  Colonel Roberts were watching?  Isn't that the incident they

25  were watching?

1   A.    Are you talking about on this page, the following page;

2   right?

3   Q.    The following page and the next page.

4   A.    Okay.  The following page, the grievance from March the

5   26th is the informal grievance that was filed, and they

6   didn't respond to it timely.

7   Q.    But we're talking about the facts that you were

8   supposed to put in the grievance, Mr. Sears.

9   A.    Okay.  Now, the facts -- yes, it's in reference to

10  Sergeant Prince's unlawful use of chemical agents on me.

11  Q.    But you don't mention Colonel Roberts and Lieutenant

12  Hart in that grievance; do you?

13  A.    No.  I was talking about Sergeant Prince in this

14  complaint.

15  Q.    And you didn't talk about them watching you?

16  A.    No.

17  Q.    Well, that's okay.

18        You did -- in a couple of grievances in May, you

19  did mention them in a grievance.  But from March to May, you

20  didn't; did you?

21  A.    When I was referring to them, I had to write the

22  grievance about that particular situation.  When I was

23  grieving this particular issue, when I was telling his

24  supervisor officials that Sergeant Prince falsified a prison

25  document to cover his behind because he know he broke the

 1  law, what he did to me, that was an issue completely by

 2  itself.  And I couldn't go into detail, every little detail

 3  about what happened, you know.

 4  Q.    Okay.  Mr. Sears, did anything happen to you between

 5  March and May that Colonel Roberts was involved in?

 6  A.    You say anything?  Like what?

 7           MS. WICK:  Objection, Your Honor.

 8           THE COURT:  What's the objection?

 9           MS. WICK:  Objection to relevance.

10           THE COURT:  What is the relevance of that?

11           MS. DURHAM:  The relevancy would be why Colonel

12  Roberts started to show up in his grievances.

13           THE COURT:  Okay.  Overruled.  You can answer the

14  question.

15           THE WITNESS:  What was the question?

16  BY MS. DURHAM:

17  Q.    Did anything happen to you between March and May

18  involving Colonel Roberts?

19  A.    Not that I could recall.

20  Q.    You didn't participate in anything involving Colonel

21  Roberts?  You just don't remember; correct?

22  A.    Wait a minute.  That involved her?

23  Q.    Excuse me?

24  A.    I remember a situation about some individual packs of

25  sugar, and I think that was before this.  That was outside

1   the time frame that you're talking about.

2   Q.    Okay.

3   A.    But it was about individual packs of sugar, something

4   like that, if that's what you're referring to.  And I asked

5   her why we couldn't buy sugar out of the canteen, and she

6   said, because I said so, you know, like, you know.

7   Q.    That's okay, Mr. Sears.  Mr. Sears, that's okay.

8              Now, let's talk about when you were in -- when you

9   were in the isolation cell.  When you got there, what -- do

10  you recall what you told them your major complaint was?

11  A.    In the isolation cell?

12  Q.    Yes.  You were examined when you went to the isolation

13  cell.  I'm not talking about with these -- with our -- with

14  these defendants.  I'm talking about when you left and you

15  were in the isolation cell after you declared a psychological

16  emergency.  You were taken to the isolation cell; correct?

17  A.    Yes.

18  Q.    Okay.  You were examined; correct?

19  A.    Well, I was seen by a specialist, you know.

20  Q.    Okay.  Well, do you recall what you said your major

21  complaint was when you were seen?

22  A.    When I threatened to commit suicide?

23  Q.    Yes.

24  A.    She came and interviewed me, Miss Catherine Rich.  She

25  came and interviewed me.  We had a conversation.  She didn't

1  like -- I guess she examined me mentally.

2  Q.    Do you think -- if you reviewed your medical records

3  from that day, do you think that would refresh your

4  recollection about what happened?

5  A.    Sure.

6  Q.    Do you recognize who those documents are for?  You

7  don't have to tell us the contents.

8          MS. WICK:  Your Honor, if we could just be

9  notified of what documents.

10          THE COURT:  Yes.  You need -- before you show

11  something to the witness, you need to go to opposing counsel

12  and let them see what you're showing.

13  BY MS. DURHAM:

14  Q.    Do you recall any of that?

15  A.    No, ma'am, I sure don't.

16  Q.    Well, what does it say your major complaint was when

17  you checked in?  Just look at it.  You don't have to testify

18  from the document, but look at it.  That would be on the

19  first page.  And tell us what you told them your first

20  complaint was.

21  A.    I have a line on this document that says history, and

22  it say the chief complaint.

23  Q.    Chief complaint.  What is the chief complaint?

24  A.    Chief complaint, pain in the left shoulder.  That's

25  what that says, that document.  This one here.

1   Q.   Okay.  Can you go to Page 2, and look at the date

2   3-25-10.  And what does it say that you said on that day?

3   A.   3-25-10.

4          MS. WICK:  Objection, Your Honor.

5          MS. DURHAM:  Or how does it say that you were

6   feeling on that day?

7          THE COURT:  I think the objection is as to the

8   form of the question, and it is sustained.

9   BY MS. DURHAM:

10   Q.   How does it -- what does it say you said you were

11   feeling that day?

12          MS. WICK:  Objection, Your Honor.

13          THE COURT:  Sustained.

14   BY MS. DURHAM:

15   Q.   What did you tell them about how you were feeling that

16   day?

17          MS. WICK:  Objection, Your Honor.

18          THE COURT:  Sustained.

19   BY MS. DURHAM:

20   Q.   Did you tell them how you were feeling on that day?

21   A.   The depressive mode, is that --

22   Q.   No.  On 3-25 it says --

23   A.   3-25.

24          MS. WICK:  Objection, Your Honor.  The witness

25   isn't being allowed to answer the question.

1            THE COURT:  All right.  We'll just do one at a

2    time.

3    BY MS. DURHAM:

4    Q.    The first line, what does it say, Mr. Sears?

5            MS. WICK:  Objection, Your Honor.

6            THE COURT:  Why are you --

7            THE WITNESS:  It says --

8            THE COURT:  Hold on a second, Mr. Sears.  Hold on.

9            I'm not certain what you're getting at here,

10   Miss Durham.  Are you trying to impeach him or do you want

11   him just to read the exhibit?

12           MS. DURHAM:  I don't want him to read the exhibit.

13   I asked Mr. Sears how does it say he was feeling that day.

14   What did he say -- how he said he was feeling that day, and

15   he's being a difficult witness.

16           THE WITNESS:  I have --

17           THE COURT:  Hold on a second.  Hold on a second.

18   What page are you referring to here?

19           MS. DURHAM:  It's on the second page, Your Honor.

20   Do you have that?

21           THE COURT:  I'm not certain I've got this last one

22   here.  Did you bring it up here?

23           MS. DURHAM:  This one you don't have, Your Honor,

24   because I'm not putting it into evidence.

25           THE COURT:  You're just impeaching him?

1          MS. DURHAM:  Yes.

2          THE COURT:  Then that is -- if you're impeaching

3   him with his testimony, there's another way for you to do it.

4   So, first of all, he has a copy of it, opposing counsel has a

5   copy of it.

6          The way that I prefer that you do it is that you

7   have him read it to himself so that he has the opportunity to

8   read the entire document, and then you can go ahead and

9   impeach him with his prior statement, which is what you're

10  attempting to do; correct?

11         MS. DURHAM:  Yes.

12         THE COURT:  All right.

13         MS. WICK:  Your Honor, if I can be heard?

14         THE COURT:  Sure.  Go right ahead.

15         MS. WICK:  I believe it's improper for counsel to

16  characterize the witness's testimony.  And I would ask that

17  her comment regarding him being a difficult witness is

18  stricken from the record.

19         THE COURT:  It is.  It is stricken from the

20  record.  It is improper.  Thank you.

21         Go ahead and read it to yourself, Mr. Sears.

22         THE WITNESS:  I've read it, Your Honor.

23         THE COURT:  Okay.  Then I ask if you're going to

24  impeach him, that you do it in a proper fashion.  So go

25  ahead.

1   BY MS. DURHAM:

2   Q.    Mr. Sears, on March 25th, 2010, did you indicate that

3   you were feeling good on that day?

4   A.    According to this document -- not according to this

5   document.  On this document -- I have two.  And one says the

6   depressive mood, right here.  And one says -- I assume this

7   is the evaluation of the inmate, abbreviated, and it's saying

8   no complaints.  Falsity will, something like that.

9   Q.    Thank you, Mr. Sears.

10           And on the third page, on March 23rd, '10, did you

11  tell anyone, I'm suicidal as long as I'm at Polk?  Did you

12  say that, Mr. Sears?

13  A.    I don't recall it, but it's right here in writing.  And

14  it's not my handwriting.

15  Q.    Thank you, Mr. Sears.

16           THE COURT:  He gets to answer the question.  So

17  just let him go ahead and answer it.

18           Are you finished, Mr. Sears?  Go ahead and answer

19  the question, sir.

20           THE WITNESS:  What was the question?

21  BY MS. DURHAM:

22  Q.    I asked you did you tell anyone on that day that you

23  were feeling good, and you answered it with -- finish your

24  answer.

25  A.    Not to my recollection did I respond like that.  But

 1    according to this form right here, someone wrote, I'm
 2    suicidal as long as I'm at Polk.  And they said some other
 3    things right here.
 4    Q.    Thank you, Mr. Sears.
 5    A.    As a matter of fact, they wrote a whole paragraph right
 6    there.
 7    Q.    Thank you, Mr. Sears.
 8              MS. DURHAM:  That's all, Your Honor.
 9              THE WITNESS:  And once this document --
10              THE COURT:  Okay.  Mr. Sears, I think she said
11    she's finished.  Thank you.
12              Does the plaintiff wish to ask any questions in
13    cross-examination?
14              MS. WICK:  Yes, Your Honor.
15              THE COURT:  You may proceed.
16                        CROSS-EXAMINATION
17    BY MS. WICK:
18    Q.    Good afternoon, sir.
19    A.    Good afternoon.
20    Q.    Mr. Sears, when you are filing a grievance against a
21    correctional officer, would you agree with me that it's
22    important to be very specific in that grievance about what
23    your issue is?
24    A.    Yes.
25    Q.    Okay.  And is it important to do that because the

1  institution only allows you to address a single issue at a

2  time?

3  A.    Exactly.

4  Q.    And if you didn't do that, can you explain to the jury

5  what would happen?

6  A.    Yes.  It's a rule, Chapter 33, 33-103.014 FAC, the rule

7  that tells you plainly, this is the reason your grievance

8  could be denied or rejected, for talking about more than one

9  issue at a time.  So if you have another issue, it got to be

10  on a separate complaint of its own.

11  Q.    So is it fair to say that if you weren't very specific

12  in your grievance, that you fear that it would be rejected

13  outright on that basis?

14  A.    Definitely.

15  Q.    Okay.  So when you filed a grievance, let's say against

16  defendant Prince that was addressed in your direct

17  examination a moment ago, you were focusing on what happened

18  specifically with defendant Prince; isn't that right?

19  A.    Exactly.  And if I submit a grievance that talked about

20  Colonel Roberts watching and Hart standing right here, just

21  doing nothing, they would talk about, hey, man, you're

22  talking about more than one issue.  So, you know, that's

23  basically why it's specific stuck to one issue.

24  Q.    Now, sir, you didn't go to law school; did you?

25  A.    No, ma'am.

 1   Q.    You haven't received any specialized legal training; is

 2   that right?

 3   A.    No.

 4   Q.    So when you're drafting these grievances, you're doing

 5   that by yourself; isn't that right?

 6   A.    Yes, ma'am.

 7   Q.    You don't have any assistance?

 8   A.    No.

 9         MS. WICK:  Your Honor, I would like to publish

10   Defendant's Exhibit 9-M.  And that has been admitted into

11   evidence.

12         THE COURT:  That would be fine.  Of course.

13         MS. WICK:  May I approach to obtain the exhibit?

14         THE COURT:  Yes, you may.

15   BY MS. WICK:

16   Q.    Sir, do you have a copy of 9-M at the stand with you?

17   A.    No, she took it back.  No.

18   Q.    Can you see it on the screen?  Can you see that on the

19   screen, sir?

20   A.    Yes.

21   Q.    I'm sorry.  Let me get to the right page.

22         Sir, is this a copy of one of the grievances that

23   you filed?

24   A.    Yes, it is.

25   Q.    Okay.  And I would direct your attention to that first

1    paragraph.

2              Sir, isn't it true that in this grievance that you

3    state that prison officials sprayed chemical agents in your

4    face and used excessive physical force on you?

5    A.    Yes.

6    Q.    And you stated in that grievance that that was done

7    while you were handcuffed and shackled?

8    A.    Yes.

9    Q.    And moving on to the second paragraph of that

10   grievance, isn't it true that in this grievance, you stated,

11   I was slammed to the ground by Officers Plough and Officer

12   Smith, and these officers continued -- I'm sorry, commenced

13   to punching me in the head, back, jaw, rib cage?  Do you see

14   that?

15   A.    Yes.

16   Q.    And you continued to say, I was choked by Officer

17   Plough and kicked in the back by Officer Smith after you were

18   handcuffed and shackled.  Did you also say that in this

19   grievance, sir?

20   A.    I sure did.

21   Q.    Did you also say that defendant Prince had sucker

22   punched you in the jaw as you were entering the medical

23   building, and when you complained, he kicked you in the

24   buttock as Officers Plough and Smith held you?

25   A.    Yes.

1    Q.    So when you were asked by defendants' counsel if your

2    grievance had included being knocked to the ground, you

3    didn't use those specific words in this grievance; right?

4    A.    No.

5    Q.    But is that what you were trying to get across in this

6    grievance?

7               MS. DURHAM:  Objection, Your Honor.

8               THE WITNESS:  It's written right there.

9               THE COURT:  Hold on a second.  The objection is

10   overruled.  Go ahead.

11   BY MS. WICK:

12   Q.    Is that what you were trying to get across in this

13   grievance?

14   A.    Yes.  Yes.

15   Q.    Thank you, sir.

16             Further down in this same grievance, sir, did you

17   state that Lieutenant Hart and Colonel Roberts stood by and

18   watched from the corridors of the visiting park?

19   A.    Yes.  Yes, I did.

20   Q.    And in other grievances that you filed, maybe not

21   specifically the ones that have been addressed, but have you

22   likewise stated that Officer Hart and defendant Roberts stood

23   by and watched while there was excessive use of force used

24   against you by the prison officers?

25   A.    Yes, ma'am.

1   Q.    Sir, in grievances that you've filed, have you

2   specifically noted that supervisory officials were aware of

3   the excessive force, and they did nothing about it?

4   A.    Yes, I stated that.

5   Q.    And, in fact, didn't you do that in a grievance on

6   March 26th of 2010?

7   A.    Yes.

8   Q.    And that would have been within 10 days, less than 10

9   days of the event occurring; is that right?

10  A.    Yes.

11          MS. WICK:  May I have a moment, Your Honor?

12          THE COURT:  You may.

13          MS. WICK:  No further questions, Your Honor.

14          THE COURT:  Okay.  Thank you.  Any redirect for

15  this witness?

16          MS. DURHAM:  Yes, Your Honor.

17          THE COURT:  You may proceed.

18                    REDIRECT EXAMINATION

19  BY MS. DURHAM:

20  Q.    You just testified that you couldn't put everything in

21  a grievance because it will be rejected or returned to you;

22  did you not?

23  A.    Yes.

24  Q.    Well, I have a grievance -- have you ever written a --

25  well, in this case, did you write a grievance where you

```
 1   included everything that you said you couldn't include in a
 2   grievance, which is why Colonel Roberts and Lieutenant Hart
 3   weren't mentioned before May?
 4   A.    So your question is, have I ever wrote a --
 5   Q.    About this incident, did you write a grievance that
 6   included everything that happened to you on March 18th, 2010?
 7   A.    Yes.
 8   Q.    So it's possible for you to include everything you need
 9   to in --
10   A.    If you talk about one issue, one incident.
11   Q.    That's right.  They were part of that incident; weren't
12   they?
13   A.    Yes.
14   Q.    So you could have put them in the grievance because
15   it's one incident; isn't that correct?
16              MS. WICK:  Objection, Your Honor.  Misstating the
17   testimony.
18              THE COURT:  Well, are you able to answer the
19   question?  Mr. Sears, are you able -- do you understand the
20   question or do you want her to restate it?
21              THE WITNESS:  If she could restate it, I'll try to
22   respond to it.
23              THE COURT:  Why don't you go ahead and restate the
24   question.
25              MS. DURHAM:  I will, Your Honor.
```

1   BY MS. DURHAM:

2   Q.    Officer Dees, Prince, Roberts, Hart and Dexter, that's

3   one incident; isn't it?

4   A.    Yes.

5   Q.    Thank you, Mr. Sears.

6              THE COURT:  All right.  Any recross?

7              MS. WICK:  Yes, Your Honor.

8                      RECROSS-EXAMINATION

9   BY MS. WICK:

10  Q.    Sir, we've already talked about the fact that you're

11  limited in what you can put in a grievance against a

12  particular correctional officer; correct?

13  A.    Yes.

14  Q.    So in this case, did you, in fact, file separate

15  grievances against the defendant officers?

16  A.    I sure did.

17  Q.    Okay.  So can you -- well, let me back up.

18             So you filed a grievance against defendant Prince?

19  A.    Yes.

20  Q.    And you did the same for Officer Plough?

21  A.    Well, Plough was part of the use of force.  So I talked

22  about him in that use of force grievance.

23  Q.    I see.  And what about Officer Dees, did you file a

24  separate one for Officer Dees?

25  A.    No.  I filed a separate grievance about Officer Dees

1  because it was a separate incident.

2  Q.    I see.  So even though all of those officers were

3  involved on that day, on March 18th of 2010 --

4  A.    Yes.  Grieving it together would have conflict with

5  each other.

6  Q.    So you decided that in order to comply with the rules,

7  you needed to file separate grievances --

8  A.    Yes.

9  Q.    -- as to those officers; is that correct?

10  A.    Exactly.

11            MS. WICK:  Thank you, sir.  No further questions.

12            THE COURT:  Okay.  Thank you.  All right.  Let me

13  go ahead and excuse the jury for a minute.

14            Ladies and gentlemen, you need to be excused for a

15  few minutes.

16            COURT SECURITY OFFICER:  All rise for the jury.

17            (Jury exits courtroom at 1:49 p.m.)

18            COURT SECURITY OFFICER:  Please be seated.

19            THE COURT:  I forgot about the questions.  They

20  have already left.  We need to bring the jurors back in.  I

21  forgot about the questions.  I forgot.  So stay seated.  We

22  need to bring the jury back in.  I forgot to ask them if they

23  had any questions.

24            COURT SECURITY OFFICER:  All rise for the jury.

25            (Jury enters courtroom at 1:50 p.m.)

```
 1              COURT SECURITY OFFICER:  Thank you.  Please be
 2    seated.
 3              THE COURT:  And I'm sorry, ladies and gentlemen.
 4    I forgot to ask if you had any questions.  Nobody has any
 5    questions?  Okay.  Then I'm sorry, I need to excuse you
 6    again.  That's the only reason I brought you back in here.
 7              Oh, we do have one.  Okay.
 8              So we'll just wait for counsel to return.  Okay.
 9    I guess you were doing the questioning.
10              MS. WICK:  We can proceed.
11              THE COURT:  Okay.  That's fine.
12              (The following was held at sidebar:)
13              THE COURT:  There are four questions.  "In 2010,
14    was it customary that an officer would use a cell phone to
15    video an inmate showering?"
16              I don't know if he's going to know the answer to
17    that.  Let me just read them all.
18              "Would the cell phone have been a personal cell or
19    an issued phone by the facility?"
20              "Does the facility require consent for medical
21    photos or video written?"
22              "What was the chain of custody of the video or
23    when did Dexter receive the video camera per the grievance?"
24    I'm not certain that this witness can answer those questions.
25              MS. WICK:  I don't think he can.
```

1          MR. BELITZKY:  Right.

2          THE COURT:  Okay.

3          (Sidebar ended.)

4          THE COURT:  All right.  As I said earlier,

5    sometimes the witness is not the best witness to answer the

6    questions, able to answer the questions or there are

7    evidentiary matters.  So I'm not going to ask the witness to

8    answer these questions.  But I thank the jury for submitting

9    them.

10          Now, I'm going to ask you to please take a short

11   break.

12          COURT SECURITY OFFICER:  All rise for the jury.

13          (Jury exits courtroom at 1:54 p.m.)

14          COURT SECURITY OFFICER:  Please be seated.

15          THE COURT:  All right.  Mr. Sears can return to

16   counsel table.

17          Does anybody else need to take a break?  Would you

18   all like to take a five-minute break?  And I'll try to take

19   another break around 3:30 or so.  Five minutes.  That's it.

20          (Recess taken from 1:55 p.m. to 2:00 p.m.)

21          COURT SECURITY OFFICER:  All rise.

22          This Honorable Court is now in session.

23          THE COURT:  So Mr. Sears is back at the table.  Do

24   we have all the jurors ready?

25          COURT SECURITY OFFICER:  Yes, Your Honor.

1                THE COURT:  Is the defendant ready with its next

2    witness?

3                MS. DURHAM:  Yes, Your Honor.

4                THE COURT:  The jury can come back in, then.

5                COURT SECURITY OFFICER:  All rise for the jury.

6                (Jury enters courtroom at 2:01 p.m.)

7                COURT SECURITY OFFICER:  Thank you.  Please be

8    seated.

9                THE COURT:  Welcome back, ladies and gentlemen.

10               Is the defendant ready with its next witness?

11               MS. DURHAM:  Yes, Your Honor.  We will call

12   Felisha Dexter.

13               THE COURT:  Okay.

14               THE COURTROOM DEPUTY:  Please raise your right

15   hand.

16               Do you solemnly swear or affirm under penalty of

17   perjury that the testimony you shall give in this cause will

18   be the truth, the whole truth, and nothing but the truth?

19               THE WITNESS:  I do.

20               THE COURTROOM DEPUTY:  Please state and spell your

21   name for the record.

22               THE WITNESS:  Felisha, F-e-l-i-s-h-a, M. Dexter,

23   D-e-x-t-e-r.

24               THE COURTROOM DEPUTY:  Thank you.  You may take

25   the witness stand.

1          THE COURT:  All right.  Miss Dexter, you've heard

2     the warnings that I gave to the other witnesses about not

3     speaking too quickly and speaking into the microphone and

4     waiting until the question is finished before you begin

5     answering.  All right?

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  All right.

8          Go ahead.  You may proceed.

9               FELISHA M. DEXTER,

10    having been first duly sworn by the Courtroom Deputy,

11    testified as follows:

12               DIRECT EXAMINATION

13    BY MS. DURHAM:

14    Q.    Miss Dexter, please introduce yourself to the jury.

15    A.    My name is Felisha M. Dexter.

16    Q.    And Miss Dexter, are you currently employed?

17    A.    Yes, I am.

18    Q.    Where are you employed?

19    A.    I am employed with Bridges International, which is a

20    work release center, still working with inmates in Bradenton,

21    Florida.

22    Q.    And are you employed with the Department of

23    Corrections?

24    A.    No, ma'am.

25    Q.    Who are you employed with now?

1   A.    Bridges International.

2   Q.    Okay.  It's a private --

3   A.    Yes, ma'am.  It's a private company that cares for

4   inmates that are close to being released.

5   Q.    Okay.  When did you depart the Department of

6   Corrections?

7   A.    October the 6th, 2011.

8   Q.    So how did you -- why did you leave the Department of

9   Corrections?

10  A.    It was time, after 20 plus years.  I left the

11  Department of Corrections and chose a job that was working

12  with 120 inmates as opposed to 1200 inmates.

13  Q.    Okay.  Where were you employed when you left the

14  Department of Corrections?

15  A.    At Polk Correctional Institution.

16  Q.    And how long had you been employed at Polk Correctional

17  Institution?

18  A.    I started my career at Polk Correctional Institution in

19  March 17th of 2000 -- I mean, excuse me, 1992.  And I got

20  promoted at Zephyrhills Correctional Institution, which was a

21  mental health institution in the year 2000.  And in the year

22  2008, I lateraled back to Polk Correctional Institution as a

23  captain.  And there is where I ended my career, which gave me

24  11 years with working at Polk Correctional Institution.

25  Q.    Okay.  While at Polk, were you familiar with an inmate

1   by the name of Terry Sears?

2   A.    Yes, ma'am.

3   Q.    What type of dorm did the inmate stay in?

4   A.    There were different levels of housing.  Ones, twos and

5   threes.  They categorize by the level of --

6           MS. LEE:  Your Honor, we would object at this time

7   to the relevance of this question.

8           THE COURT:  Well, I think -- are you --

9           MS. DURHAM:  This is what we probably should

10  approach about, Your Honor.  Remember, you said we shouldn't

11  approach unless it was like sensitive?

12          THE COURT:  All right.  That's fine.  You can

13  approach.

14          (The following was held at sidebar:)

15          MS. DURHAM:  He was in a high security dorm, which

16  is why they were all alert.  And it deals with their state of

17  mind about how they dealt with Mr. Sears.

18          MS. LEE:  Your Honor, I don't know that we need to

19  go through all the different dormitories and specify that

20  Mr. Sears was connected to --

21          THE COURT:  I don't want it that it's so

22  prejudicial, and that is my concern.  Now, I'll let you --

23          MS. LEE:  Further, we haven't established yet -- I

24  mean, keep in mind, Plough hasn't testified.  I don't think

25  Smith will testify.  And Miss Dexter hasn't yet testified nor

 1   have any of the other defendants.  We actually don't know

 2   what their state of mind was.

 3            MS. DURHAM:  We're talking about -- right now

 4   we're talking about Miss Dexter.  She has a right to defend

 5   her case.

 6            THE COURT:  But it can't be so prejudicial that

 7   its prejudicial value outweighs its probative value.  You can

 8   touch on this.  You can touch on it, but not go into detail.

 9            MS. DURHAM:  What about he was housed in a dorm

10   with violent inmates?  That is why they dealt with him.  They

11   haven't testified, Your Honor, but I know what they will say.

12   And they can defend themselves in this case.

13            THE COURT:  I think they can.  You can give an

14   explanation, but it can't be so overly prejudicial, but you

15   can explain.  It's just going to be subject to objections.

16            MS. DURHAM:  What should I say, Your Honor?  I'm

17   willing to work with them.  What can I say?

18            THE COURT:  That's what I'm saying.  You can ask

19   her limited questions on this.  Okay.  I do need to let --

20   they need to explain why they're treating him that way.

21   That's my ruling.

22            MS. LEE:  Can we say high security dorm?  Again,

23   there hasn't been established --

24            THE COURT:  You can ask her was this a high

25   security.  That's fine.  That's fine.

1           MS. DURHAM:  That's not why they -- how they were

2    dealing with him, to keep him from escaping.

3           THE COURT:  I can only do one at a time.  I can

4    only do one at a time.  I think that you can go into this

5    area, just -- you don't need to overdo it.

6           MS. DURHAM:  No.  But I don't want to --

7           THE COURT:  All right.  I think this is enough.

8    We need to move on.

9           (Sidebar ended.)

10          THE COURT:  Go ahead.

11   BY MS. DURHAM:

12   Q.   Miss Dexter, what type of dorm was Mr. Sears housed in?

13   You don't have to go through all the levels.  But what type

14   was he housed in?

15   A.   He was housed in a special housing unit for secure

16   cells.  They had to be in a cell that was with two people in

17   the cell only because of special grades.

18   Q.   And what do you mean by special grades?

19   A.   The reason that they came to prison, if they had any --

20   Q.   Well, don't go into the details, but --

21   A.   Okay.

22   Q.   Were there concerns with the -- I'll just ask you this.

23   A.   Okay.

24   Q.   Were there security concerns?

25   A.   Inmate concerns.  Inmates with security concerns were

1   housed in special housing units.

2   Q.    And was Mr. Sears a part of that dorm?

3   A.    Yes, ma'am.

4   Q.    Now, we're here about an incident that occurred on

5   March 28th of 2010.  Do you recall that incident at Polk

6   Correctional Institution?

7               MR. BELITZKY:  18th.

8   BY MS. DURHAM:

9   Q.    Oh, excuse me.  March 18th.

10  A.    I didn't until I got the first request to go to court a

11  couple of years ago.

12  Q.    Oh, I'm sorry.  I gave the wrong date.  The incident

13  occurred on March 18th, 2010.

14  A.    Yes, ma'am.

15  Q.    Do you recall that incident?

16  A.    I recall that incident.  Yes, ma'am.  The date was not

17  familiar to me until I got the request to go to court a

18  couple of years ago.

19  Q.    And that's why you're aware it was March?

20  A.    Yes, ma'am.

21  Q.    Okay.  Can you tell the jury, what were you doing on

22  March 10th -- excuse me, March 18th, on the date of this

23  incident, what were you doing?

24  A.    On that date, I was conducting my security rounds.  And

25  I started my checks on the north end of the compound, which

```
1  entails me having to go to each housing unit, walk through

2  the dormitories, make sure that everything is safe and

3  secure, have a conversation with the officers as to what's

4  been going on in the dorm, and see if there were any

5  problems.

6  Q.    What was your rank on that day?

7  A.    Correctional officer captain.

8  Q.    Okay.  And you were the OIC that day?

9  A.    Yes, ma'am.

10  Q.    What were your duties that day?

11  A.    Safety and security of the facility.  Making sure that

12  everything is going right that can go right and will go

13  right.

14  Q.    Okay.  At some point during that day, were you

15  approached by an inmate named Terry Sears?

16  A.    Yes, ma'am, I was.

17  Q.    Can you tell the jury what happened?

18  A.    I was on the south end of the compound, and I received

19  a radio transmission from Officer Dees who was assigned to

20  G dorm on the north end of the compound, which is the housing

21  unit that inmate Sears lived in.

22         And Officer Dees asked me what was my location.

23  And I told him that I was in Fox dorm.  So he called me on

24  the phone in Fox dorm, and he told me that inmate Sears was

25  looking for me.  And so I said, okay.  I said, I'm done on
```

1   this end of the compound.  I'm heading your way, anyway.

2          So before I got to the center of the compound, I

3   was approached by inmate Sears down by recreation.  And when

4   he was coming up the sidewalk, his arms were just out of

5   control and his mouth was just screaming and yelling.

6          And so by the time I got to him, Officer Plough

7   was behind me because he was coming out of recreation.  And

8   when he saw inmate Sears talking to me, Officer Plough just

9   continued up the sidewalk behind me.

10          So I told inmate Sears that I would not talk to

11   him while his arms were flailing all over everywhere, and I

12   told him to cuff up.  So he told me that he wasn't going to

13   cuff up.  He refused to cuff up.  Why do I need to cuff up?

14   I said, because I'm not going to talk to you while you're

15   agitated.

16          MS. LEE:  Objection, Your Honor.  That's hearsay.

17          THE COURT:  Sustained.

18          MS. DURHAM:  Your Honor, this is a statement by

19   the plaintiff.

20          THE COURT:  As to what other people -- as to what

21   other people said, it is hearsay.  As to what Mr. Sears said,

22   it's the statement of a party opponent.

23          MS. LEE:  I understand, Your Honor, but she's

24   testifying as to what she told to Mr. Sears.  That is

25   hearsay.

 1              THE COURT:  So she can -- she's here.  She's

 2    testifying.  She can testify as to what she said.  She can

 3    testify as to what Mr. Sears said.  She shouldn't testify as

 4    to what other third parties said, unless there is an

 5    exception.

 6              All right.  That is my ruling on that.  Go ahead.

 7    BY MS. DURHAM:

 8    Q.    Go ahead.

 9    A.    Okay.  So I told Officer Plough to apply wrist

10    restraints on inmate Sears.  And inmate Sears became

11    agitated, and stated that no MF'ing body was going to cuff

12    him up.

13              So I saw Officer Smith and Sergeant Prince coming

14    out of the back of C building, because they were making sure

15    that the building was cleared for count, because we were

16    going into count.

17    Q.    Let me stop you at that.  During count, are inmates

18    allowed to just go wherever they want to go?

19    A.    No, ma'am.

20    Q.    So was Mr. Sears out of place?

21              MS. LEE:  Objection, Your Honor.  What is the

22    relevance of this question?  We haven't established that

23    Mr. Sears was involved in any count.

24              THE COURT:  I'm going to overrule it.  I think

25    she's trying to tell her story.  Go ahead.

1          THE WITNESS:  So when we're counting, all inmates

2    are to return to their housing assignment to be counted in

3    their housing areas unless they're in medical for some

4    specific reason, or they're in food service because they're

5    working during a lunch hour, preparing lunch.

6              So everyone is to be in a specific area and not on

7    the yard.  So the yard was being cleared for the noon count.

8    BY MS. DURHAM:

9    Q.    Okay.  So go ahead and finish telling what happened.

10   A.    So when inmate Sears approached me and I instructed

11   Officer Plough to cuff him up, he refused.  So I called

12   Sergeant Prince and Officer Smith over.  And I told inmate

13   Sears, I said, if you don't comply, we're going to use force

14   on you, we're going to use gas on you, we're going to spray

15   you with gas, which is a very small amount of force that's

16   used on somebody.  That's the least amount of force that

17   we're allowed to use without authorization.

18              So inmate Sears continued to say he was not going

19   to cuff up for any MF-ing body.  And so Sergeant Prince

20   attempted to cuff inmate Sears.  Inmate Sears continued to

21   refuse.  And he stated, I'm going to make y'all use force on

22   me today.

23              And so when Sergeant Prince reached out to grab

24   his hand to put his hand behind his back, he said, if you

25   don't cuff up, I'm going to spray you.

1          And so at that time, Sergeant Prince reached for

2     his canister, which was on the left side of his body because

3     he's a left-handed person.  So he reached for his canister.

4     He broke the seal.  And inmate Sears refused to cuff up.  So

5     Sergeant Prince hit him with the spray.  And Officer Plough

6     and Officer Smith helped him over to the grass.

7          But before that, inmate Sears -- once Sarge

8     sprayed him with the gas, inmate Sears charged Sarge, and hit

9     him on the right side of his body, on his head and his

10    shoulder.

11         And so Officer Plough and Officer Smith then took

12    him down to the -- they placed him on the ground, and they

13    restrained him.

14         And once they restrained him, they picked him up,

15    they lifted him up in an escort hold.  We walked him over to

16    medical.  Medical was too crowded.  There were so many

17    inmates in there that were being seen by the nurses and the

18    doctors.

19         We went out the back door of medical, and we

20    walked down the sidewalk into the back side of confinement.

21    We went through the confinement door, and took him into a

22    cell for him to be decontaminated.

23         Prior to my going -- us going into that building,

24    into medical, I radioed for someone to bring a camera to

25    medical for the post use of force exam, which is what's

1  required after a spontaneous use of force.

2  Q.    Okay.  Let's back up now.

3          When you were first encountered by inmate Sears,

4  did you have a camera on you?

5  A.    No, ma'am.

6  Q.    Can you tell the jury why it is you wouldn't have had a

7  camera on you?

8  A.    Cameras are -- cameras at that time were sealed in

9  cabinets.  And they were located in specific locations, so

10  you just didn't walk around the compound with a camera in

11  your hand waiting to take videos of things going on on the

12  compound.

13          So in order for you to get a camera, you had to

14  break a seal, log that break, and then utilize the camera.

15  Q.    Are you familiar with the rules about uses of force

16  from 2010?

17  A.    Fairly.

18  Q.    Fairly?  Did you make a report about the incident?

19  A.    Yes, ma'am.

20  Q.    Would that report refresh your recollection as you

21  testify today?

22          MS. LEE:  Your Honor, is there a question pending?

23          THE COURT:  Is there?

24          MS. DURHAM:  Well, Your Honor, I'm just going to

25  go ahead and ask that this be admitted into evidence.  I'll

 1  ask her, can you identify this document?

 2          MS. KERR:  Which document?

 3          THE COURT:  She -- so normally with a report,

 4  normally people don't testify from reports.  So I'm not going

 5  to let her look at that report unless she can't answer the

 6  questions.  And did you show -- does opposing counsel know

 7  what you're going to show her?

 8          MS. DURHAM:  Well, we -- I told her earlier what I

 9  was going to --

10          MS. LEE:  Which number?  Can you just show them to

11  me?

12          THE COURT:  Okay.  You need to stay at the podium

13  when you say something, Miss Durham, so I can hear you.

14          MS. DURHAM:  Yes, Your Honor.

15          THE COURT:  All right.  Normally, I don't allow a

16  witness to testify from a report, unless they just absolutely

17  have no memory of it.

18          MS. DURHAM:  Okay.

19          THE COURT:  All right.  We need to get moving.

20          MS. DURHAM:  Yes, Your Honor.

21  BY MS. DURHAM:

22  Q.    You wrote an incident report about the incident?

23  A.    Yes, ma'am.

24  Q.    Do you recall when the -- do you recall who used the

25  video camera?  You said you sent for the video camera.  Do

1  you recall who appeared?

2  A.    Sergeant Voorhees.

3  Q.    And do you recall what time -- where he was when he

4  started to video?

5  A.    In confinement.

6  Q.    In confinement?

7  A.    Yes, ma'am.

8  Q.    So he would have been in a -- that's when he was taking

9  his shower or --

10  A.    Yes, ma'am.  We took him directly into the shower.

11  Probably about 11:25 when we got there, maybe.  And he was

12  placed in the shower right there next to the officer's

13  station.

14        And so Sergeant Voorhees was positioned right next

15  to the officer's station with the camera facing upward from

16  the waist up, videotaping inmate Sears.

17  Q.    Okay.  We'll stop there for a moment.

18        MS. DURHAM:  Your Honor, I would like to use the

19  assistance of a diagram just for demonstrative purposes.

20        MS. LEE:  That's okay.

21        THE COURT:  Okay.

22        MS. DURHAM:  And I've provided it to counsel.

23  This is defendant's demonstrative Exhibit 1.  Can I publish

24  it to the jury?

25        THE COURT:  Yes, you may.  Of course.

1   BY MS. DURHAM:

2   Q.     Do you recognize what that diagram -- what it is?

3   A.     Yes.  It's a bad diagram of the compound.

4   Q.     You said bad?

5   A.     Yes.  It's a bad diagram of Polk's compound.

6   Q.     Does it accurately represent the way the compound

7   appeared on March 18th, 2010?

8   A.     Yes, ma'am, pretty much.  Yes, ma'am.

9   Q.     Can you draw on that diagram where you were when you

10  were met by inmate Sears.

11  A.     Inmate Sears approached me, it was right up in this

12  area (indicating).

13  Q.     Can you draw a circle around it.  Oh, you put an I?

14  Draw a circle around it.

15  A.     (Witness complies.)

16  Q.     Okay.  Where is that?

17  A.     That is the space that's between the multipurpose

18  building and the canteen.

19  Q.     Okay.  Now, can you show us where building C is?

20  A.     That would be this building right here, the security

21  building.

22  Q.     Okay.  Now, can you show us where the visiting park is?

23  A.     The visiting park is this area back out here, this

24  area.

25  Q.     Okay.  And can you show us where the corridors are to

1    the visiting park?

2    A.    There is no corridor.  There is a door that's right

3    back here, and that door just leads into this building.

4    There is no corridor.

5    Q.    Can you show us where colonel -- do you know where

6    Colonel Roberts' office was at that time?

7    A.    Colonel Roberts' office would have been back over in

8    here.

9    Q.    I'm sorry.  Where?

10    A.    I'm assuming this is supposed to be medical over here.

11    Let me erase that.  So this is a security building.  Colonel

12    Roberts' office would have been in that corner right there.

13    Q.    Okay.  Do you know if it was possible just to walk in

14    Colonel Roberts' office?

15    A.    There is a possibility to just walk into that building

16    where this door is here.  That door is usually unlocked

17    during the day so all staff would have access to that

18    building.  And this door on this side is secured all the

19    time.  You have to have a key to access this side.

20          So if somebody were to come into the building on

21    this side of the building, they would have access to that

22    office.  But then Lieutenant Hart's office was right there

23    when you turned the corner to go to Colonel Roberts' office.

24    His office was right there, and you had to pass him to get to

25    Colonel Roberts.  And usually, that was a no-go, unless you

1    had a pass to be in the building.

2              And in order to get a pass, you had to have

3    someone call up to the building and say, so and so needs to

4    see the colonel or so and so needs to see the lieutenant or

5    the captain, whomever is in that building.  And they would

6    say, okay, let me find out if they can see them.

7              And if they can see them, they'll get a pass to

8    the building and they'll go up.  Other than that, you're not

9    allowed in that building without a pass.

10   Q.    And how are inmates given passes?

11   A.    From the housing officers.

12   Q.    So Lieutenant Hart would have been the block to getting

13   to Colonel Roberts?

14   A.    Yes, ma'am.

15   Q.    Okay.  Now, can you -- can you show the jury where it

16   was that -- where you all were when Mr. Sears was sprayed

17   with the chemical agent and when he was taken down.

18   A.    We were right up in this area here.

19   Q.    Okay.  Now, you said that they took him over to the

20   grass --

21   A.    Yes, ma'am.

22   Q.    -- and took him down?  Did you see anyone slam him to

23   the ground?

24   A.    No, ma'am.

25   Q.    Can you tell the jury how they took him down?

1    A.    Officers Plough and Smith each had an arm, and they had

2    him in the escort hold.  And they placed him down on the

3    ground in the escort hold so that they could apply wrist

4    restraints on him.

5    Q.    Was he shackled?

6    A.    No, ma'am.  We don't have shackles on the compound.

7    Q.    Where was he handcuffed when he was taken down?

8    A.    He was handcuffed when he was placed on the ground.

9    That's when Officers Plough and Smith applied the wrist

10   restraints.

11   Q.    Let me ask you, was he complying when you all were

12   trying to handcuff him?

13   A.    Not really.

14   Q.    Can you explain what you mean, not really?  Did y'all

15   have to stress -- well, you weren't a part of putting the

16   handcuffs on him?

17   A.    No, ma'am.

18   Q.    Did Smith and Plough have to struggle with him to

19   handcuff him?

20   A.    Yes, ma'am.  He was cussing them a little bit.  And

21   when they put the wrist restraints on him, they stood him up,

22   and he walked over to medical.

23   Q.    Did anyone spray him after they picked him up?

24   A.    No, ma'am.

25   Q.    Did you see anyone hitting, punching or kicking him?

1   A.    No, ma'am.

2   Q.    During this incident, did you tell them not to cuff

3   Mr. Sears?

4   A.    No, ma'am.

5   Q.    Were you the one who instructed them to cuff Mr. Sears?

6   A.    Yes, ma'am.

7   Q.    Were you walking around, talking with Mr. Sears on this

8   day?

9   A.    No, ma'am.  The only thing I said to inmate Sears when

10  he approached me was, I'm not going to talk to you while

11  you're agitated like this.  And he kept yelling, I need you

12  to do something with Officer Dees.  Officer Dees is harassing

13  me.  I need you to do something with Officer Dees.

14           I said, I'm not talking to you while you're

15  agitated like this.  I said, I need you to cuff up.  I'm not

16  cuffing up.  Why I got to cuff up?  So then I asked Officer

17  Plough to cuff him, and he still refused.

18  Q.    And why is it that you felt the need to have him cuff

19  up?

20  A.    Because I could have been in a dangerous situation with

21  inmate Sears because I don't know what his mindset was at

22  that moment.  So for my safety and the safety of the inmate,

23  I wanted him to cuff up.

24  Q.    Now, you all -- after this -- okay.

25           Let me ask you, did you see Colonel Roberts and

1    Lieutenant Hart when you were with Mr. Sears --

2    A.    No, ma'am.

3    Q.    -- when the incident started?

4    A.    No, ma'am.

5    Q.    Okay.  So you all escorted him to medical.  Did he make

6    any complaints on the way to medical?

7    A.    Just that his eyes were burning.

8    Q.    And let me ask you, do you recall how far Mr. Prince

9    was from him -- Sergeant Prince was from him when he

10   administered the chemical agent?

11   A.    Probably three feet.

12   Q.    Is that a normal range?

13   A.    Yes, ma'am.

14   Q.    But the ranges can vary?

15   A.    Yes, ma'am.

16   Q.    Depending on what?

17   A.    The size of the canister, the distance between the two

18   people, and the situation itself.

19   Q.    Can you estimate roughly, what was the size of the

20   canister?

21   A.    The canister probably was about, I would say, six to

22   eight inches long, and probably about two to three inches in

23   circumference.

24   Q.    Did you see Sergeant Prince empty the can on -- or

25   spray him for 16 minutes?

1    A.    No ma'am.  The cans are weighed every morning prior to

2    being issued, and directly after any use of force or anytime

3    the seal is broken, even if there was no force used.  The

4    canister is weighed again to see if there is a loss of gas

5    from the can.

6    Q.    Do you recall how much was sprayed out of this can?  If

7    you don't, that's fine.

8    A.    A little over two grams, which is less --

9              MS. LEE:  Objection, Your Honor.  First, the

10   witness is speculating.  And second, that testimony lacks a

11   lot of meaning when you're considering contents that are

12   understand pressure.  We don't know the weight of the

13   canister.

14             THE COURT:  You can -- the question was, do you

15   recall how much was sprayed out, and she answered the

16   question.  So you can cover that in cross-examination.

17             MS. LEE:  Thank you, Your Honor.

18             THE COURT:  Overruled.

19   BY MS. DURHAM:

20   Q.    And let me ask you, did you have a canister on you that

21   day?

22   A.    Yes, ma'am.

23   Q.    Did you give your canister to Mr. Prince?

24   A.    No, ma'am.

25   Q.    Are you allowed to be -- during that time, were you

1  allowed to be involved in the use of force?

2  A.    A white shirt, as we're called, a supervisor doesn't

3  get involved in a use of force, because you have to give

4  direction to the staff that are using force.  So we're not

5  allowed to get involved unless it becomes absolutely

6  necessary, and there is no way around it.

7  Q.    Were you watching anyone use excessive force on

8  Mr. Sears on that day?

9  A.    No, ma'am.

10  Q.    Now, you followed the escort to medical?

11  A.    Yes, ma'am.

12  Q.    And on the way to medical, did you see anyone hit,

13  kick, or knock Mr. Sears to the ground?

14  A.    No, ma'am.

15  Q.    Did Mr. Sears make any complaint to you about being

16  abused on that day?

17  A.    No, ma'am.

18  Q.    Now, you all went to medical.  And what was he allowed

19  to do?

20  A.    We didn't go to medical.  We didn't stay in medical,

21  because he was still acting out.  So we went out the back

22  door of medical and directly into Y dorm.

23  Q.    Tell us why you said he was acting out.  Well, tell us

24  what you mean by acting out.

25  A.    He was still yelling and cursing and just being

1   agitated and aggravated.  And so medical was not a place for

2   him with that gas on him and his state of mind at that time.

3   I won't say state of mind, I take that back.  The way he was

4   acting.  His actions led us to take him directly to Y dorm

5   instead of taking him into medical.

6   Q.    Okay.  So he went and took a shower?

7   A.    Yes, ma'am.

8   Q.    And did someone from medical come to examine him?

9   A.    Yes, ma'am.

10  Q.    Now, when you all were taking him through medical, you

11  said you -- did you see anyone kick him and hit him and he

12  fell to the ground?

13  A.    No, ma'am.

14  Q.    Was he yelling?

15  A.    Yes, ma'am.

16  Q.    And what -- you probably don't recall what he was

17  saying?

18  A.    I don't remember what he was yelling, the words he was

19  yelling.  But he was talking about the spray in his eyes, it

20  was burning, which is normal.

21  Q.    Now, during the use of force, did any spray get on you?

22  A.    We all got spray on us, because it was a little bit

23  breezy, so we all got a touch of the spray.

24  Q.    And what effect did the spray have on you?

25  A.    Not good.  I'm asthmatic, so it was uncontrollable

1    coughing from that point forward.

2    Q.    Okay.  And when Mr. Sears -- when Mr. Voorhees arrived

3    with the video, what were you supposed to do?

4    A.    When Mr. Voorhees arrived with the video, what he was

5    supposed to do was to continue recording.  He was to start

6    recording from the point that the force was ending, and that

7    was when Sears was placed in the shower.

8              And so once he was placed in the shower, that's

9    when Mr. Voorhees arrived back there, and he started

10   recording everything after what happened on the compound.  So

11   that was where his recording was supposed to start.

12   Q.    Okay.

13   A.    And he -- it was just such a high, agitated day that a

14   lot of things were not done.

15   Q.    Okay.  And you were supposed to give the lead-in

16   statement?

17   A.    No, ma'am.  There's no lead-in statement during a

18   spontaneous use of force.  A lead-in is only during planned

19   forces.

20   Q.    So what were you supposed to do?

21   A.    I was supposed to do nothing until the end.  And at the

22   end, I was supposed to introduce everyone and ask anyone if

23   they had any injuries.  And once he's secured in the cell,

24   then that's when all force ceases with us.

25   Q.    Okay.  Did you do that?  Like, did you ever talk to the

1  warden about you guy's performance?

2  A.    Yes, ma'am.

3  Q.    What -- do you recall what the warden said?

4  A.    Yes, ma'am.  He asked me why was I coughing so much.

5  And I explained to him that I'm asthmatic, and that's why I

6  avoided using chemical agents at all costs.  And so then we

7  talked about me not introducing the staff, and that was it.

8  Q.    Did you explain to him why you didn't?

9  A.    I did.

10 Q.    And why didn't you?

11 A.    I could barely breathe.

12 Q.    Okay.  Now, after the camera turned off, there was a

13 video taken; correct?

14 A.    Yes, ma'am.

15 Q.    Did you receive the video from Sergeant Voorhees?

16 A.    Yes, ma'am.

17 Q.    And how did you receive it?

18 A.    I received it from him.  It was in an evidence bag, and

19 he gave me a chain of custody letter with it.  And I signed

20 off on the chain of custody letter that I had received it

21 from Sergeant Voorhees.  And once I signed my name on it, I

22 dropped it in the box.  And that's the last I saw of it.

23 Q.    Do you know whether or not the warden watched the

24 video?

25 A.    I can't say that the warden watched the video.  I can

 1   only say that he made comments.  So when he spoke to me, that

 2   gave me an idea that he had watched the video.  So that's my

 3   knowledge.

 4   Q.    And when you were in the shower area -- did you go to

 5   the shower area?

 6   A.    Yes, ma'am.

 7   Q.    Were you allowed back where he was showering?

 8   A.    No, ma'am, I was not.  I was in the area, but I was not

 9   on the side where the camera was.  I was back up near the

10   officer's station.

11   Q.    Okay.  Do you recall seeing Lieutenant Hart and Colonel

12   Roberts there?

13   A.    Yes, ma'am.

14   Q.    Where were they?

15   A.    In the foyer of Y dorm.  There is a glass partition in

16   the officer's station.  And then directly across from the

17   officer's station, there is a hearing room.  And they were in

18   that foyer area right there, and they were looking into the

19   housing area.

20   Q.    Did you ever see Colonel Roberts taking pictures of

21   Mr. Sears with her cell phone?

22   A.    No, I did not.

23   Q.    Can you see from where the incident occurred to the

24   visiting park?

25   A.    No, ma'am.

1    Q.    Do you recall -- when Mr. Sears was taken down to the

2    ground, do you recall how long he stayed down there?

3    A.    It could have only been a couple of minutes.

4    Q.    So this whole incident didn't take 16 minutes?

5    A.    No, ma'am.

6    Q.    And you indicated that you did prepare a report about

7    this incident?

8    A.    Yes, ma'am.

9    Q.    What did you do as a supervisor regarding the reports?

10   A.    Once the incident reports and the use of force reports

11   were written, they were placed in a packet, and turned over

12   to the colonel for processing.

13   Q.    Which colonel?

14   A.    Colonel Roberts.

15   Q.    Okay.  Whose incident reports did you review?

16   A.    I reviewed Sergeant Prince, Officer Plough, Officer

17   Smith.  And Sergeant Voorhees didn't really have a lot to

18   say, but I signed off on his incident report, I believe, as

19   well, and two nurses, Nurse Willis and Brandy.

20   Q.    You don't remember her name?  Cooper?

21   A.    Yes, Nurse Cooper.

22         MS. DURHAM:  Your Honor, may I approach the

23   witness?

24         THE COURT:  You may do so.

25         (Document tendered.)

1  BY MS. DURHAM:

2  Q.    Do you recognize this?

3  A.    Looks like the incident report that we did -- that I

4  did for that day.

5        MS. DURHAM:  Your Honor, at this time, the state

6  would offer into evidence -- excuse me, the defense would

7  offer into evidence Defense Exhibit 3-A.

8        THE COURT:  Defense Exhibit 3-A.  Is there any

9  objection to 3-A?

10        MS. LEE:  Yes, Your Honor.

11        THE COURT:  Then you need to give me 3-A so I can

12  look at it.

13        (Document tendered.)

14        THE COURT:  Thank you.

15        MS. LEE:  Your Honor, when you're ready, I'll

16  proceed with my --

17        THE COURT:  Yes.  Just give me a quick second.

18        Okay.  What is your objection?  If you think you

19  need to do it at sidebar, that's okay.

20        MS. LEE:  I think that's appropriate.

21        THE COURT:  Okay.

22        (The following was held at sidebar:)

23        MS. LEE:  Your Honor, you've already decided this

24  statement right here, its prejudicial value far outweighs any

25  probative value that it may have.

```
 1              THE COURT:  Let me just say, on criminal cases,

 2    reports don't come in.

 3              MS. LEE:  Absolutely.

 4              THE COURT:  Not one.

 5              MS. LEE:  It's cumulative.

 6              THE COURT:  Well, I know that.  But just because

 7    something is a report, just because it comes in under the

 8    business records exception doesn't mean it's accepted all the

 9    time.

10              MS. LEE:  It's absolutely unnecessary.  All of

11    these witnesses are here to testify today, Your Honor.

12    Miss Roberts and Miss Dexter can testify to the statements

13    that they made in here.

14              THE COURT:  I think so, too.  I think its

15    prejudicial value outweighs the probative value.  So I will

16    not receive this into evidence.

17              MR. BELITZKY:  For the record, Your Honor, we

18    would state our objection.

19              THE COURT:  That's fine.  You have your objection

20    in the record.

21              MS. LEE:  Thank you, Your Honor.

22              THE COURT:  Thank you.

23              (Sidebar ended.)

24              THE COURT:  You may proceed.

25              MS. DURHAM:  One moment, Your Honor?
```

1          THE COURT:  Sure.

2          MS. DURHAM:  That's it, Your Honor.

3          THE COURT:  Thank you.  Any cross-examination of

4  this witness?

5          MS. LEE:  Yes, Your Honor.

6          THE COURT:  You may proceed.

7                    CROSS-EXAMINATION

8  BY MS. LEE:

9  Q.    Good afternoon, Miss Dexter.

10 A.    Good afternoon.

11 Q.    Miss Dexter, you just testified to the events that

12 occurred on March 18th, 2010, involving yourself, several

13 other correctional officers and Mr. Terry Eugene Sears; is

14 that correct?

15 A.    Yes, ma'am.

16 Q.    Miss Dexter, on that day, March 18th, 2010, Mr. Sears

17 did not touch you; did he?

18 A.    No.

19 Q.    And he did not threaten you; did he?

20 A.    He was verbally threatening.

21 Q.    He was verbally threatening you?

22 A.    He was verbally threatening with his voice and his

23 actions.  His arms were in the air waving all over every

24 where.

25 Q.    Excuse me, Miss Dexter.

1          MS. DURHAM:  Your Honor, may she be allowed to

2     please answer the questions.

3          THE COURT:  She should be allowed to answer the

4     questions.  Go ahead.

5          THE WITNESS:  He was yelling at me, I need you to

6     do something with Officer Dees, I'm tired of Officer Dees.

7     He's aggravating me.  You need to do something with Officer

8     Sears (sic), and his arms is just all over everywhere, and

9     he's yelling at me.  So I felt threatened.

10    BY MS. LEE:

11    Q.    Miss Dexter, did you see Mr. Sears testify yesterday

12    and today?

13    A.    Yes.

14    Q.    And are you aware that some people, sometimes Italian

15    people, tend to speak with their hands?

16    A.    I speak with my hands.

17    Q.    You do?

18    A.    I do.

19    Q.    Okay.  And Miss Dexter, just a few moments ago, you

20    testified that inmates are not allowed in the yard during

21    count; is that correct?

22    A.    That's right.

23    Q.    And Miss Dexter, you also made a statement in relation

24    to this case; is that correct?

25    A.    I made a statement?  Can you --

1    Q.    You made a statement after the use of force incident.

2    A.    I made a statement after the use of force incident in

3    what manner?

4    Q.    You filled out a use of force report, and you made a

5    statement to Mr. Alexander, I believe Sergeant Alexander; do

6    you recall that?

7    A.    Sergeant Alexander?

8    Q.    Yes, Miss Dexter.

9    A.    No, I don't.

10   Q.    Do you remember filling out a use of force report,

11   Miss Dexter?

12   A.    I do.

13   Q.    You do.  And in that use of force report, you knew that

14   it was important to include all of the facts; is that

15   correct?

16   A.    Yes, ma'am.

17   Q.    And you did include all of the facts in that report; is

18   that correct?

19   A.    To my knowledge.

20   Q.    Absolutely.  Because you knew that it could come up

21   later on in, perhaps, a disciplinary hearing?

22   A.    Yes.

23   Q.    And Miss Dexter, I am going to hand you a copy of part

24   of that statement, or I'm sorry, that use of force report.

25              MS. LEE:  Would Your Honor like a copy?

1           THE COURT:  If you have one, that would be

2     terrific, thank you.

3              (Document tendered.)

4     BY MS. LEE:

5     Q.    Miss Dexter, go ahead and take a moment for that,

6     please, and look up when you're ready.

7     A.    Okay.

8     Q.    Are you ready, Miss Dexter?

9     A.    Yes.

10    Q.    I would ask that you please turn that statement over.

11    Thank you, Miss Dexter.

12              Miss Dexter, could you please tell me where in

13    that statement it says anything about inmates not being

14    allowed on the yard during count?

15    A.    This report had nothing to do with inmates being

16    allowed on the yard at count.

17    Q.    But it's not in that report, is it, Miss Dexter?

18    A.    No.  It's not in that report in reference to count, no.

19    Q.    Miss Dexter, you also testified a moment ago that you

20    ordered Mr. Sears to cuff up; is that correct?

21    A.    I did.

22    Q.    Okay.  And Miss Dexter, you may take a look at that

23    report again, and please let me know when you're ready.  If

24    you don't think you need to, that's fine.  I can continue.

25    A.    Continue.

1  Q.    Do you remember what it said?  Could you please point

2  out where in that report it says that you personally told

3  Mr. Sears to cuff up.

4  A.    Sometimes when you're writing a report, there are

5  things that you don't recall at that moment.

6  Q.    But, Miss Dexter, you knew that it was important to

7  include all of the important facts in that report?

8  A.    Okay.

9  Q.    And you didn't include the fact that you told Mr. Sears

10 to cuff up?

11 A.    Okay.

12 Q.    And Miss Dexter, again, back to the same report, could

13 you show me in that report where you told Mr. Sears that you

14 were going to use gas on him if he did not cuff up?

15 A.    It says, at that time, I advised him we would use force

16 on him if he did not comply, meaning gas.

17 Q.    Miss Dexter, you just testified that you told him you

18 would use gas on him if he did not comply.

19 A.    Gas is force.

20 Q.    Miss Dexter, in that report, could you please show me

21 where it says that medical was too crowded for Mr. Sears?

22 A.    It does not say it in this report that medical was too

23 crowded.  I was the shift supervisor.  When we entered the

24 back door, the building was full of inmates.  We went out the

25 back of medical, through the infirmary, and out the back door

1   of medical to Y dorm.

2   Q.    Miss Dexter, you testified a moment ago that you had to

3   go to the Y dormitory because Mr. Sears was acting out; isn't

4   that correct?

5   A.    He was acting out.

6   Q.    And Miss Dexter, could you please show me in that

7   report where it says that Mr. Sears was acting out, and

8   that's why you had to bring him to the Y dormitory?

9   A.    It does not say that.

10  Q.    It does not say that in that report.  That report was

11  supposed to be a complete recollection of the facts from

12  March 18th; wasn't it, Miss Dexter?

13  A.    It was a complete recollection of the facts.

14  Q.    But it missed some of the facts that you just testified

15  to today, Miss Dexter.

16  A.    And if I continue to think back about things that

17  happened, I would find other things that happened that

18  weren't included in the report.

19  Q.    Miss Dexter, you testified just a moment ago that you

20  radioed for a camera once you reached the administrative

21  confinement building; is that correct?

22  A.    I radioed for the camera when we got to the back of H

23  dorm, which is medical.  When we were going through the side

24  of the door, I said I need a camera to Y dorm.

25  Q.    What kind of radio did you have?

1   A.    The one that the state supplied.

2   Q.    Is it like a -- is it on your chest or is it more like

3   a handheld?

4   A.    It was clipped onto my belt.  And I had a radio mic on

5   my shoulder.

6   Q.    Okay.  So Miss Dexter, were you wearing that radio mic

7   when this use of force incident began out on the yard?

8   A.    Yes, I was.

9   Q.    And did you radio for a video camera at that time after

10  you had warned Mr. Sears that you were going to use force on

11  him?

12  A.    No, I did not.

13  Q.    And Miss Dexter, you testified a moment ago that you

14  thought perhaps two grams of pepper spray had been used

15  against Mr. Sears; is that correct?

16  A.    Yes, ma'am.

17  Q.    And do you believe that that is accurate right now?

18  A.    You want me to look back at my report?

19  Q.    If it would help refresh your recollection.  Not that

20  one.  I'm going to give you a different one.

21  A.    In this report it says that 6.4 grams were used.

22  Q.    Okay.  So not two grams, 6.4?

23  A.    Yes, 6.4 grams.

24  Q.    And that was, in fact, so much spray, that you

25  testified yourself you were having trouble breathing?

1   A.    I have trouble breathing when I use pepper in the

2   kitchen.

3   Q.    I sneeze sometimes, too.

4         And Miss Dexter, at the beginning of your

5   testimony, I believe you stated that you received a radio

6   call from Officer Dees regarding Mr. Sears; is that correct?

7   A.    He called me on the radio and asked me my location, and

8   then he called me on the phone.

9   Q.    Miss Dexter, could you please show me in that same

10  report that you have up there with you where it says that you

11  received a radio call or a phone call from Officer Dees

12  regarding Mr. Sears?

13  A.    That had nothing to do with the use of force report so

14  it wasn't mentioned.

15  Q.    It had nothing to do with the use of force report?

16  A.    Not at that moment, no, ma'am.  That was a separate

17  report written by Officer Dees.

18  Q.    Please wait for a question.  Thank you, Miss Dexter.

19        Miss Dexter, you testified that this incident

20  didn't last for 16 minutes; isn't that correct?

21  A.    No, it didn't.

22  Q.    Miss Dexter, could you please look at that report and

23  tell me the time that you stated the incident began?

24  A.    It was at 11:10.

25  Q.    11:10.  And Miss Dexter, did you just testify that you

1   told Mr. Scoot Voorhees to get a video camera at 11:27?

2   A.    No.

3   Q.    You didn't testify to that?

4   A.    No.  I said it was 11:27 when he arrived in

5   confinement.

6   Q.    So your testimony right now is that it was 11:27 when

7   Mr. Voorhees arrived in confinement?

8   A.    Yes, ma'am.

9             MS. LEE:  Your Honor, may I please approach?

10            THE COURT:  You may.

11            (Document tendered.)

12  BY MS. LEE:

13  Q.    Miss Dexter, could you please take a look at the

14  statement that I've just handed you, and look up when you are

15  ready.

16  A.    Okay.

17  Q.    And what time did Mr. Voorhees -- what time was

18  Mr. Voorhees instructed by you to get the video camera?

19  A.    11:27.

20  Q.    11:27.  Thank you, Miss Dexter.

21            And just a moment ago, you also testified that you

22  were not required to do a lead-in statement during a post use

23  of force video; is that correct?

24  A.    Yes.

25  Q.    That is correct.  And would the warden know whether or

1   not you were required to do a lead-in statement on a use of

2   force video?

3   A.    Yes.

4   Q.    Okay.  And Miss Dexter, are you aware that the warden

5   did review a video of this incident and made comments about

6   that video?

7   A.    Yes, I am aware.

8   Q.    And Miss Dexter, are you aware that the warden

9   criticized the video for the failure to do a proper lead-in

10  statement?

11  A.    He commented, yes.

12  Q.    That there was no proper lead-in statement?

13  A.    And I did not know that until after I saw the report.

14  Q.    And just one more question from -- I guess we don't

15  have the demonstrative up.

16          From the C building, is it at all possible to get

17  from the front stairs of the C building that face the

18  interior of the compound to the visiting park outside?  Is

19  that possible?

20  A.    From the front stairs?

21  Q.    I can get the demonstrative if it's not clear.

22  A.    There are no stairs to C building.  There are steps

23  inside the compound.

24  Q.    That's what I mean.

25  A.    But there are no steps on the front side.

1    Q.    Maybe the demonstrative will be helpful.

2              THE COURT:  That would be fine.

3    BY MS. LEE:

4    Q.    And I know you just did this, Miss Dexter, but could

5    you please just quickly circle the C building?

6    A.    All of this is C building.

7    Q.    Okay.  And show me where the visiting park is.

8    A.    The visiting park is the interior of this building here

9    and this area here.

10   Q.    So that front area that says security, is that indoors

11   or outdoors?

12   A.    That's outdoors.

13   Q.    That's outdoors.  Is it at all possible to get from

14   there to the back part of the visiting park that you just

15   circled?

16   A.    Yes, it's possible to get there.

17   Q.    It is possible.  Thank you, Miss Dexter.

18             MS. LEE:  If I could just have a moment to confer

19   with co-counsel?

20             THE COURT:  Sure.

21             MS. LEE:  Your Honor, we have no further questions

22   right now.

23             THE COURT:  Thank you.  Any redirect from the

24   defendant?

25             MS. DURHAM:  Yes, Your Honor.

1          THE COURT:  You may proceed.

2              REDIRECT EXAMINATION

3   BY MS. DURHAM:

4   Q.    Miss Dexter, it's possible to get through from the

5   visitors park to where this incident occurred, but you can't

6   see through it; is that right?

7   A.    No, ma'am.

8   Q.    And, again -- well, did you see anyone abusing

9   Mr. Sears --

10  A.    No, ma'am.

11  Q.    -- on March 18th, 2010?

12  A.    No, ma'am.

13  Q.    If someone had abused him, would you have reported it?

14  A.    Yes, ma'am.

15  Q.    Or would you have intervened to stop them?

16  A.    Yes, ma'am.

17  Q.    Do the rules allow you to order an inmate to cuff up if

18  you feel threatened?

19  A.    Yes, ma'am.

20  Q.    Do the rules allow an inmate to tell you, I'm not going

21  to cuff up, you can't make me cuff up, ain't no MF-ing body

22  going to cuff me?  Do the rules allow that?

23  A.    No, ma'am.

24  Q.    And disciplinary infractions are not crimes; correct?

25          MS. LEE:  Objection, Your Honor.  Counsel has used

1   several leading questions.  This is her own witness.

2               THE COURT:  That's true.  Sustained.

3   BY MS. DURHAM:

4   Q.    Can you tell the jury whether disciplinary infractions

5   are crimes?

6   A.    Yes, ma'am, they are.

7   Q.    They are violations of prison rules; correct?

8   A.    Yes, ma'am.

9   Q.    And what are you allowed to do when a prison rule is

10  violated?

11  A.    It depends on what kind of rule it is.  You have

12  different levels of things that you can use, a CC -- you can

13  write an inmate a CC, which is a corrective consultation for

14  an action that that inmate has committed.  You can write the

15  inmate a DR.  You can give an inmate extra detail duty.

16  Well, you can't do it, anymore.  It has to go through ICT.

17              You give them recommendations for an inmate to get

18  extra duty.  They'll give them extra duty instead of giving

19  them -- taking away gain time, which would find them guilty

20  for whatever infraction that they broke.

21              MS. LEE:  Your Honor, I don't mean to interrupt

22  the witness.  But this is beyond the scope of cross.

23              MS. DURHAM:  Your Honor, counsel asked if he

24  threatened her or --

25              THE COURT:  Well, I'll tell you what.  I'll let

1    you clarify some of these things.  But we need to move on.

2    Go ahead.

3    BY MS. DURHAM:

4    Q.    What determines or who makes the decision or do the

5    facts determine the action that the guard will take?

6    A.    It's usually the facts that determine the action and

7    how severe it was.  Say, for an instance, if an inmate cursed

8    at a staff member, and depending on what that person said and

9    what manner it was said in, then that officer could just say,

10   okay, I'm going to slough this off today saying you're having

11   a bad day, and I'm just going to give you some extra duty.

12           And they call C building and say, hey, Lieutenant

13   Hart, I'm going to give this inmate some extra duty because

14   he cursed in my presence.  I just want him to have extra

15   duty.

16           And if the inmate was cursing at the officer in an

17   aggressive manner, then that officer would call the shift

18   supervisor and say, I've got one I'm bringing to you to --

19           MS. LEE:  Your Honor, again, this is beyond the

20   scope of cross.

21           THE COURT:  Well, not for that objection.  I think

22   she's testifying in a narrative fashion.  On that objection,

23   I'll sustain it.  You need to ask a question and have her

24   answer.

25   BY MS. DURHAM:

1   Q.   Why did you make the decision to have Mr. Sears cuffed

2   on March 18th, 2010?

3   A.   Because he was so agitated and aggravated, and I was in

4   fear of my own life.  I don't know what his thought process

5   was.  So for my safety and his safety, I wanted him to be

6   cuffed.  And then I was going to talk to him after he was

7   cuffed, but he refused to be cuffed at all.

8              MS. DURHAM:  Nothing further.

9              MS. LEE:  Your Honor, I believe we just have one

10  or two.

11             THE COURT:  Yes.  You can do recross.  Of course.

12                     RECROSS-EXAMINATION

13  BY MS. LEE:

14  Q.   Miss Dexter, do you recognize this demonstrative that's

15  on the screen?

16  A.   Kind of, sort of.

17  Q.   What does it kind of, sort of look like?

18  A.   It's an aerial view of Polk.

19  Q.   Polk Correctional Institution?

20  A.   Yes.

21  Q.   Can you identify from this view where the C building

22  is?

23  A.   Kind of hard to tell.

24  Q.   And it's okay if you can't.  I can try a different way.

25  A.   It's too blurry.

1   Q.    Is that a little better?

2   A.    Yes, that's better.

3   Q.    Can you tell where C building is now?  You can use a

4   circle again, if that's helpful.

5   A.    C building would be ...

6   Q.    Don't worry about it, Miss Dexter.  We will ask it a

7   different way.  You can ignore the demonstrative for now.

8   A.    This looks backwards.

9   Q.    So, Miss Dexter, you testified a moment ago that you

10  can't see from the visitors park to the yard in front of

11  C building; is that correct?

12  A.    Yes.

13  Q.    Okay.  But if you were standing at the front of C

14  building and there is, of course, a corridor that goes from

15  the front of C building to the visitors park, from that area,

16  you could see the yard; couldn't you?

17  A.    From the front gate?

18  Q.    Not the gate to the institution, but rather the doors

19  on the other side, the part we just circled before?

20  A.    Yes.  That's at the front gate.  That's the only way

21  you can see into the visiting park is from the front gate.

22  Q.    But I'm asking if you can see into the yard, not into

23  the visiting park.

24  A.    Into the yard?  No.  If you're standing in the center

25  of the compound, which is where C building is, in the center

1  of the compound, across in front of food service, the whole

2  area is the yard.

3  Q.    Okay.  And if you're standing in the front of C

4  building, you can see that area in front of food service,

5  that concrete area where this incident occurred?

6  A.    Yes.

7  Q.    Okay.  Thank you, Miss Dexter.

8         And you also testified just a moment ago that if

9  you commit a disciplinary violation, that is a crime; is that

10 your testimony?

11 A.    Yes.

12 Q.    Okay.  Miss Dexter, isn't a disciplinary hearing a

13 procedure that's used to provide administrative due process

14 requirements to inmates?

15 A.    Yes, it is.

16 Q.    I understand, Miss Dexter, that there could be a

17 disciplinary violation that is also a crime.  But it's not

18 true, is it, Miss Dexter, that any disciplinary violation is

19 a crime such that you could be brought into a criminal court

20 and tried?

21 A.    Within the Department of Corrections, it is a crime.

22 Q.    It's a violation of a rule, Miss Dexter.

23 A.    It's a violation of a rule.

24        MS. DURHAM:  Your Honor, I believe she is --

25 objection.

1          THE COURT:   She answered the question.

2    BY MS. LEE:

3    Q.    You may finish.   It's a violation of a rule?

4    A.    It's a violation of a rule.

5          MS. LEE:   Okay.   Just one second, I'll confer with

6    co-counsel, but I believe we may be finished.

7          Your Honor, no further questions for this witness.

8    Thank you, Miss Dexter.

9          THE COURT:   Thank you.   Does the jury have any

10   questions for this witness?   I'll see counsel at sidebar.

11         (The following was held at sidebar:)

12         THE COURT:   "First, what is the officer takedown

13   like?   Is it one officer on each side?"

14         MS. LEE:   I think she did testify that it was one

15   officer on each side.

16         THE COURT:   Maybe the jury didn't get it.   So I

17   think it's okay.

18         "Is there a standard operating procedure on use of

19   force for officers with regards to use of force for chemical

20   restraint?"

21         MS. LEE:   I mean, I think she can answer that yes

22   or no.   But to state the entirety of the standard operating

23   procedure, that would be quite lengthy.

24         THE COURT:   What do you say?

25         MS. DURHAM:   I think she should answer it if she

1  can answer it.

2          THE COURT:  I think I'm okay with that.  Your

3  objection is noted but overruled.  There are several here.

4          "Was the inmate cuffed at the time of the pepper

5  spray being used?"

6          "How many officers are allowed to use control on

7  one inmate at a time?"

8          "Was medical too crowded or was it Mr. Sears'

9  behavior that he was not initially seen by medical?  She said

10  both.  Just wanted to clarify."

11          I'll let her answer unless you have an objection.

12  I think she can answer those.

13          "How frequently is pepper spray used at Polk?"

14          "What are the formal guidelines for use of pepper

15  spray?"

16          "Had Mr. Sears been sprayed before?"

17          MS. LEE:  No, I don't think we can get into that.

18  It's far too much.

19          THE COURT:  So no to this one.

20          MR. BELITZKY:  Yes, Your Honor.

21          THE COURT:  But yes to these?

22          MR. BELITZKY:  Yes, Your Honor.

23          THE COURT:  Okay.

24          (Sidebar ended.)

25          THE COURT:  Okay.  One series of questions I'm not

1  going to be able to answer, for the reasons that I've alluded

2  to earlier.  But the other three series, I will allow.

3          So what I'm going to do is I'm just going to ask

4  the court security officer, I hope that machine is working,

5  to put it up on the machine.

6          The question reads:  "What is the officer takedown

7  like?  Is it one officer on each side?"

8          So if the witness can answer.

9          THE WITNESS:  Yes.  It is one officer on each

10 side, and it's an escort takedown.  They each have an arm and

11 they've got the person to the ground.

12         THE COURT:  Okay.  Thank you.  The second

13 question.  There are three questions here.  We'll go one at a

14 time.

15         Number one.  "Was the inmate cuffed at the time of

16 the pepper spray being used?"

17         THE WITNESS:  No, he was not cuffed.

18         THE COURT:  Number two.  "How many officers are

19 allowed to use control on one inmate at a time?"

20         THE WITNESS:  It depends on the situation.

21 Usually, there are what's required for the situation.  With

22 that situation, it was only necessary for two people to take

23 him down to the ground, to place him on the ground, and so

24 that's all that was used.

25         And if you're doing a planned use of force, you

 1   can use as many as five people in a use of force.  So it's

 2   just depending upon the situation, the number of officers

 3   that you have in the use of force.

 4          THE COURT:  Okay.  Number three.  "Was medical too

 5   crowded or was it Mr. Sears' behavior that he was not

 6   initially seen by medical?"  And then the author says, in

 7   parentheses, "She said both.  Just wanted to clarify."

 8          THE WITNESS:  And it was both.  It was too

 9   crowded, and he was still acting out, cursing and carrying

10   on.  So my choice was to take him back to Y dorm, and wait

11   for medical to come back there and see him.

12          THE COURT:  Okay.  Thank you.  And we have the

13   next group of questions.

14          "Is there a standard operating procedure on use of

15   force for officers with regard to use of force or chemical

16   restraint?"

17          THE WITNESS:  Yes.  There is a procedure for

18   chemical use of force, as well as physical restraint.

19          THE COURT:  Okay.  We will mark these as court

20   exhibits, and then I'll allow the lawyers limited questions.

21   This was a defense witness.  So I'll ask the defense counsel,

22   Miss Durham, if you would like to ask a few follow-up

23   questions.

24          MS. DURHAM:  Yes.

25                  REDIRECT EXAMINATION

1   BY MS. DURHAM:

2   Q.   Can you describe for the jury, then, the procedure

3   regarding the use of chemical agents?  If you can recall it

4   at this time.

5   A.   Let's see.  Chemical agents -- it's been a hundred

6   years.  But when you apply chemical agents, you have to --

7   you're required to be a certain distance, and sometimes that

8   doesn't happen.  But you're required to be somewhere between

9   three to five feet from the person, and you're required to

10  spray from the chest up and ...

11  Q.   Well, how far was Mr. Prince away -- Sergeant Prince

12  away from --

13          MS. LEE:  Objection, Your Honor.  Asked and

14  answered on direct.

15          THE COURT:  Sustained.  Anything else?

16  BY MS. DURHAM:

17  Q.   It wasn't at pointblank range; correct?

18          MS. LEE:  Objection.  That's a leading question,

19  Your Honor, and it's asked and answered.

20          THE COURT:  Sustained.

21  BY MS. DURHAM:

22  Q.   When Mr. Sears was taken down, did they slam him down

23  on the cement?

24  A.   No, ma'am.  He was placed in the grass area.

25  Q.   What do you mean, he was placed in the grass area?

1  A.    He was -- he was running away.  And in his running away

2  motion, they both grabbed him by his arms from behind, and

3  just placed their hands in the middle of his back and placed

4  him down in the grass.

5           THE COURT:  That's normally all the questions I

6  permit.  It's normally two or three.  Thank you.

7           Would you like to ask a few questions on the

8  plaintiff's side?

9           MS. LEE:  Just a couple, Your Honor.  Thank you.

10          THE COURT:  That's fine.  Thank you.

11                    RECROSS-EXAMINATION

12  BY MS. LEE:

13  Q.    Miss Dexter, just a few moments ago you testified that

14  Mr. Sears was running away, which is when he was placed onto

15  the ground; is that correct?

16  A.    He was moving away from --

17  Q.    Is that correct?

18  A.    Yes.

19  Q.    Okay.  And Miss Dexter, I'm going to bring you a copy

20  of your statement, which earlier you testified was a true and

21  correct statement of all the things that happened on March

22  18th, 2018 [sic.].

23  A.    I have one.

24  Q.    Miss Dexter, would you please take a look at that

25  statement, and look up when you're ready.

1          MS. DURHAM:  I'm going to object because I believe

2     this was a follow-up to the questions and not a follow-up to

3     my question.

4          MS. LEE:  Absolutely, it is a follow-up.

5          THE COURT:  Well, it can be a follow-up to the

6     questions that the jury asked.  That's what it is.  It's a

7     follow-up, not to what you asked, to what the jury asked.

8     Just like yours was a follow-up to what the jury asked.  It's

9     the same thing.

10         And I really let you ask a lot of questions.  So

11    I'm going to give her -- I'm going to cut her a little bit of

12    slack, too, just like I cut you a lot of slack.

13         MS. LEE:  I just have two.

14    BY MS. LEE:

15    Q.   Are you ready, Miss Dexter?  Could you please show me

16    where in that statement it says that Mr. Sears ran away at

17    any time?

18    A.   It's not written in that statement.

19    Q.   It's not written in the statement.

20         And Miss Dexter, I'll ask you to take one more

21    look at that statement, and look up when you're ready.

22    A.   Go ahead.

23    Q.   And, again, could you please show me in that statement

24    where it says that either Mr. Sears' behavior is why he was

25    taken to Y dorm or that medical was too crowded for Mr. Sears

1    to be taken there?

2                   MS. DURHAM:  Asked and answered.

3                   THE COURT:  It's overruled.

4                   THE WITNESS:  It's not in the statement.

5    BY MS. LEE:

6    Q.    It's not in the statement.  Thank you, Miss Dexter.  No

7    further questions.

8    A.    You're welcome.

9                   THE COURT:  All right.  Thank you.  I'll excuse

10   the witness.  You can go back to counsel table.

11                  All right.  It's about time for our afternoon

12   break, our real break.  We'll try to take about 10 minutes,

13   and then we'll go to 5 o'clock.  So 10 minutes.  Please don't

14   discuss the case or form any opinions until you've heard all

15   the evidence.

16                  COURT SECURITY OFFICER:  All rise for the jury.

17                  (Jury exits courtroom at 3:21 p.m.)

18                  COURT SECURITY OFFICER:  Please be seated.

19                  THE COURT:  A couple of things.  Have a seat.  Let

20   me just wait for this door to close.

21                  Okay.  On jury questions, for a while, I did not

22   allow lawyers to ask any questions after the jury asked their

23   questions.  And I realized that that was unfair because there

24   were some things that needed to be clarified.

25                  These aren't depositions where you can go on for,

1  you know, eight hours.  You can ask two or three questions.

2  That's it.  I'm going to start absolutely putting my foot

3  down.  Two to three questions per side.  That's it.

4        It doesn't open up the flood gates to ask whatever

5  you want about anything.  It's just about what the jury asked

6  to tie up some loose ends.  Two or three questions each, and

7  that's it.

8        With respect to exhibits, I don't know, will you

9  be -- I imagine that the defense will be introducing more

10  exhibits?

11        MR. BELITZKY:  Thank you, Your Honor.  That was

12  the question I was going to -- I was going to attempt to

13  introduce the same type of exhibits that were -- Miss Durham

14  was not allowed to introduce with Mr. Prince.  So I -- and,

15  in fact, there were some additional exhibits with Mr. Prince,

16  for instance, a weapons qualification.  My request is that I

17  believe allowed to give him the packet.  He may need to

18  refresh his recollection on something.  I understand

19  Your Honor's ruling, but --

20        THE COURT:  Well, you should do it one by one on

21  that particular one.  I mean, here's the problem.  I don't

22  have these exhibits in front of me.  I'm not used to a trial

23  where I don't have the exhibits with the little exhibit tag

24  in front of me where I look at them, I study them.  I see

25  what's coming up.

 1          I haven't had that here.  And it makes it really

 2   hard, and I'm at a big disadvantage when I don't have the

 3   exhibits in advance, at least to read them.  So when I was

 4   handed them, I could see that there was a lot of information

 5   in it that I thought was extremely prejudicial.

 6          If you want to introduce a portion of an exhibit,

 7   I'm not telling you what you should or should not do.  You

 8   are free to try to introduce any and all exhibits.  I will

 9   look at them and I will rule on them.

10          But I need to have them ready to go with their

11   exhibit tag so that I can find them, look at them.  If you

12   want to hand it to me at the time that you want it received

13   into evidence, that's fine.  I'm happy to look at it.

14          But number one, just because something is a

15   business record doesn't mean it automatically gets received

16   into evidence, because the Court has to do a balancing test.

17          I do think these are business records, and so

18   that's not the issue that I have.  The issue is does its

19   prejudicial value outweigh the probative value.  And that's

20   why I kept out those documents before.  Clearly business

21   records, though.  Clearly.

22          MR. BELITZKY:  All right.  Thank you.

23          THE COURT:  So just so that we understand each

24   other on that.  And you understand my ruling if I wasn't

25   specific enough before.

```
 1              All right.  So that's where we're at.  You should
 2   present all of those.  I don't mean to say that none of them
 3   should come in.  Absolutely not.  You should please feel free
 4   to present everything that you would like to present.  I just
 5   need to make certain that things move along on schedule.
 6   That's all.  And it makes it easier if it's -- we're not here
 7   fumbling for exhibits.
 8              MR. BELITZKY:  All right.  Thank you.
 9              THE COURT:  Which I kind of felt we were before.
10   So, anyway, I think that's that.  So we'll take our break and
11   I'll see you back in a few minutes.  Thank you.
12              (Recess taken from 3:25 p.m. to 3:38 p.m.)
13              COURT SECURITY OFFICER:  All rise.
14              This Honorable Court is now in session.
15              THE COURT:  Welcome back, everyone.  Are you ready
16   with your next witness?
17              MR. BELITZKY:  Yes, Your Honor.
18              THE COURT:  Thank you.  We will bring in the jury.
19              COURT SECURITY OFFICER:  All rise for the jury.
20              (Jury enters courtroom at 3:38 p.m.)
21              COURT SECURITY OFFICER:  Thank you.  Please be
22   seated.
23              THE COURT:  Welcome back, ladies and gentlemen.
24              Is the defendant ready with its next witness?
25              MR. BELITZKY:  Yes, Your Honor.  Defendants call
```

1   David Prince to the stand.

2              THE COURT:  All right.  Mr. Prince, if you could

3   please come forward to be sworn in.

4              THE COURTROOM DEPUTY:  Please raise your right

5   hand.

6              Do you solemnly swear or affirm under penalty of

7   perjury that the testimony you shall give in this cause will

8   be the truth, the whole truth, and nothing but the truth?

9              THE WITNESS:  Yes, I do.

10             THE COURTROOM DEPUTY:  Please state and spell your

11  name for the record.

12             THE WITNESS:  David Prince, P-r-i-n-c-e.

13             THE COURTROOM DEPUTY:  Thank you.  You may take

14  the witness stand.

15                       DAVID PRINCE,

16  having been first duly sworn by the Courtroom Deputy,

17  testified as follows:

18                    DIRECT EXAMINATION

19  BY MR. BELITZKY:

20  Q.    Good afternoon, Mr. Prince.

21  A.    Good afternoon.

22  Q.    How are you currently employed, sir?

23  A.    I am retired.

24  Q.    And on March 18th, 2010, were you employed by the

25  Department of Corrections?

1    A.    Yes, I was.

2    Q.    At Polk Correctional Institution?

3    A.    Yes, I was.

4    Q.    Okay.  And you understand, of course, that you're here

5    today in court because you've been named as a defendant in a

6    lawsuit filed by Terry Sears?

7    A.    Yes, I do.

8    Q.    And were you involved in an incident involving use of

9    force on March 18th, 2010, with Mr. Sears?

10   A.    Yes, I was.

11   Q.    Can you tell the jury how you came to be involved in

12   that incident, from as best you -- do you have an independent

13   recollection?

14   A.    From reading my report, yes, I do.

15   Q.    And what do you recall about those events?

16   A.    Officer Smith and I had exited C building, walked out

17   the back door of C building, and heard a disturbance.  We

18   look over.  And Captain Dexter calls to me and says, Sergeant

19   Prince, you and Smith come over here, you know, put handcuffs

20   on this inmate.

21           So we went over.  Officer Plough had -- was

22   already on the scene.  So --

23   Q.    You were a sergeant at that time?

24   A.    I was.  Officer Plough and Officer Smith attempted to

25   handcuff inmate Sears.  And Sears, you know, pulled away from

1  him, started jumping around, and distancing himself from

2  them, and making it plain that no one was going to put

3  handcuffs on him without a fight.

4  Q.    Excuse me.  Do you know why they were attempting to put

5  handcuffs on Mr. Sears?

6  A.    Captain Dexter ordered it because inmate Sears was in

7  an agitated state.

8  Q.    And how was Mr. Sears behaving that you observed when

9  you first arrived at the scene?

10  A.    I could hear him yelling as I approached, yelling at

11  officer -- Captain Dexter.

12  Q.    Do you remember the specifics of what he was saying?

13  A.    No.

14  Q.    But that he was yelling?

15  A.    That I could hear him.

16  Q.    Okay.  So what did you then do?

17  A.    Well, after he refused to allow the correctional

18  officers to handcuff him, I ordered him to comply with

19  cuffing procedures.

20  Q.    Did you have the authority to order an inmate to be

21  handcuffed?

22  A.    Absolutely.

23  Q.    Why was that?

24  A.    Handcuffing is a normal procedure in prison.  Any

25  inmate can be handcuffed at any time.

1   Q.    And what -- did you observe any reason why he should be

2   handcuffed at that time, he being Mr. Sears?

3   A.    Given the way that he was towering over Captain Dexter

4   with his arms -- I'm simulating what he was doing

5   (indicating).  And she was at risk.

6   Q.    And so what happened next?

7   A.    I ordered the inmate to comply with cuffing procedures.

8   The exact words would have probably been, turn and cuff up.

9   He refused.  I advised him that if he did not comply, that I

10  would administer a chemical agent.  My exact words were, cuff

11  up or I'm going to spray you.

12  Q.    And did you have the authority, then, to contemplate

13  using chemical agents?

14  A.    Yes, I did.

15  Q.    And how was that?

16  A.    A chemical agent, it's a spontaneous use of force.  And

17  a chemical agent in this particular scenario was what was --

18  I considered to cause -- be least likely to cause injury to

19  anybody concerned.

20  Q.    As opposed to doing what else?

21  A.    As opposed to Officer Plough, Officer Smith and myself

22  grappling with inmate Terry Sears, and trying to get him

23  under control and take him down on the concrete.

24  Q.    All right.  So what happened then?  You said you gave

25  him the order to cuff up, and you warned him, if not, you

1   would use chemical agents?

2   A.    Yes.

3   Q.    And did he comply?

4   A.    No.

5   Q.    So what did you do?

6   A.    No.  I removed my chemical agent from the holster.  It

7   was in my left hand, keeping it away from the inmate.

8   Reached for his right arm, telling him again, look, cuff up

9   or I'm going to spray you.

10          At that time, inmate Sears snatched from me,

11  stepped back, boy, if you spray me, it's going to get

12  physical.  And at that time, you know, he snatched away.  And

13  again, just looking around, it's -- the body language he's

14  displaying makes it obvious that he intended to fight.  I

15  administered the chemical agent.

16  Q.    And what happened next?

17  A.    Inmate Sears stood good on his word.  He told me he was

18  going to get physical if I sprayed him.  And when I sprayed

19  him, he attacked me.

20  Q.    Physically attacked you?

21  A.    Absolutely.

22  Q.    What happened to what parts of your body?

23  A.    I didn't have time to put the canister back, you know.

24  Because as soon as the spray hit him, he lunged for me.  I'm

25  trying to step back and put the canister away, but I can't.

1  He's on me, just wind-milling.  It's all I can do.  I'm

2  just --

3  Q.    Did he land punches on you?  Did he connect physically?

4  A.    Absolutely, yes.  Numerous times.

5  Q.    And then how was he then ultimately restrained?

6  A.    As he's pummeling me, Officers Plough and Smith come

7  and take him by the arm and pull him away from me.

8  Q.    And were they able to cuff him?

9  A.    Yes.

10  Q.    And what did you do?  Did you continue participating in

11  getting him cuffed?

12  A.    I was still there.  At this point, I don't recall move

13  for move.  I know I had to finish putting the canister away

14  and securing that on my belt, you know.  As I was doing that,

15  they were moving toward the grass with inmate Sears and, you

16  know, they laid him on the grass.  At that point he was

17  much -- he wasn't subdued, but he was much easier to control

18  because as time went on, the chemical was having its desired

19  effect.

20  Q.    Did anything happen -- you heard the testimony that in

21  some fashion he went to get medical treatment first for a

22  shower and then on being escorted away.  Do you recall that,

23  hearing that testimony?

24  A.    I heard it.  I know it is standard procedure.  We had

25  to have him within the shower within 20 minutes of being

1  sprayed.

2  Q.    Did you join in the escort away from the area where the

3  force was used?

4  A.    I'm sure I did.  I can recall from my report that it

5  says that I was actually in confinement and turned off the

6  hot water so that he didn't introduce hot water to the

7  chemical.  So, yes, sir, I would have accompanied him.

8  Q.    Now, did you use any further force on Mr. Sears after

9  you had sprayed the chemical agent?

10  A.    No.

11  Q.    Did you hear his testimony that -- first of all, how

12  long did the spraying last, as best you remember?

13  A.    The spraying was -- the spraying itself was a one-time

14  administration.  Approximately a second, maybe two.  It was

15  (indicating).

16  Q.    And the amount of the spray that was used, do you

17  recall that?

18  A.    According to the report, after it was weighed out, 6.4

19  grams.

20  Q.    Did you hear Mr. Sears' testimony that it may have

21  lasted up to 15 minutes?

22  A.    That's ridiculous.

23  Q.    And that there were two canisters used, that someone --

24  that you obtained a second canister and sprayed him from two

25  canisters; did you hear that?

1   A.    That's beyond ridiculous.

2   Q.    Now, did you also hear the testimony that you sucker

3   punched him back towards -- or in the confinement area when

4   you escorted him, that you sucker punched him in the jaw?

5   Did you hear that testimony?

6               MS. WICK:  Objection, leading.

7               THE COURT:  Sustained.  Re-ask the question in a

8   non-leading way.

9   BY MR. BELITZKY:

10  Q.    Did you hear any testimony as far as any further

11  physical force that you applied to Mr. Sears?

12  A.    I've been listening.  Yes, sir.

13  Q.    Did you sucker punch Mr. Sears in the jaw?

14  A.    No.

15  Q.    Did you kick him in the butt?

16  A.    Absolutely not.

17  Q.    And were you trained in the use of a chemical agent

18  before, you know, as part of your training, becoming sergeant

19  or before?

20  A.    Yes, I was.

21  Q.    And did you have to sign -- is there a log that you

22  signed out that indicated how much spray you were taking with

23  you on a daily basis if you were to load in your -- I'll call

24  it your side pocket?

25  A.    There was a log where -- there was an issue log for the

```
 1   chemical agent.  Yes, sir.

 2            MR. BELITZKY:  May I approach?

 3            THE COURT:  You may.

 4            (Document tendered.)

 5            MR. BELITZKY:  If I can just hand him the packet

 6   so I don't have to stand over him, and I'll just ask him

 7   questions.

 8            THE COURT:  For the record, please identify what

 9   it is you're showing him.

10            MR. BELITZKY:  Yes.

11            THE COURT:  And what defendant's exhibits are you

12   showing him?

13            MR. BELITZKY:  Your Honor, this is Defendant's

14   Exhibit DX-2001.

15            THE COURT:  Okay.  Defendant's Exhibit 2001.

16   BY MR. BELITZKY:

17   Q.   Can you read from the exhibit and just see if you can

18   identify it.  Read it to yourself.  Tell us when you've

19   concluded.

20            Are you familiar with that exhibit?

21   A.   Yes, I am.

22   Q.   Is that the report of force that you wrote concerning

23   this incident?

24   A.   Yes.

25            MR. BELITZKY:  Your Honor, defendants would offer
```

 1   DX-2001 into evidence.

 2              THE COURT:  Okay.

 3              MS. WICK:  We object, Your Honor, based on Rule

 4   403, and, also, it's cumulative.

 5              THE COURT:  All right.  I need to take a look at

 6   it.  Let's see.

 7              MS. WICK:  Hearsay, as well, Your Honor.

 8              THE COURT:  I'm sorry.  What was the last one?

 9              MS. WICK:  Hearsay, as well.

10              THE COURT:  Well, it's overruled on hearsay.  It's

11   a business record exception.

12              I don't see here what's so prejudicial.  Can you

13   lay a foundation, though, for business records, please, which

14   I don't think you did.

15              MR. BELITZKY:  Yes.

16   BY MR. BELITZKY:

17   Q.   Mr. Prince, would this be a report that you would have

18   written as part of your duties --

19              THE COURT:  Don't lead the witness, please.

20   BY MR. BELITZKY:

21   Q.   How did you come to write the report?

22   A.   This is a report of force used, you know.  The lead

23   officer in the use of force is required to write this after

24   the use of force.  It's a report of use of force.

25   Q.   Do you know whether that type of report is written or

1    was written at the time of the incident as part of the normal

2    correctional business?

3    A.    Yes, it was.

4          MR. BELITZKY:  Your Honor, we believe that we've

5    shown that it's --

6          THE COURT:  Well, there are some additional

7    questions that I normally like to be established.  You need

8    to hit those points.

9    BY MR. BELITZKY:

10   Q.    Did you write this report in the course of your duties

11   as a sergeant?

12   A.    Yes, I did.

13   Q.    And did you write this report as subsequent to the

14   force that you used on March 18th, 2010?

15   A.    Yes, I did.

16   Q.    And were you required to write this report?

17   A.    Yes, I was.

18   Q.    And did you turn this report into a supervisor?

19   A.    Yes, I did.

20         MR. BELITZKY:  At this point, defendants would

21   renew their introduction attempt.

22         THE COURT:  I wish you could ask one or two more

23   questions so that I'm positive that the foundation has been

24   laid.  And you're still missing some questions.

25   BY MR. BELITZKY:

1  Q.   Mr. Prince, when you wrote this report, did it

2  accurately reflect what you did and what you observed on your

3  own actions as far as your own use of force upon Mr. Sears on

4  March 18th, 2010?

5  A.   Yes, it does.  This is a report of --

6  Q.   Were the facts accurate that you've just now read as

7  best you recall from the time of the incident?

8  A.   Yes, it is.

9          THE COURT:  Okay.  I'll receive it into evidence

10 over the plaintiff's objection.  This is a business record

11 exception.  And I've done the balance under Rule 403, and I

12 believe it's admissible.  So you may publish it to the jury.

13 Defendant's Exhibit DX-2 is received into evidence.

14          (*Defendant Exhibit 2 received in evidence*.)

15          THE COURT:  This will go back to the jury for

16 deliberations.  They can -- I'm trying to be efficient in the

17 use of our time.

18          MR. BELITZKY:  I have no further questions of the

19 witness.

20          THE COURT:  Then it's received into evidence.

21          MR. BELITZKY:  Thank you.

22          THE COURT:  Thank you.  Can I now turn him over to

23 the plaintiff for any questions?  Are you finished?

24          MR. BELITZKY:  I just have a few more exhibits,

25 Your Honor.

```
 1              THE COURT:  Oh, I'm sorry.  I thought you were

 2   finished.  Thank you.

 3   BY MR. BELITZKY:

 4   Q.   Mr. Prince, did you yourself receive any medical

 5   treatment following the incident?

 6   A.   It was required that I be seen by medical, but I didn't

 7   complain of any injuries.

 8              MR. BELITZKY:  If I can approach, Your Honor, I

 9   have just a few more.

10              THE COURT:  Absolutely.

11   BY MR. BELITZKY:

12   Q.   Mr. Prince, this is DX-4001.

13              THE COURT:  DX-4 --

14              MR. BELITZKY:  DX-4001.

15              THE COURT:  All right.  We'll look for it.  Thank

16   you.

17   BY MR. BELITZKY:

18   Q.   Are you familiar with it?  Don't talk about the

19   contents, just --

20   A.   Yes, I am.

21   Q.   Is this a weapon -- Department of Corrections weapons

22   qualification?

23   A.   Yes, it is.

24   Q.   Does that reflect the fact that you have gone through a

25   training process?
```

1  A.    Yes, it does.  It shows that my certifications were up

2  to date.

3  Q.    Was that in effect on the date of the incident?

4  A.    Yes, it was.

5           MR. BELITZKY:  Defendants would offer DX-4-A001

6  into evidence.

7           THE COURT:  Any objection?

8           MS. WICK:  No, Your Honor.

9           THE COURT:  Defendant's Exhibit 4-A is received

10  into evidence and may be published to the jury.

11           (*Defendant Exhibit 4A received in evidence.*)

12  BY MR. BELITZKY:

13  Q.    Okay.  Next, Mr. Sears -- I'm sorry, Mr. Prince, I'm

14  handing you DX-02.

15           MR. BELITZKY:  Your Honor, 02-A is the next

16  exhibit.

17           (Document tendered.)

18  BY MR. BELITZKY:

19  Q.    Can you take a look at this, Mr. Prince, and see if you

20  can identify it.

21  A.    Yes, I can.

22  Q.    Is that the weapons chemical agent accountability log?

23  A.    That's what it is.

24           MR. BELITZKY:  Defendants would offer this exhibit

25  into evidence.

 1          THE COURT:  Okay.  And what's the -- is that

 2  202-A, you said?

 3          MR. BELITZKY:  202-A.  The clerk has received

 4  this.

 5          THE COURT:  All right.  Any objection?

 6          MS. WICK:  No, Your Honor.

 7          THE COURT:  Okay.  It's received into evidence and

 8  may be published to the jury.

 9          (*Defendant Exhibit 202-A received in evidence.*)

10          MR. BELITZKY:  We'll wait for it to get up on the

11  screen, and then I'll ask you to explain what it is.

12  BY MR. BELITZKY:

13  Q.   Mr. Prince, can you describe for the jury what this

14  document demonstrates?

15  A.   This document demonstrates -- it shows that, you know,

16  it was -- the name of the canister was MK4.  The number of

17  the holster was number 58.  It was signed out to me at 8:00

18  a.m., or it was signed out at 8:00 a.m.  It's where it had

19  been weighed.  The weight when it was issued to me was 124.9

20  grams.  Then after it was used, it was showing -- it was

21  weighed in at 118.5, showing the total use of 6.4 grams of

22  chemical agent.

23  Q.   Was that -- to your recollection, was that the amount

24  that was used on Mr. Sears?

25  A.   According to this and all the reports, I mean, nine

1  years ago.

2  Q.   Right.  But from your knowledge, would that -- would

3  the use of that amount, would that -- could that have been on

4  for 15 minutes?

5  A.   No.  No.

6         MR. BELITZKY:  Just a few more, Your Honor.

7  BY MR. BELITZKY:

8  Q.   Mr. Prince, you, of course, were involved with Officers

9  Plough and Smith at the same time as you were administering

10  the agent.  Did you see either of them do anything, commit

11  any act of force that you thought was considered excessive to

12  Mr. Sears?

13  A.   No.

14  Q.   And if you had witnessed another officer using

15  excessive force, what would you have done?

16  A.   It would have been my duty to intervene and stop that

17  from happening.  And there would have also been reports

18  generated.

19  Q.   And to your knowledge, were there any such reports

20  generated of excessive use of force?

21  A.   There was no excessive use of force in this situation.

22         MR. BELITZKY:  Nothing further, Your Honor.

23         THE COURT:  All right.  Thank you.  Any

24  cross-examination for this witness?

25         MS. WICK:  Yes, Your Honor.

```
 1                    CROSS-EXAMINATION
 2    BY MS. WICK:
 3    Q.    Good afternoon, sir.
 4    A.    Hello.
 5    Q.    In 2010, how long had you been a correctional officer?
 6    So 10 years ago, roughly.
 7    A.    I started in 2010, so it would be, I don't know, 16, 18
 8    years.
 9    Q.    Somewhere between 16 and 18 years, you said?
10    A.    Roughly, yes, ma'am.
11    Q.    Okay.  And in your experience as a correctional officer
12    for those 16 to 18 years, I assume you had training; is that
13    correct?
14    A.    Yes, I did.
15    Q.    Okay.  And specifically, you had training on the
16    appropriate time to use force on inmates?
17    A.    Yes, ma'am.
18    Q.    And also on the application of chemical agents, should
19    it become necessary?
20    A.    Yes, ma'am.
21    Q.    Okay.  Now, you're aware that the Florida Department of
22    Corrections has certain policies and procedures that you were
23    required to comply with as a correctional officer?
24    A.    Of course.
25    Q.    And you knew that at the time on March 18th of 2010?
```

1  A.     Yes, ma'am.

2  Q.     Okay.  Now, you would agree with me that you're only

3  allowed to use physical force on an inmate under certain

4  circumstances?

5  A.     That's correct.

6  Q.     And only as a last resort?

7  A.     That's correct.

8  Q.     And only when other alternatives are not possible?

9  A.     I'm not so sure about that one.

10  Q.     So, in other words, if you had another option available

11  to you other than using force, you should use that other

12  option?

13  A.     You mean if I opened the gate and let him out?  I mean,

14  I don't understand.  The option was, you know, we cleared the

15  yard for count.  There was no other options.  This -- this

16  situation had to be resolved.

17  Q.     I'm speaking generally, sir.  My question to you is, if

18  you have the option between using force and talking an inmate

19  down so that you didn't have to use force, for example, the

20  policies require you to use that other alternative; isn't

21  that correct?

22  A.     In this case -- that's correct, yes.

23  Q.     Okay.  And you're not allowed to use force against an

24  inmate just because they're talking back to you; correct?

25  A.     That's correct.

1   Q.    And even when you are permitted by the policies and

2   procedures to use force in certain circumstances, that force

3   still has to be reasonable; right?

4   A.    It needs to be the minimum amount of force reasonably

5   necessary to accomplish the task.

6   Q.    Okay.  Now, on March 18th, 2010, your testimony

7   established that you used force against Mr. Terry Sears;

8   correct?

9   A.    Yes, I did.

10  Q.    And, in fact, you sprayed him with a chemical agent?

11  A.    Yes, I did.

12  Q.    Specifically, with Sabre Red Pepper Spray?

13  A.    Yes, I did.

14  Q.    Okay.  Let's talk about how the incident started.

15        You stated that you and another officer were

16  leaving the C building; is that right?

17  A.    That's correct.

18  Q.    Okay.  And that's when you heard defendant Dexter call

19  your name?

20  A.    That's correct.

21  Q.    And you claim that that's when you saw Mr. Sears waving

22  his arms around?

23  A.    That is correct.

24  Q.    Okay.  But he wasn't harming anyone at that time; was

25  he?

1  A.    No, not at that time.

2  Q.    And at that time, you didn't know the reason why the

3  other officers were trying to cuff him up; did you?

4  A.    It was irrelevant to me.

5  Q.    So you didn't know the reason, though?

6  A.    No.

7  Q.    Now, when you leave C building and you go over to where

8  they are, I want to be clear, at that time it would have been

9  you, defendant Dexter, Officer Smith, and then later Officer

10 Plough comes.  Do I have that right?

11 A.    No.  Officer Plough was already there.

12 Q.    Okay.  So it was you, defendant Dexter, Officer Smith

13 and Officer Plough?

14 A.    Yes, ma'am.

15 Q.    Okay.  So that's four correctional officers?

16 A.    Yes, ma'am.

17 Q.    Okay.  And there are no other inmates involved other

18 than Mr. Sears?

19 A.    That's correct.

20 Q.    Now, when the officers were trying to cuff Mr. Sears,

21 he wasn't striking anyone; was he?

22 A.    His actions could have been considered a threat, yes.

23 Yes, he was.

24 Q.    That wasn't my question, sir.  My question was, did he

25 strike anyone?

1   A.    Before being sprayed?

2   Q.    While he was -- while the officers were cuffing him up,

3   did he strike anyone?

4   A.    When they were cuffing him up, he was on the ground.

5   Q.    Prior to him being cuffed up, when the officers are

6   asking him to cuff up, had he taken his hand and punched

7   anybody?

8   A.    No.

9   Q.    Had he put his hands on anyone at all?

10   A.    Before the use of the spray?

11   Q.    That's right.

12   A.    Not that I know of, no.

13   Q.    But you decided to spray him in the face with pepper

14   spray; is that correct?

15   A.    That's absolutely correct.

16   Q.    Okay.  And before you sprayed him, you didn't try and

17   de-escalate the situation at all; did you?

18   A.    Absolutely, I did.

19   Q.    Well, you didn't try to talk him down; did you?

20   A.    I -- I advised inmate Sears that if he did not comply

21   with cuffing procedures, that I would spray him with a

22   chemical agent.

23   Q.    Okay.  And you consider that trying to de-escalate the

24   situation?

25   A.    That was absolutely de-escalation.  Yes, ma'am.

1   Q.    Now, you state that you used Sabre Red Pepper Spray; is

2   that right?

3   A.    Yes.

4   Q.    Now, is that the type of pepper spray that you

5   typically carried at that time?

6   A.    That was what they issued.  Yes, ma'am.

7   Q.    Okay.  Now, you would agree with me that Sabre Red

8   Pepper Spray is a chemical agent?

9   A.    It is.

10  Q.    Okay.  And that it causes tearing up?

11  A.    It causes tearing up.

12  Q.    Nasal discharge?

13  A.    Nasal discharge.

14  Q.    Coughing?

15  A.    Yes.

16  Q.    Sensation of respiratory distress?

17  A.    Respiratory distress, yes.

18  Q.    Disorientation?

19  A.    Possibly.

20  Q.    Burning of the eyes, nose, and mouth?

21  A.    Yes.

22  Q.    Okay.  Now, you would also agree with me that there are

23  different types of pepper sprays, depending on how severe

24  they are; right?

25  A.    Pepper spray?

```
 1   Q.    Yes.  There are different types of pepper spray?

 2   A.    No.  There's only one pepper spray, that I know of.

 3   Q.    Okay.  So, sir, you could -- anyone, just a person off

 4   the street, could go buy pepper spray in the store; correct?

 5   A.    Yes.

 6   Q.    But that's -- there's different kinds of pepper sprays.

 7   There's a pepper spray that's specific for law enforcement

 8   use; isn't that right?

 9   A.    There's different brands, yes.

10   Q.    Okay.  But there's also different levels of pepper

11   spray?

12   A.    Possibly.

13   Q.    Okay.  And, in fact, the pepper spray you used, Sabre

14   Red, was for use in a correctional facility or for law

15   enforcement purposes; right?

16   A.    It was.

17   Q.    Okay.  Now, in fact, Sabre Red Pepper Spray is, in

18   fact, the hottest pepper spray that Sabre makes; isn't that

19   right?

20   A.    I have no idea.

21   Q.    And after you sprayed Mr. Sears with the Sabre Red

22   Pepper Spray, you could see the effects that he suffered

23   physically from the application of the pepper spray?

24   A.    Yes.

25   Q.    And you saw that he was tearing up?
```

1   A.   Yes.

2   Q.   Having trouble breathing?

3   A.   Yes.

4   Q.   Disoriented?

5   A.   Yes.

6   Q.   Okay.  Getting back to some of the policies that are in

7   place in the Department of Corrections, and specifically the

8   Polk Institution, the use of pepper spray is limited to

9   certain circumstances; right?

10  A.   The use of chemical agent, the chemical agent can be

11  used anytime in a spontaneous situation, and be used in lieu

12  of physical force.

13  Q.   But you can't just go around spraying inmates with

14  pepper spray whenever you want to; right?

15  A.   If physical force was justified in that situation, then

16  a chemical agent is justified in that situation.

17  Q.   So its use is limited?

18  A.   It is.

19  Q.   And, in fact, you're only supposed to use pepper spray

20  after other reasonable efforts are made to control an inmate;

21  right?

22  A.   Use of force.  If a use of force is required in that

23  situation, then a chemical agent is authorized in a

24  spontaneous use of force.

25  Q.   Okay.  My question is:  You're only supposed to use

1   pepper spray after other reasonable efforts to control the

2   inmate are made?

3   A.    Define a reasonable effort.  You order the inmate to

4   comply.  In this case, there were several orders for the

5   inmate to cuff up.  Inmate does not comply, does not -- he

6   offers physical resistance to a lawful command, then chemical

7   agents are absolutely authorized.

8   Q.    And you are only supposed to be using chemical agents

9   when absolutely necessary?

10            MR. BELITZKY:  Objection.  Asked and answered.

11            THE COURT:  I think the other question was a

12   little bit different.  So it's overruled.  You can answer it,

13   if you're able to.

14            THE WITNESS:  Any use of force --

15            THE COURT:  Why don't you repeat the question.

16   BY MS. WICK:

17   Q.    Sir, you're only permitted to use pepper spray when it

18   becomes absolutely necessary?

19   A.    I would agree with that, yes.

20   Q.    Okay.  Now, if you needed to use pepper spray

21   spontaneously, and that's your position that this was a

22   spontaneous use of pepper spray; correct?

23   A.    Yes, it was.

24   Q.    Okay.  If you needed to use spray spontaneously and

25   without pre-approval of using it, then you were only supposed

1  to use it for self-defense; isn't that correct?

2  A.    Use it for self-defense or defense of others or to

3  overcome resistance to a lawful command.

4  Q.    So you would agree with me that you can only use pepper

5  spray spontaneously for purposes of self-defense?

6  A.    And there's other reasons, but, yes.  I agree with you.

7  Q.    And specifically as to the reasons why you can use it

8  spontaneously, would it refresh your memory if I showed you a

9  copy of the Florida Department of Corrections policies on

10  that?

11  A.    Was that policy current or was that a 2010 policy?

12  Q.    In 2010, sir.

13  A.    Sure.

14  Q.    Okay.

15        MS. WICK:  May I have a moment, Your Honor?

16        THE COURT:  Of course.

17        MS. WICK:  Thank you.  May I approach, Your Honor?

18        THE COURT:  You may.

19        (Document tendered.)

20  BY MS. WICK:

21  Q.    Sir, I've handed you what is a copy of the Florida

22  Administrative Code that was in place in 2010 regarding the

23  use of chemical agents.  If you would take a moment and look

24  at that.

25        Specifically, I would direct your attention to the

1   bottom of Page 1 where it refers to the use of chemical

2   agents.  Let me know when you've had a moment to look at

3   that.

4   A.    Okay.

5   Q.    Did that refresh your memory as to when you were

6   permitted to use chemical agents?

7   A.    I already knew when I was permitted.  I mean, you know.

8   I've read your document, yes.

9   Q.    Okay.  Then you would agree with me that, according to

10  the Florida Administrative Code, which is incorporated into

11  the institution's policies and procedures, that you're only

12  allowed to use spontaneous use of force for purposes of

13  self-defense?

14  A.    No.

15  Q.    That's not what that document says, sir?

16  A.    No.  A spontaneous use of force could be used in

17  self-defense or defense of others.  It could be used to quell

18  a disturbance, it could be used to prevent an escape or --

19  you know, I've been retired for three years.  There's -- the

20  list goes on.

21  Q.    Sir, I would ask you to refer down to the bottom of the

22  page there, where it refers to the use of chemical agents.

23  And if you would, I would ask you to give that a read again,

24  and see if you agree with me that you can only use

25  spontaneous use of force for purposes of self-defense.

1   A.    No.  I do not agree.

2          MR. BELITZKY:  Can you point to the specific

3   subsection?  I have different pages.

4          MS. WICK:  Certainly.  May I?

5          THE COURT:  Of course.

6   BY MS. WICK:

7   Q.    Okay, sir.  So based on your review of the document,

8   you would agree with me that you can use spontaneous -- you

9   can use chemical agents in spontaneous circumstances without

10  prior approval if you believe there was an imminent threat of

11  bodily harm for self-defense purposes?

12  A.    It could be used in that situation, yes.

13  Q.    Okay.  And that's the only situation that you are

14  permitted to use it, according to this document; is that

15  right?

16  A.    That's a very small piece of one piece of paper.  There

17  are many authorized times when force can be used.

18  Q.    Okay.  But according to this document, which is the

19  Florida Administrative Code on this issue, that's when you

20  are allowed to use it; right?

21  A.    That is on that page, yes.

22  Q.    Okay.  Now, going back to March 18th, 2010, prior to

23  you spraying the pepper spray, there had been no physical

24  punches thrown by Mr. Sears; is that right?

25  A.    No one had been punched at that time.  No.

1   Q.    Okay.  And Mr. Sears had not made any threats at that

2   time that he would punch someone; is that right?

3   A.    Prior to being sprayed, inmate Mr. Sears told me if I

4   spray him, he was going to get physical.

5   Q.    Okay.  Prior to him being -- well, let me back up.

6           Would you agree with me that cuffing someone up is

7   a use of physical force?

8   A.    Absolutely not.

9   Q.    Can you explain that?

10  A.    The simple application of handcuffs is not a use of

11  force.

12  Q.    So putting someone's hands -- putting an inmate's hands

13  behind their back forcibly is not a use of force?

14  A.    Well, you did not say forcibly.  You said cuffing him

15  up.  If the inmate had complied, there would be no use of

16  force.

17  Q.    Okay.  Then I guess -- can you explain to me what you

18  mean when you say cuff someone up?

19  A.    Apply handcuffs to the wrists.

20  Q.    Okay.  So they're not doing it themselves, you're doing

21  it for them?

22  A.    They don't put the cuffs on, no.

23  Q.    Okay.

24  A.    But when you tell an inmate, turn around and cuff up,

25  the inmate knows this is what he needs to do (indicating).

1    He'll put his hands behind his back, and allow the handcuffs

2    to be applied.

3    Q.    Now, the use of pepper spray was not the only use of

4    force that was applied on that day; is that right?

5    A.    Not that I know of.

6    Q.    Okay.  Well, Officers Smith and Plough took Mr. Sears

7    to the ground.  You would agree with me on that?

8    A.    Oh, yeah, yeah.  I mean, that's all part of the same --

9    yes, you're correct.

10   Q.    Okay.  And Mr. Smith and -- excuse me, Officers Smith

11   and Plough held him on the ground?

12   A.    They held him on the ground until they could get him

13   handcuffed.  Yes.

14   Q.    Okay.  And this is after he had been pepper sprayed?

15   A.    Yes.

16   Q.    You would agree with me, sir, that pepper spray

17   wouldn't cause a lump on someone's leg; would it?

18   A.    No, it would not.

19   Q.    And you would agree with me that pepper spray wouldn't

20   cause bleeding?

21   A.    No, it will not.

22   Q.    And pepper spray wouldn't cause shoulder pain?

23   A.    No, it would not.

24   Q.    And pepper spray wouldn't cause a black eye; would it?

25   A.    No, it would not.

1    Q.    Now, on March 18th, 2010, Captain Dexter, was she your

2    superior?

3    A.    She was.

4    Q.    Okay.  She didn't try and stop you from spraying the

5    Sabre Red Pepper Spray; did she?

6    A.    No.

7    Q.    And defendant Roberts, she was the colonel at the time?

8    A.    She was a colonel, yes.

9    Q.    Also, your superior?

10   A.    Yes.

11   Q.    And she didn't take any steps to stop you from spraying

12   the pepper spray?

13   A.    I don't even know if she was there.

14   Q.    Was defendant Hart your superior, as well?

15   A.    Yes, he was.

16   Q.    And he didn't try to stop it, either?

17   A.    I'm not certain that he was there.

18   Q.    Now, after you sprayed Mr. Sears, you and the other

19   officers escorted him to the medical building?

20   A.    We went to the medical building.  We went to Y dorm.

21   Q.    I'm sorry?

22   A.    We went to Y dorm.

23   Q.    Y dorm?

24   A.    Yes.  That's the way my report reads.

25   Q.    And based on your recollection of the facility, is Y

1  dorm connected to the medical facility?

2  A.    They are connected, yes.

3  Q.    They are connected, okay.

4         And when you got to the medical building, even

5  more force was applied to Mr. Sears; isn't that correct?

6  A.    No.

7  Q.    You're telling the jury that you did not punch him?

8  A.    I'm telling you that that is an outright lie.

9  Q.    Okay.  At some point, Mr. Sears is placed in the shower

10  for decontamination; right?

11  A.    That's correct.

12  Q.    Okay.  And decontamination means washing off the

13  chemical agents from Mr. Sears' body?

14  A.    That is correct.

15  Q.    And then Mr. Sears was placed in a cell?

16  A.    It was -- I was not there at that point after the

17  shower.  He would have been placed in the cell eventually,

18  yes.

19  Q.    And are you aware, sir, that Mr. Sears was given back

20  the same clothes he had on when he was sprayed with pepper

21  spray?

22  A.    No, I'm not.

23  Q.    Are you aware, sir, that he was left in that cell with

24  his contaminated clothes so long that he felt that he had no

25  choice but to call out that he was going to kill himself?

1    A.    No.  I was not assigned to confinement.  I didn't work

2    that wing, no.

3    Q.    You would agree with me, sir, that at some point,

4    Mr. Sears was seen by a nurse?

5    A.    Yes.  He was seen by the nurse in the shower.

6    Q.    Okay.  You were also seen by a nurse; is that right?

7    A.    I was.

8    Q.    You didn't have any injuries, sir; did you?

9    A.    I didn't complain of any injuries.

10   Q.    In fact, you didn't have any injuries; right?

11   A.    I didn't complain of any injuries.  I had the usual

12   complications of being exposed to a chemical agent, but I

13   know what to expect and I knew what it was.  There was no

14   need for me to complain about it.

15           MS. WICK:  May I have a moment, Your Honor?

16           THE COURT:  You may.

17   BY MS. WICK:

18   Q.    One more question, sir.  Were you aware that Officer

19   Voorhees took a video while in the Y building of the post use

20   of force incident that occurred?

21   A.    I've heard the testimony, yes.

22   Q.    Okay.  Did you see Voorhees there taking the video?

23   A.    I don't -- from that long ago, I don't recall.

24           MS. WICK:  Okay.  Thank you.  No further

25   questions.

1           THE WITNESS:  You're welcome.

2           THE COURT:  Thank you.  Any redirect?

3           MR. BELITZKY:  Yes, just briefly, Your Honor.

4           THE COURT:  Of course.

5           MR. BELITZKY:  Thank you.  May I approach?

6           THE COURT:  You may.

7                      REDIRECT EXAMINATION

8    BY MR. BELITZKY:

9    Q.   Mr. Prince, I'm handing you another copy of the same

10   document that counsel has just shown you, but this is from a

11   different type of publication so the pages are different.

12   I'm just going to refer you to specific pages here.

13           First, refer to Page 5.  Does that page contain --

14           MS. WICK:  Can we see a copy of that, please?

15           MR. BELITZKY:  It's -- yes.

16           THE COURT:  Now, please remember to show opposing

17   counsel before you give it to the witness.

18   BY MR. BELITZKY:

19   Q.   Have you had a chance to review the categories of

20   permissible use of force on that page?

21   A.   Yes, I have.

22   Q.   And can you tell the jury what -- applicable to the

23   situation you faced, which of those categories applied as far

24   as allowing you to use force?

25   A.   Applicable to the situation that we were faced with

 1   that day, use of force, a chemical agent was used to overcome

 2   the inmate's physical resistance to a lawful command.

 3            MR. BELITZKY:  I'm referring to Page 10 now,

 4   counsel.

 5   BY MR. BELITZKY:

 6   Q.    If you can take a moment to look at Page 10.  And is

 7   there a description there of specifically mentioning chemical

 8   agents?

 9   A.    Yes, sir.  You want me to go over it?

10   Q.    Yes.

11   A.    All right.  Chemical agents shall only be used when a

12   use of force is necessary, and when this level of force is

13   the least likely to cause injuries to staff or inmates.

14   Q.    And, again, how did that apply to your decision to use

15   chemical agents?

16   A.    My options were to spray inmate Terry Sears and

17   incapacitate him with a chemical agent, or have myself,

18   inmate Sears, Officer Plough, and Officer Smith locked in

19   mortal, physical combat on the concrete where we were likely

20   to go down hard, because he was not going to go easy.

21   Q.    So was chemical agent your decision as opposed to an

22   acceleration of physical force?

23   A.    Yes.

24   Q.    And do you recall counsel's question as far as the use

25   of force incident involved more than chemical agents because

1  chemical agents wouldn't result in a lump, a physical lump on

2  him?

3  A.    Yes, I recall.

4  Q.    So I assume, then, that instead of chemical agents, you

5  would have used physical force that might have -- assuming

6  that there were lumps caused by the use of force, that might

7  have caused additional lumps or other physical --

8  A.    Would have exacerbated the situation.

9            MS. WICK:  Objection, Your Honor.  Leading and

10  speculative.

11           THE COURT:  Sustained.

12           MR. BELITZKY:  Nothing further.

13           THE COURT:  All right.  Anything from the

14  plaintiff's side?

15           MS. WICK:  Yes, Your Honor.

16                    RECROSS-EXAMINATION

17  BY MS. WICK:

18  Q.    Sir, your testimony was that Mr. Sears was waving his

19  hands; is that right?

20  A.    He was waving his arms, yes.

21  Q.    And he was yelling?

22  A.    And he was yelling.

23  Q.    Okay, sir.  And you just testified that because of

24  that, you were scared that officers would be in, quote,

25  mortal, physical combat.  Was that your testimony?

1   A.    I said that the chemical agent was used as an

2   alternative to that possibly happening.  Yes.

3              MS. WICK:  No further questions.  Thank you.

4              THE COURT:  Thank you.  Let me see if the jury has

5   any questions.

6              (Document tendered.)

7              THE COURT:  Let me see counsel at sidebar.

8              (The following was held at sidebar:)

9              THE COURT:  I'm not certain I can read what this

10  means.

11             MS. WICK:  Rephrase.

12             MR. BELITZKY:  Rephrase.  Yes.

13             THE COURT:  This is all it says.  "Rephrase

14  chemical agents."

15             MS. LEE:  That's the problem with introducing --

16             THE COURT:  Someone else.  Okay.  "It was stated

17  the witness did not sucker punch Sears after he was cuffed.

18  Was any physical contact made by the witness after cuffing

19  occurred?  If so, what?"

20             MS. WICK:  It's fine.  He can testify to that.

21             MR. BELITZKY:  He can testify to that.

22             THE COURT:  There are several questions here.

23  One.  "Can 6.4 grams of spray be used within two to three

24  seconds?"

25             MS. WICK:  I think that's expert testimony.

1          THE COURT:  "Did any officers receive treatment

2   from medical because of the pepper spray?"

3          MS. WICK:  He can answer that, if he knows.

4          MS. LEE:  There are other officers, too.

5          THE COURT:  "How much spray needs to be used to be

6   considered excessive?"

7          MR. BELITZKY:  I don't think he can answer that.

8          MS. WICK:  No.

9          THE COURT:  Okay.  So let me just see here.  "Did

10  any officers receive treatment?"  I'm just going to check

11  that that one is okay.

12          "Does training for pepper spray review the

13  different type strengths of pepper spray there are?"

14          MS. WICK:  I think he can answer that.

15          MR. BELITZKY:  If he knows, yeah.

16          THE COURT:  "Was Mr. Sears seen by the nurse while

17  in the shower area?"

18          MS. WICK:  If he knows.

19          MR. BELITZKY:  If he knows.

20          MS. LEE:  I think -- didn't Nurse Cooper -- she

21  can be recalled so she can clarify that, too.

22          THE COURT:  No.  You can ask that question if you

23  would like.

24          (Sidebar ended.)

25          THE COURT:  Okay.  Because I'm allowing some --

1    actually, this one you can put on the PowerPoint, the

2    overhead.  Excuse me.

3              All right.  Let me read it.  "It was stated the

4    witness did not sucker punch Sears after he was cuffed.  Was

5    any physical contact made by the witness after cuffing

6    occurred?  If so, what?"

7              THE WITNESS:  None that I can recall.  You know,

8    again, it was nine years ago.

9              THE COURT:  Okay.  So I'm going to read this

10   because I'm not permitting all of the questions.

11             "Did any officers receive treatment from medical

12   because of the pepper spray?"  If you know.

13             THE WITNESS:  Medical -- I mean, after a use of

14   force, everyone involved has to be seen by medical.  And if

15   you've ever been around a chemical agent, once it's sprayed,

16   it affects everybody.  You can spray a little bit in that

17   corner, and within a few minutes, we'd have to go.

18             THE COURT:  And, again, if you know the answer to

19   this.  "Does training for pepper spray review the different

20   types or strengths of pepper spray that there are?"

21             THE WITNESS:  It reviews three different types:

22   OC, CS, and CN.  OC being the lowest level.

23             THE COURT:  Again, if you know:  "Was Mr. Sears

24   seen by the nurse while in the shower area?"

25             THE WITNESS:  Yes, he was.

1           THE COURT:  Okay.  And, again, the other

2    questions, either they're not appropriate for this witness

3    or, under our rules, not permitted.

4           All right.  I'm going to ask -- allow the parties

5    just to ask two or three at most clarifying questions.  No

6    more than that.  Just as to the testimony elicited as a

7    result of the jury's questions.

8           So I'll begin with Mr. Belitzky.  Any questions?

9           MR. BELITZKY:  No further questions.

10          THE COURT:  Thank you.  How about Miss Wick?  Any

11   questions?

12          MS. WICK:  May I have a moment?

13          THE COURT:  Of course.

14          MS. WICK:  No further questions, Your Honor.

15          THE COURT:  All right.  Thank you.  I'll excuse

16   the defendants' witness to go back to counsel table.

17          And it's getting kind of late.  It's 20 to 5:00.

18   So we'll go ahead and stop for the day.  Tomorrow I have

19   another matter at 8:30, but this one I really think will be

20   finished by 9:00.  So my goal is to start at 9:00.  Again, if

21   I'm running a little bit late, I hope you'll understand that

22   it's because sometimes these matters, it's hard to predict

23   exactly how long they will take.  But we should be finished

24   by 9:00.

25          So I ask that you make your effort to get here.

 1   I'll still hopeful.  Are we still -- I'll ask the defendants,

 2   are we still on target to finish tomorrow, or what are your

 3   plans?

 4            MR. BELITZKY:  I believe we are, Your Honor.

 5            THE COURT:  Okay.  So that's what we're looking

 6   at.  We're looking to finish tomorrow.  So it's most

 7   certainly my goal that we will be finished then.

 8            Okay.  So I think that's it for today.  I look

 9   forward to seeing everybody tomorrow morning.  Thank you.

10            COURT SECURITY OFFICER:  All rise for the jury.

11            (Jury exits courtroom at 4:39 p.m.)

12            COURT SECURITY OFFICER:  Please be seated.

13            MS. DURHAM:  Your Honor, may we discuss an

14   evidentiary issue before we leave?

15            THE COURT:  All right.  Yes.  Please be seated.

16            MS. DURHAM:  Your Honor, I know the Court ruled

17   that -- before that we couldn't mention the fact that

18   Mr. Sears was in a violent dorm.  But it's --

19            THE COURT:  I think I may have -- there may have

20   been an objection made, and I may have sustained it.  I

21   forget exactly the context of it, but it was in that

22   particular context.

23            MS. DURHAM:  Yes, Your Honor.  The issue is,

24   though, 1983 is -- deliberate indifference goes to intent.

25   The officers' intent to violate Mr. Sears' constitutional

1    rights.  And when they stand up --

2            THE COURT:  Hold on a second.  I need to go back

3    to see exactly what happened.  So without putting it in

4    context, I'm going to have to go back and, you know, look at

5    when that occurred so that I can remember the context of it.

6    So without that in front of me -- why don't you go ahead,

7    though, and make your argument, because I think we had that

8    at sidebar and --

9            MS. DURHAM:  Yes, we did.  We had it at sidebar.

10   And plaintiff objected and said that, knowing his history,

11   where he was, was too prejudicial.  It's our -- we need to be

12   able to defend our case.  Our position --

13           THE COURT:  I think I said you could.  I think I

14   completely agreed that you have every right to do that.  It's

15   just that some of that evidence was overly prejudicial, I

16   thought.  But, again, I need to go back and look at it,

17   unless you want to re-raise it.

18           MS. DURHAM:  They opened the door, Your Honor, to

19   stand up and say, well, he didn't hit you.  I mean, to ask

20   the witnesses the reason for spraying Mr. Sears, he didn't

21   hit you, he didn't threaten you, and they can't speak to

22   their intent hampers -- hampers their defense of their case,

23   because their mind was on the fact that they knew he could be

24   violent.

25           He was in front of Officer Dexter, waving his

1   hands, yelling, and screaming.  Their knowledge about his

2   behavior surely goes to their intent to how they responded to

3   him.  And the questions that they asked opened the door for

4   them to tell the jury their knowledge of his violent

5   behavior.

6           MS. LEE:  Your Honor, I have a response, if you

7   will --

8           THE COURT:  Sure.  Of course.

9           MS. LEE:  Thank you, Your Honor.  First, while a

10  civil rights 1983 claim -- and I'm reading from the jury

11  instructions, by the way, does require that the plaintiff

12  prove that the use of force was intentional, it does not --

13  it's not a specific intent claim, Your Honor.

14          So there is no need to show that these officers

15  used force with the specific intent to violate Mr. Sears'

16  rights.

17          And regarding the questions about whether or not

18  Mr. Sears swung at the officers, struck the officers, hit the

19  officers, those are perfectly relevant.  We just want to get

20  the facts of the matter out.  And the facts are, of course,

21  that he did not strike any of the officers.

22          Whether or not he was in a special classification

23  dorm is so prejudicial, we've already brought out the fact

24  that he's been convicted of four felonies.  He's in a

25  confinement facility.  Of course, officers may be skeptical

1   of inmates, and we're not trying to preclude defense counsel

2   from eliciting information that they were skeptical of

3   Mr. Sears.

4           Frankly, they didn't ask any of those questions.

5   So I don't think his dorm classification is relevant here.

6   And it would be so prejudicial, it should be excluded under

7   Rule 403, as Your Honor ruled this morning.

8           MS. DURHAM:  Your Honor, 1983 is a specific

9   intent.

10          THE COURT:  You need to go to the podium.  You can

11  stay seated, but you need to speak into the microphone.

12          I'll tell you what, what would you like me to -- I

13  mean, I'm happy to look at this tonight and reevaluate it, if

14  you would like me to.

15          MS. LEE:  And, Your Honor, we would --

16          MS. DURHAM:  Would you please, Your Honor?  The

17  case that I cited in my motion in limine, in order to use his

18  criminal history, that has a case in it where the court --

19  the Eleventh Circuit said that a prior bad act or knowledge

20  of his prior acts, what he did, what the inmate did to go to

21  prison, the jury can hear that because that had to do with

22  the officers' intent when they used force.

23          MS. LEE:  Your Honor, you ruled --

24          MS. DURHAM:  And this is specifically the same

25  thing.

```
 1              THE COURT:  Just a second.  Hold on.  I can only
 2     do one at a time.  I'm going back and I'm looking at what
 3     I've ruled.
 4              MS. DURHAM:  1983 is specific intent.  If the
 5     officers didn't intend to violate his rights, then there is
 6     no 1983.
 7              MS. LEE:  Your Honor, when you'll hear me, I do
 8     have a response.
 9              THE COURT:  Okay.  I'm looking to see which was
10     your exact motion in limine.  Can you tell me the docket
11     number on that?
12              MS. DURHAM:  Yes, Your Honor.  One moment.
13              Oh, it was not a -- I'm sorry.  It's my response
14     to their motion in limine about his prior record.  That's
15     where it is.  I'm sorry.
16              THE COURT:  That's why I was having a hard time
17     finding it.  Okay.  It's the motion in limine to exclude
18     grievances and disciplinary history?  Is it your response to
19     that?
20              MS. DURHAM:  His history.  His prior record.
21              THE COURT:  That disciplinary history.  Right.
22              MS. DURHAM:  My response included all of it.  Yes.
23     That's it.
24              THE COURT:  Okay.  I'm pulling it up.
25              Go ahead and make your arguments, then, Miss Lee.
```

```
1              MS. LEE:  Yes, Your Honor.  First, at the

2    beginning of this trial, we -- Your Honor ruled on the motion

3    to exclude the circumstances of Mr. Sears' prior convictions.

4    And the Court held that defense counsel could only introduce

5    the fact that he had been convicted of four prior felonies.

6    It sounds like now we're trying to relitigate that issue.

7              THE COURT:  That's not what she's saying.  That's

8    not what she's saying.  I don't think she's trying to

9    relitigate that.  Are you, Miss Durham?  I think that's --

10             MS. DURHAM:  No.  No.  I'm going more to their

11   intent.  The reason I said that the disciplinary records and

12   other things might be relevant was because their knowledge of

13   Mr. Sears, his violent behavior, is the reason they responded

14   the way that they did.  They had knowledge of him.  He was --

15   the dorm that he lived in was a dorm for violent inmates.

16             He came towards them -- towards Captain Dexter,

17   swinging his arms, and they responded.  No, he didn't hit

18   them.  No, he didn't punch them.  However, he posed a threat.

19   This jury should know the threat that he imposed that made

20   them respond to him in the way that they did.

21             THE COURT:  Well, I think this witness outlined

22   that for the jury.  I mean, don't you think, Miss Durham?  I

23   heard this witness say he felt -- I mean, the defendant, your

24   client, say he felt threatened.

25             MS. DURHAM:  He felt threatened.  But she said, he
```

1  didn't punch you, he didn't hit you, he didn't kick you.  No,

2  he didn't do any of that, but he posed a threat.

3           MS. LEE:  And frankly, Your Honor, Miss Dexter and

4  Mr. Prince's response to those questions, they were quite

5  good, actually.  They explained that, even though Mr. Sears

6  hadn't done those things, they still felt threatened.

7           And defense counsel has not established from

8  Mr. Prince that he was even aware of where Mr. Sears was

9  housed.  She did get that information from Miss Dexter.  And

10  then, again, the Court ruled to exclude the nature of that

11  dormitory.

12           Now, of course, she did testify that that was a

13  secure housing for, I think it was, at-risk inmates.  I can't

14  recall specifically.  But that's more than enough.  This is a

15  prison.  The jury knows that he was an inmate.  Of course,

16  they can discern that there might be reasons for the

17  correctional officers to feel threatened by him.  And I think

18  David Prince and Felisha Dexter did so quite well in their

19  testimony on direct.

20           I don't think we need to introduce the fact that

21  he was in a special classification dormitory.  And then, of

22  course, we would need to introduce evidence of why he was in

23  the dormitory, the types of people that are in that dormitory

24  to, perhaps, establish that it's not quite as bad.  I frankly

25  don't have any of that information.

1           MS. DURHAM:  Your Honor, that information wouldn't

2      be necessary because it goes to these defendants' intent.

3      What was in their mind.  Not that the inmates weren't so bad.

4      It's their perception of Mr. Sears that matters in this case.

5      That is it.

6           MS. LEE:  And, Your Honor, they may testify to

7      that perception, just without introducing the specific piece

8      of evidence that he was in the high-classification dorm, or

9      without introducing the specific facts of his four prior

10     convictions.  I mean, those were over 20 years ago.

11          THE COURT:  I'll tell you what.  I will think

12     about it overnight.  I think the defendant's position is that

13     when we're looking at the intent of the individuals, the

14     individual defendants, right?

15          MS. DURHAM:  Yes.

16          THE COURT:  That your concern in defending them is

17     that the jury needs to see the whole picture.  If Mr. Sears

18     was in a facility for violent individuals, then it may be

19     that their -- without that information, that the jury may not

20     be able to draw a conclusion as to their intent, an

21     appropriate conclusion to their intent.  I think that's what

22     you're saying to me.

23          MS. DURHAM:  That's what I'm saying.  Yes.

24          THE COURT:  I'm just trying to see if there's a

25     way to fashion that or to craft that without it being so

1  overly prejudicial.  That's all.

2          MS. LEE:  Your Honor, I thought Miss Dexter did

3  that perfectly fine this morning when she testified as to the

4  nature of the dormitory.  She stated that it was a secure

5  dormitory for risky inmates.

6          I mean, they've testified that they've been

7  afraid -- again, defense counsel didn't even establish that

8  Mr. Prince knew where Mr. Sears was housed.

9          THE COURT:  All right.  Let me think about it

10  overnight.

11          What is it that you would like, Miss Durham, with

12  respect to your case?  What would you like me to permit?

13          MS. DURHAM:  From henceforth, if the witnesses are

14  aware of his -- I knew that those two were because I spoke

15  with them.  But if the witnesses from henceforth are aware of

16  his violent -- that he was in a dorm for violent inmates,

17  when asked why or if they say, he didn't hit you, he didn't

18  punch you, he didn't do this, they should be able to testify

19  what was it that made you think that he was a threat, other

20  than he posed a threat for waving his arms.

21          Waving his arms is when what they told the jury

22  isn't -- that's no reason to use force.  No, you can't use

23  force for those things separately.  But when you know this

24  individual is violent, then that might be a reason to use

25  force.

1          MS. LEE:  Again, Your Honor, we don't have any of

2     the information about the nature of the dormitory in which

3     Mr. Sears was housed.  This is typically the kind of thing

4     that would have been done during discovery which, of course,

5     was closed in 2015.

6          I think at this time Miss Dexter has established

7     that Mr. Sears was in a secure housing facility for certain

8     risky inmates.  I think it's fair for the witnesses to

9     testify that they, perhaps, felt threatened, as they did

10    today.  I think that's perfectly fine.

11         But the facts of the matter are that Mr. Sears

12    didn't strike anybody, so we certainly haven't opened the

13    door by eliciting that simple fact.  Again, we prepared this

14    case without any of this information.

15         THE COURT:  You know, I understand your point

16    there, Miss Durham, and I think it does go to the defendants'

17    perception of the danger that they thought that they were in.

18    On the other hand, I'm hopeful that there is a way to craft

19    it so that the information is limited.

20         And why don't you folks see if you're able to come

21    up with a resolution, because I most certainly understand

22    what your concern is, Miss Durham.  I do.  Particularly, when

23    it does go to intent.  I understand that.

24         You know, if you're dealing with very violent

25    inmates, you're going to act one way versus people who have

 1    not had any infractions over the 30 years that they've been

 2    incarcerated.  You're going to deal with that kind of person

 3    differently.

 4              MS. DURHAM:  Definitely.

 5              THE COURT:  And I get that.  And I think it does

 6    go to intent.  Again, I don't want it to be so overly

 7    prejudicial.

 8              So why don't you see if you can sit down and come

 9    up with something.  If you don't or if you can't, I will

10    resolve it in the morning.  All right.

11              MS. DURHAM:  Thank you, Your Honor.

12              THE COURT:  Okay.  Yes.  Go ahead.

13              MR. BELITZKY:  Comparatively, a brief housekeeping

14    matter.  I did not -- after certain of the exhibits were

15    admitted through Mr. Prince, I did not submit them to the

16    clerk for admission.

17              Frankly, I don't know whether -- because we have

18    given Your Honor the packet, whether they are admitted.  They

19    were --

20              THE COURT:  If I said they were admitted, they are

21    admitted.

22              MR. BELITZKY:  I understand.  What I'm saying is I

23    don't know whether I need to give the clerk the actual

24    documents.  She's nodding yes.

25              THE COURT:  Okay.  Yes.  Because that's what goes

 1   back to the jury.  So, yes.

 2          Okay.  I don't think I have anything else.  Thank

 3   you.  We'll see you at 9:00, because I have a sentencing at

 4   8:30.  I'll see everybody at 9:00.  Thank you.

 5          (Proceedings adjourned at 4:55 p.m. and reconvened

 6   on August 14, 2019.)

 7                          - - -

UNITED STATES DISTRICT COURT   )
                               )
MIDDLE DISTRICT OF FLORIDA     )


## **<u>REPORTER CERTIFICATE</u>**


     I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript from the stenographic notes taken by the undersigned in the matter of *TERRY EUGENE SEARS vs. EDUARDO RIVERO, et al.*, Case No. 8:12-cv-288-T-33TGW (Pages 1 through 234), and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


   /s/ *Scott N. Gamertsfelder*, RMR, FCRR

   *Official Court Reporter*

                        Date: November 30, 2019