[DO NOT PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 19-13668

_____

TERRY EUGENE SEARS,

                                        Plaintiff-Appellant,

versus

EQUARDO RIVERO, et al.,

                                        Defendants,

VERNIA ROBERTS,
F. DEXTER,
J. HART,
DAVID PRINCE,

D. SMITH, et al.,

                                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 8:12-cv-00288-VMC-TGW

_____

Before WILLIAM PRYOR, Chief Judge, LUCK, and ED CARNES, Circuit Judges.

PER CURIAM:

      Terry Sears is a Florida inmate who brought 42 U.S.C. § 1983 claims against several Florida correctional officers for excessive force and deliberate indifference. After the district court granted summary judgment to the officers, we vacated and remanded, noting that Sears' and the officers' dueling stories about the underlying incident presented "a classic swearing match, which is the stuff of which jury trials are made." *Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019).

      On remand, a jury trial lasting three days was made of the swearing match. Finding the officers' swearing more believable, the jury returned a verdict for them. In this appeal from that

verdict, Sears contends that several errors deprived him of a fair trial. Because the parties are familiar with the record facts, we will move straight to the issues and arguments.

I.

Before trial, Sears moved for an adverse inference jury instruction based on spoliation of a videotape that contained footage of a post-force medical examination and pepper spray decontamination that the prison staff conducted on him. Sergeant Scott Voorhees had recorded those events and given the videotape to one of the defendant officers, Felishia Dexter. The videotape was later viewed by the prison warden, who then sent it to be reviewed by an Inspector General's Office employee. After that employee viewed the videotape, he sent it back to the prison.

When Sears asked for the videotape during pretrial proceedings, defense counsel responded that it no longer existed, leading Sears to argue the officers had "either destroyed the video evidence or failed to preserve [it] as required." Sears contended that the defendants had been so reckless with the videotape that it amounted to bad faith and entitled him to an adverse inference instruction.

At a pretrial conference, the district court determined that the loss of the videotape was "just negligence" and not the result of bad faith. It denied Sears' request for an evidentiary hearing, but agreed to let Sears' counsel talk informally to defendant Dexter with her lawyer present. After his counsel's conversation with Dexter, Sears filed a motion asking for a jury instruction about the

videotape. Ultimately, the parties agreed to have this joint stipulation read to the jury: "The video taken by Sergeant Scott Voorhees on March 18th, 2010, involving Mr. Sears, would have been returned from the Office of the Inspector General to the Polk Correctional Institution. The video no longer exists."

Sears argues to us that the district court should have held an evidentiary hearing about whether the officers acted in bad faith in spoliating the videotape. We review the district court's decisions about spoliation only for an abuse of discretion. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009). "In some circumstances, a *party's* spoliation of critical evidence may warrant the imposition of sanctions," including "a jury instruction on spoliation of evidence which raises a presumption *against the spoliator*." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (quotation marks omitted and emphasis added). The problem for Sears' spoliation argument is that no evidence was presented or proffered to show who was the last person to have the videotape. There was nothing to show that any of the parties destroyed it or acted in bad faith regarding it. The district court did not abuse its discretion in denying Sears' motion for a spoliation instruction without an evidentiary hearing.

II.

On the morning of the trial but before the proceedings began, Sears' counsel pointed out that three uniformed corrections officers were "sitting directly behind" Sears, which counsel argued was "highly prejudicial." The court responded that it was the

guards' "job to make certain that nothing bad happens," and there was "no way" the court was "going to tell them not to be here." Sears' counsel then asked if the officers "could sit in the row behind instead of right behind" him.  The court replied that if the guards "think they need to sit there, I'm going to let them sit there," and that it was "not about to tell a law enforcement officer how to do his or her job when they think they need to be right behind the person."  After confirming with the guards that they thought they needed to sit where they were, the court stated: "That's it.  I'm not going to tell them differently."

The court also permitted the additional security measure of having Sears wear shackles.  Sears' counsel asked that the jury be excused whenever Sears walked to the witness stand unless the guards would take the shackles off during his walk.  The court declined to allow the temporary removal of the shackles but did agree to excuse the jury for Sears' walks to the stand.

Sears challenges the district court's decision to allow him to be shackled and to allow uniformed guards to sit behind him during the trial.  "[W]e review the district court's shackling determination for abuse of discretion." *United States v. Baker*, 432 F.3d 1189, 1245 (11th Cir. 2005), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813 (2006).  We use the same standard to evaluate a district court's decision about what "measures are necessary to ensure the security of the courtroom," *United States v. Durham*, 287 F.3d 1297, 1304 (11th Cir. 2002), such as the court's decision to allow the uniformed guards to sit behind Sears.

The Supreme Court has recognized that shackling a defendant during a criminal trial is an extreme and inherently prejudicial measure that must be justified by an essential state interest. *Deck v. Missouri*, 544 U.S. 622, 635 (2005). A less demanding form of scrutiny applies to practices such as allowing uniformed guards or officers to sit behind a criminal defendant. As the Court has explained, a conspicuous courtroom security presence is not inherently prejudicial like shackles are, but the practice should still be evaluated on a case-by-case basis. *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986). The Court went on to hold that four uniformed and armed policemen "quietly sitting in the first row of a courtroom's spectator section" did not create an "unacceptable risk of prejudice" to the criminal defendant. *Id.* at 571. The officers were "unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings." *Id.*

*Deck* and *Holbrook* were criminal cases, and we have never extended their holdings to civil cases. Which makes sense. The Court's reasoning in those decisions focused primarily on the fact that a criminal defendant is entitled to a presumption of innocence, which may be threatened by the government taking steps like having him shackled. *See Deck*, 544 U.S. at 630; *Holbrook*, 475 U.S. at 569. Those concerns are not present in civil cases, and certainly not in civil cases where the jury already knows that the plaintiff has been convicted of a crime. The jury knew Sears was a convicted criminal who was incarcerated at the time of the events that

19-13668　　　Opinion of the Court　　　7

resulted in his lawsuit against correctional officers. He was not being tried for another criminal charge.

But we need not definitively decide whether *Deck* and *Holbrook* are applicable to civil cases. Even if they are, and even if the district court abused its discretion in allowing Sears to be shackled or guards to sit directly behind him, any error was harmless. The jury knew that Sears was a prisoner who had already been convicted and was serving time in prison. No reasonable juror would expect a prisoner not to be accompanied by guards when outside prison walls. The presence of guards was "unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings." *Holbrook*, 475 U.S. at 571.

As for the shackles, there is no indication in the record that the jury saw them or knew about them. The court excused the jury from the courtroom while Sears walked to the stand and the record has nothing to show that the shackles were ever visible to the jury. *Cf. United States v. Moore*, 954 F.3d 1322, 1330 (11th Cir. 2020) (holding no prejudice under the plain error standard where there was "no indication in the record that the jury was aware of the shackles").

### III.

Sears also contends that the district court abused its discretion in allowing certain trial testimony from Samuel Pacchioli. He was an employee in the "use of force unit" in the Inspector

General's Office who had reviewed and "approved" after the fact the use of force in the incident involving Sears. Pacchioli testified about the steps he took to review the use of force incident. He recounted how he had reviewed a "packet" about the incident, which included the use of force report and the videotape. He had compared that material to a checklist or a set of procedures established by the Inspector General's office. The reason he had "approved" the use of force incident was that he did not "find anything in the use of force checklist that did not comply with the procedures that would have been — [that] reflect an appropriate use of force." Sears' counsel did not object to any of that testimony.

Sears' counsel did object to a series of blatantly leading questions that defense counsel had asked Pacchioli about the conclusion he had reached in his review. The court sustained the objection. It told defense counsel: "[M]ost of your questions are leading questions. And it's absolutely inappropriate." The court struck the questions and answers from the record and instructed defense counsel to stop leading his own witness.

Immediately after that, defense counsel asked Pacchioli, "did you find anything inappropriate according to your checklist that had occurred during the use of force?" Pacchioli said he didn't. Defense counsel then asked him "had there been times during your duties as the use of force reviewer that you did find other reports without talking about specifics, where you disapproved?" Sears' counsel objected that defense counsel was again asking a leading question.

The court sustained the objection, stating: "First of all, sustained. Number two, it's eliciting expert testimony. These questions are inappropriate. The answers are stricken from the record." Sears' counsel asked the court to instruct the jury that it could not consider testimony that is stricken, and the court did so. It told the jury: "When testimony is stricken, you're not to consider it in any way. It's as if it did not occur. This is expert testimony, [defense counsel]. The jury is not to consider this testimony. . . . For the last five or six questions, you're not allowed to consider that."

On cross-examination, Sears' counsel elicited from Pacchioli that he had not personally observed the use of force, that he had not spoken with Sears about it, and that his approval was based on the officers' statements in the use of force report. Counsel also elicited from Pacchioli that the warden had noted in the report that Sears was ordered to put on contaminated clothes after he had been pepper sprayed and that the order to do so, according to Pacchioli, was not proper.

At the conclusion of Pacchioli's testimony the jury was allowed to submit written questions to potentially be asked to Pacchioli by the court. One of the questions was: "What was your final finding, recommendation or outcome about use of force?" Sears' counsel objected to the question, arguing that the jury would substitute Pacchioli's opinion about the ultimate issue in the case for its own independent determination. But the court rejected that argument, reasoning that the jury had "every right" to "find differently" and that any "credibility bolstering" was not

"overwhelming." The court told Sears' counsel she could "deal with [it] in closing argument" and "tell the jury they're here to decide whether it was right or wrong" regardless of "what the agency says." The court itself later instructed the jury that it was required to decide on its own whether to believe or disbelieve the witnesses.

After Pacchioli was asked the question about his final finding, he responded that his "approval of the use of force approved the type and amount, and that was the end of the review." Sears' counsel had another chance to cross-examine Pacchioli, and elicited from him that at the time he approved the use of force report he was an employee of the state and was paid by the state.

Sears argues that the court erred in permitting Pacchioli's testimony. He contends that Pacchioli, despite being presented as a lay witness, actually testified as an expert witness, which was improper because the court had ruled that expert testimony was not allowed in the case. And he argues that Pacchioli's testimony invaded the province of the jury by being about the ultimate issue in the case: whether the use of force was reasonable. In a credibility contest, Sears asserts, Pacchioli's testimony supporting the defendants was an insurmountably prejudicial hurdle.

We review only for an abuse of discretion the court's admission of witness testimony under Federal Rule of Evidence 701. *United States v. Moran*, 778 F.3d 942, 958–59 (11th Cir. 2015). The discretion is broad: a court has considerable leeway when deciding whether to allow witness testimony. *See, e.g.*, *Maiz v. Virani*, 253 F.3d 641, 662 (11th Cir. 2001).

19-13668               Opinion of the Court                    11

Federal Rule of Evidence 701 allows a lay witness to testify about his opinions if the testimony is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. We've held that the firsthand knowledge requirement, or the requirement that the testimony be "rationally based on the witness's perception," Fed. R. Evid. 701(a), can sometimes be satisfied where a lay witness has "base[d] his opinion testimony on his examination of documents[,] even when the witness was not involved in the activity," *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011). For example, law enforcement agents who have reviewed financial records can testify as lay witnesses about those records, *United States v. Hamaker*, 455 F.3d 1316, 1331–32 (11th Cir. 2006), and law enforcement agents who have examined documents to decipher code language can testify about a defendant's use of that code language, even without having been party to a defendant's conversations, *Jayyousi*, 657 F.3d at 1103.

Those witnesses in those circumstances would not be testifying as experts even if their experience makes them "more efficient" at reviewing the records, *Hamaker*, 455 F.3d at 1331, and even if the testimony is aided by "their particularized knowledge garnered from years of experience within the field," *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1223 (11th Cir. 2003). The testimony remains lay testimony

at least when it is "limited . . . to what [the witness] learned during this particular investigation," *Jayyousi*, 657 F.3d at 1104, and when the "review itself was within the capacity of any reasonable lay person," *Hamaker*, 455 F.3d at 1331–32.

Pacchioli testified as a lay witness, not as an expert witness. His testimony was about his review of the use of force report, which is similar to an agent's testimony about an investigation or a review of financial records. He testified that he compared the use of force incident to a checklist or a set of procedures established by the Inspector General and that based on the comparison he approved the use of force. That is not the use of "scientific, technical, or other specialized knowledge" that goes into expert testimony. Fed. R. Evid. 702. It is closer to bureaucratic box checking. And it is the kind of review that is "within the capacity of any reasonable lay person," even if Pacchioli's background made him "more efficient at reviewing [the] records," *Hamaker*, 455 F.3d at 1331–32, and even if his review and testimony were aided by his "particularized knowledge garnered from years of experience within the field," *Tampa Bay Shipbuilding & Repair Co.*, 320 F.3d at 1223. The testimony was also limited to what he had "learned during this particular investigation." *Jayyousi*, 657 F.3d at 1104.

Sears' argument that Pacchioli's testimony invaded the province of the jury because it was about the ultimate issue in the case also fails. The ultimate issue was whether the use of force was excessive or reasonable. Pacchioli's testimony was not about that — his testimony was that, based on the use of force report and

19-13668　　Opinion of the Court　　13

the videotape, the use of force had complied with the Inspector General's standards. He testified "[n]o" when defense counsel asked him if he had found "anything in the use of force checklist that did not comply with the procedures that . . . reflect an appropriate use of force" or if he had found "anything inappropriate according to [his] checklist that had occurred during the use of force[.]" That was the context that had been established when Pacchioli later answered the jury's question that he had approved the "type and amount" of the use of force. It was all about the Inspector General's standards.

There is a difference between whether something complies with the Inspector General's standards and whether it complies with the law. The Inspector General does not get to write the law, and its standards do not determine the outcome of § 1983 cases. The jury was not asked to decide whether the defendants complied with the Inspector General's standards, but whether they complied with the law. It was free to reject the Inspector General's standards as unreasonable, even if it found Pacchioli credible in his testimony and his review of the report. That was in addition to being instructed that it could disbelieve his testimony.

Our decision in *United States v. Myers*, 972 F.2d 1566 (11th Cir. 1992), shows why the distinction matters. We addressed a lay witness who was challenged as having "offer[ed] a legal conclusion on the ultimate issue in the case." *Id.* at 1577. His testimony was that, based on his experience and knowledge of police standards, a police officer had not used reasonable force. *Id.* The earlier

questioning of the witness had elicited his training and how the police academy teaches officers to respond to certain provocations; only after that questioning was the witness asked whether the use of force in that case had been reasonable. *Id.* at 1577 n.9. We applied to the lay witness a standard we had stated in an expert witness case: that the witness does not invade the province of the jury when his testimony addresses "whether force was 'reasonable' or 'justified'" if that testimony is about "prevailing standards in the field of law enforcement." *Id.* at 1577 (citing *Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990)).

We held that because the witness had "properly framed his opinion in accordance with prevailing police standards" the court had not abused its discretion in allowing him to testify that the use of force was unreasonable. *See id.* at 1577–78. In further support of that holding, we favorably cited an Eighth Circuit decision and described it as holding that a question "as to whether 'defendant's conduct violated a constitutional norm,' was permissible because the 'jury had the right to be informed concerning prison policy' in assessing whether a correctional officer had violated a prisoner's civil rights." *Id.* at 1578 (quoting *Wade v. Haynes*, 663 F.2d 778, 784 (8th Cir. 1981)). Similar to how the witness in *Myers* "properly framed his opinion in accordance with prevailing police standards," *see* 972 F.2d at 1578, Pacchioli's testimony was properly framed in accordance with the Inspector General's standards for use of force incidents.

19-13668               Opinion of the Court                    15

Not only that, but Pacchioli's testimony was much more limited than the testimony we held was properly permitted in *Myers*. He was not permitted, as the lay witness in *Myers* had been, to testify extensively about the details of the standards. *See id.* at 1577 n.9. Nor was he permitted, as the lay witness in *Myers* had been, to testify directly about whether in his view the force used was "reasonable." *See id.* Pacchioli instead was permitted to testify only that the use of force described in the report and shown in the videotape complied with the Inspector General's standards. And as the *Wade* decision, which we quoted in *Myers*, said, the "jury had the right to be informed concerning prison policy" about uses of force when "assessing whether a correctional officer had violated a prisoner's civil rights." *Id.* at 1578 (quotation marks omitted).

And, of course, Sears had the opportunity to cross-examine Pacchioli and did so thoroughly. *Cf. Agro Air Assocs., Inc. v. Houston Cas. Co.*, 128 F.3d 1452, 1456 (11th Cir. 1997) (holding that lay witness testimony about causation was admissible "[b]ecause [the defendant] had the opportunity to cross-examine the witnesses," meaning "any objection to the testimony went to the weight of the evidence, not to its admissibility"). The district court instructed the jury that it had to decide whether to believe or disbelieve any witnesses and that it was the jury's job to decide whether a witness was credible and truthful. *Cf. Myers*, 972 F.2d at 1578 (holding that error in allowing a lay witness to testify about the reasonableness of force without a foundation was harmless because the court

instructed the jury that "it was their duty to decide the specific facts and whether to accept and rely upon an expert witness") (cleaned up). We generally presume the jury followed its instructions. *See, e.g.*, *United States v. Hill*, 643 F.3d 807, 829 (11th Cir. 2011).

All of those reasons support our conclusion that the district court did not abuse its considerable leeway and discretion in allowing Pacchioli's testimony.

## IV.

Sears contends that defense counsel made a number of improper statements during trial and closing argument. None of the statements defense counsel made during trial resulted in rulings that amount to an abuse of discretion and justify reversal.

Sears argues that the jury's verdict should be reversed because defense counsel at one point in the trial called Sears a "difficult witness." That's a fairly mild remark. And, in any event, Sears counsel's objection prompted the court to describe that comment as "improper" and strike it. We presume the jury follows instructions when statements are stricken from the record. *See, e.g.*, *Hill*, 643 F.3d at 829.

There were other remarks defense counsel made during trial, including some during his closing argument, that Sears did not object to but now contends were reversible error. "When no objections are raised to the allegedly improper comments, however, we review for plain error, but a finding of plain error is seldom justified in reviewing argument of counsel in a civil case."

*Ruiz v. Wing*, 991 F.3d 1130, 1141 (11th Cir. 2021) (quotation marks omitted). Even when objected to, "inappropriate statements made by counsel will not justify a new trial unless the remarks were such as to impair gravely the calm and dispassionate consideration of the case by the jury." *Id.* (quotation marks omitted). None of defense counsel's remarks rose (or sunk) to that level.

V.

Sears contends that all of what he identifies as errors had the combined effect of depriving him of a fair trial. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *Baker*, 432 F.3d at 1223 (quotation marks omitted). But that seldom happens, and it didn't happen here. Sears was not deprived of a fair trial.

**AFFIRMED.**

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 24, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 19-13668-DD
Case Style: Terry Sears v. Vernia Roberts, et al
District Court Docket No: 8:12-cv-00288-VMC-TGW

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website. Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against the appellant.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Bradly Wallace Holland, DD at 404-335-6181.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs